## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

CROSSPOINT CHURCH,

Plaintiff,

v.

A. PENDER MAKIN, in her official capacity as
Commissioner of the Maine Department of
Education, and JEFFERSON ASHBY, EDWARD
DAVID, JULIE ANN O'BRIEN, MARK
WALKER, and THOMAS DOUGLAS, in their
official capacities as Commissioners of the Maine
Human Rights Commission,

Defendants.

Civil Action No. _____

## **COMPLAINT**

## INTRODUCTION

1.      After forty years of unconstitutional religious discrimination in Maine's school
choice program, Maine continues to unconstitutionally exclude particular religious schools from
participating in the state's school choice program because of their religious beliefs.

2.      In Maine, local "school administrative units" (SAUs) that do not operate their
own secondary schools may pay tuition for resident students to attend either a private secondary
school or another SAU's secondary school. For its first 100 years, the program initially permitted
participation by private religious schools, but from 1980 until the Supreme Court's decision in
*Carson v. Makin*, 142 S. Ct. 1987 (2022), the state excluded these schools from the tuitioning
program (the "sectarian exclusion").

3.     Anticipating the Supreme Court's decision in *Carson*, the Legislature narrowed the religious exemption in 5 M.R.S.A. § 4602. The exemption previously covered all religious schools, but the amendment narrowed it to protect only religious schools that do not participate in the tuitioning program. Without the exemption, religious schools are subject to investigations, complaints, and large fines for offering instruction consistent with their sincerely held religious beliefs. This "poison pill" effectively deters religious schools from participating and thereby perpetuates the religious discrimination at the heart of the sectarian exclusion.

4.     From the start, Maine's Attorney General and the then-Speaker of the House of Representatives admitted this scheme was intentional. The Legislature crafted the poison pill explicitly to circumvent the Supreme Court's decision in *Carson*.

5.     The poison pill also specifically targeted Plaintiff, who operates one of the two schools that the *Carson* plaintiffs attended.

6.     Defendants' enforcement of the Maine Human Rights Act to discriminatorily exclude Plaintiff, who operates an otherwise qualified school, from becoming approved for tuition purposes violates the Free Exercise, Establishment, and Free Speech Clauses of the U.S. Constitution.

## PARTIES

7.     Plaintiff Crosspoint Church ("Plaintiff" or the "Church") is a Christian church incorporated as a nonprofit corporation under Maine law and is located at 1476 Broadway, Bangor, Maine 04401.

8.     Bangor Christian School, a private, Christian school educating students from K4 to 12th grade, is an integrated auxiliary of Plaintiff.

9.      Defendant A. Pender Makin is the Commissioner of the Maine Department of Education, an agency of the state of Maine, headquartered in Augusta, and created and empowered under 20-A M.R.S.A. § 201, to "[s]upervise, guide and plan for a coordinated system of public education for all citizens of the State."

10.     Defendant Makin has the primary responsibility and practical ability to enforce the legal and regulatory requirements for private schools seeking approval for tuition purposes, as well as the primary responsibility and practical ability to ensure that the Department's regulations, policies, and powers are implemented in accordance with the U.S. Constitution.

11.     Defendant Makin also possesses joint rulemaking and enforcement authority with the Maine Human Rights Commission to effectuate the portion of the Maine Human Rights Act ("MHRA") relating to educational discrimination, 5 M.R.S.A. § 4602. *Id.* § 4603.

12.     Defendants Jefferson Ashby, Edward David, Julie Ann O'Brien, Mark Walker, and Thomas Douglas are Commissioners of the Maine Human Rights Commission, an agency of the state of Maine, created and empowered under 5 M.R.S.A. § 4566 to enforce the MHRA, Me. Stat. tit. 5 part 12 ch. 337, including the portions of MHRA relating to educational discrimination, 5 M.R.S.A. § 4602, and employment discrimination, 5 M.R.S.A. § 4572.

13.     Defendants Ashby, David, O'Brien, Walker, and Douglas have the duty to investigate violations of MHRA and the power to enforce MHRA. They possess rulemaking authority to effectuate MHRA and share joint rulemaking authority with Commissioner Makin to effectuate the portion of MHRA relating to educational discrimination, 5 M.R.S.A. § 4602. *Id.* § 4603.

14.     All Defendants are sued only in their official capacities.

## JURISDICTION AND VENUE

15.     Plaintiff files this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201(a) and 2202 and seeks (1) a declaratory judgment that 5 M.R.S.A. § 4602 and 5 M.R.S.A. § 4572 are unconstitutional to the extent they condition participation in the tuitioning program on Plaintiff violating its statement of faith and (2) injunctive relief enjoining Defendants from enforcing portions of 5 M.R.S.A. § 4602 and 5 M.R.S.A. § 4572 against Plaintiff.

16.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331.

17.     Pursuant to 28 U.S.C. § 1391(b)(1) and (2), venue is proper in this judicial district because Defendants reside within it and the events giving rise to Plaintiff's claims occurred within it.

## STATEMENT OF FACTS

### A.     Background of Crosspoint Church

18.     Plaintiff incorporated in 1967 under its original name Bangor Baptist Church "[f]or the purpose of maintaining a church for the worship of Almighty God, preaching the Gospel of Jesus Christ, and conducting the education of adults and children."

19.     Crosspoint Church's objective is "full obedience to the will of the Lord Jesus Christ who is the Founder and Head of the Church."

20.     Crosspoint Church is an independent church not subject to the governance or authority of any higher ecclesiastical body.

21.     Crosspoint Church operates Bangor Christian School ("BCS"), a K4–12 school created in 1970 as an integrated auxiliary of the church.

22.     Crosspoint Church's Senior Pastor and Deacon Board govern BCS.

23.     Crosspoint Church operates BCS in accordance with its Statement of Faith, which summarizes its religious beliefs.

24.     BCS's principal reports to Crosspoint Church's Senior Pastor.

25.     BCS's mission "is to assist families in educating the whole child by encouraging spiritual maturity and academic excellence in a supportive environment. Our final authority in all matters is the Word of God." BCS Student Handbook at 1.

26.     BCS's vision "is to help students discover God's plan for their lives and to equip them to be successful on whatever path He is leading them." *Id.*

27.     BCS's Educational Objectives include:

   a.   To lead each unsaved student to trust Christ as his/her personal savior and then to follow Christ as Lord of his/her life.

   b.   To instill in each student a love for God and a personal sense of responsibility to be all God wants him/her to be.

   c.   To direct each student in the process of developing Christ-like character and actions.

   d.   To instill in each student love and honor for home and parents.

   e.   To prepare each student to be successful as measured by God's standards and not the world's.

   f.   To prepare each student for the important position in life of spiritual leadership in school, home, church, community, state, nation, and the world.

   g.   To develop within each student a sense of responsibility as a Christian citizen.

   h.   To develop within each student a Christian world view and Christian philosophy of life.

   i.   To develop within each student an appreciation and understanding of God's world and how to live productively in his environment.

   j.   To provide each student opportunities for developing skills necessary for their future careers.

k. To develop within each student a moral, ethical, and spiritual sense that will lead to an appreciation of his/her own personal worth to God and that of others. To teach each student to take responsibility for his/her actions and words and the choices he/she makes.

l. To offer each student an instructional program that is centered in God's Word and meets his/her academic needs.

m. To teach each student the thinking skills that will enable him/her to meet intellectual challenges.

n. To motivate each student to master the tools of learning and communication.

o. To provide each student opportunities to develop an understanding of and appreciation for the arts as well as contributing to them.

p. To offer opportunities to participate in wholesome forms of recreation and social activities.

BCS Student Handbook at 6.

28. BCS operates in accordance with its Statement of Faith and provides in relevant part:

a. "We believe the Bible to be without error as recorded in the original manuscript. The Bible reveals God, the spiritual separation of man from God, the way of salvation, and how to have a personal relationship with God. (II Tim. 3:15-16; II Peter 1:20-21)."

b. "We believe salvation (a personal relationship with God) is by 'grace,' plus nothing and minus nothing. This salvation is found only by receiving Jesus Christ into your life. Salvation is by repentance and faith (truly being sorrowful for your sins, confessing that Jesus Christ died for your sins, and inviting Him into your life). (Eph.2:8-9; Titus 3:5-7)."

c. "We believe that those who receive Jesus Christ will go to Heaven and those who reject Him will be separated from the Lord forever. (Rev. 20:10-15)."

d. "Marriage and Sexuality:

We believe that the term 'marriage' has only one, legitimate meaning, and that is marriage sanctioned by God, which joins one man and one woman in a single, covenantal union, as delineated by Scripture. Whenever there is a conflict between this definition and

6

any new legal standard for marriage, our statement of faith, doctrines and biblical positions will govern. (Gen. 2:24; Eph. 5:22-23; Mark 10:6-9; I Cor. 7:1-9)

We believe that God has commanded that no intimate sexual activity be engaged in outside of marriage as defined above. We believe that any other type of sexual activity, identity or expression that lies outside of this definition of marriage, including those that are becoming more accepted in the culture and the courts, are sinful perversions of and contradictory to God's natural design and purpose for sexual activity. (Gen. 2:24; Gen. 19:5; Lev. 18:1-30; Rom. 1: 26-29; 1 Cor. 5:1; 6:9-10; 1 Thess. 4:1-8; Heb. 13:4). We believe that God designs each individual in his or her mother's womb (Psalm 139: 13,14). Therefore, each individual should cherish God's design because his deeds are perfect (Deut. 32:4). Any deviation from the sexual identity that God created will not be accepted."

BCS Handbook at 4–5.

29. BCS's admissions policy explains:

Bangor Christian Schools adheres to and supports the historical truth claims and moral foundations of Christianity. This includes, but is not limited to, the biblical definition of marriage, sexuality and moral conduct, and the clear biblical teaching that gender is both sacred and established by God's design. Parents or the legal guardians, who choose to enroll their children at our school, are agreeing to support these and other basic biblical values derived from historical Christianity and the relevant Christian positions embraced by Crosspoint Church. Parents understand and agree that Bangor Christian Schools will teach these principles and biblical values.

Bangor Christian Schools does not discriminate in its practices against any person because of race, color, national or ethnic origin, gender, age, or disability.

BCS Handbook at 7.

30. BCS determines admissions based on the following criteria:

a. "The student has demonstrated the ability to profit from normal school instruction."

      b.   "The student has shown a behavior pattern reflecting a desire for an education and is in agreement with school policies."

      c.   "The parents express an understanding of the school's philosophy (including Statement of Faith and Objectives in Education) and are willing to have their children trained in accordance with this philosophy."

BCS Handbook at 7.

31.     BCS "will consider admission for students from any family who, despite their religious background or beliefs, is willing to support our philosophy of Christian education, student conduct requirements, and the above-stated positions and who is willing to allow their children to be educated and influenced in an intentionally Christian environment. Continued enrollment at Bangor Christian Schools is contingent upon this same understanding and support." BCS Handbook at 7.

32.     All parents are required to sign the Parent's Statement of Cooperation, and Students in grade 4–12 must sign the Student's Statement of Cooperation. BCS Handbook at 8.

33.     No student is admitted or allowed to remain in BCS who does not agree and cooperate with the overall purpose and program of the school as set forth in the handbook. *Id.*

34.     Students are required to attend BCS's weekly chapel service.

35.     If a student persistently and unrepentantly engages in "counter-witnessing," that is, advocating beliefs contrary to BCS's statement of faith, that student would be deemed not in agreement and compliance with BCS's purpose, handbook, and code of conduct and, thus, be subject to removal from the school.

36.     Students must adhere to BCS's code of conduct and dress code, which derive from Plaintiff's religious beliefs.

37.     BCS's code of conduct prohibits students from, among other things, engaging in immoral conduct, including sexual activity outside of marriage as defined in the Statement of Faith, or identifying as a gender other than their biological sex.

38.     BCS's dress code requires students to wear clothing consistent with their biological sex.

39.     Crosspoint Church employees, including BCS staff, must be co-religionists—that is, they must be in agreement with Crosspoint's Statement of Faith and engage in religious practice consistent with Crosspoint Church's spiritual standards.

40.     BCS teachers, as those primarily responsible for fulfilling BCS's religious mission, must agree to both BCS's Statement of Faith and the Educational Philosophy and Objectives and be committed to upholding them.

41.     BCS teachers serve as Christian role models to the students; and, accordingly, must adhere to biblical standards of conduct, including those relating to sexual behavior; the use of alcohol, drugs, and tobacco; lewd public dancing; gambling; and any other activity that would hinder a teacher's religious testimony.

**B.     The Tuitioning Program**

42.     The Maine Legislature (hereinafter "Legislature") guarantees every school-aged child residing within the state "an opportunity to receive the benefits of a free public education." 20-A M.R.S.A. § 2(1).

43.     The Legislature vests the authority to fulfill the guarantee of § 2(1) in local school administrative units (hereinafter "SAUs"). 20-A M.R.S.A. § 2(2).

44.     If an SAU does not maintain a secondary school or contract with a public or private school for secondary school privileges, the SAU "shall pay the tuition . . . at the public or

approved private school of the parent's choice at which the student is accepted." 20-A M.R.S.A. § 5204(4).

45.    The Legislature created this "tuitioning program" in 1873 to fulfill residents' educational needs where SAUs lacked sufficient population or means to maintain a secondary school.

46.    Under 20-A M.R.S.A. § 2951, to be approved for tuition purposes and thus qualified to participate in the tuitioning program, a private school must:

    a.  Meet the requirements for "basic school approval" under 20-A M.R.S.A. § 2901, 20-A M.R.S.A. § 2951(1);

    b.  be nonsectarian, 20-A M.R.S.A. § 2951(2);[1]

    c.  be incorporated under the laws of the state of Maine or of the United States, 20-A M.R.S.A. § 2951(3);

    d.  comply with the state's reporting, auditing, and applicable student assessment requirements, 20-A M.R.S.A. § 2951(4)–(6);

    e.  release student records to the SAU, if a student transfers from the private school, 20-A M.R.S.A. § 2951(7).

47.    An SAU that opts to pay tuition for students instead of maintaining or contracting with a single school to educate resident secondary students does not select which schools receive tuition payments. Parents are solely responsible for selecting the school their child attends.

48.    Similarly, if an SAU does not maintain or contract with an elementary school, it pays tuition for resident students to attend the public or approved private school of their choice. 20-A M.R.S.A. § 5203.

49.    BCS is accredited by the New England Association of Schools and Colleges.

---

[1] As explained *infra*, the Supreme Court declared the "nonsectarian" requirement unconstitutional in *Carson v. Makin*, 142 S. Ct. 1987 (2022).

50.     BCS annually maintains basic school approval under 20-A M.R.S.A.
§ 2901(2)(A).

51.     BCS meets the requirements for reporting and release of student records, *see* 20-A
M.R.S.A. §§ 2951(5), (7), 2952 and is willing to comply with the remaining applicable
requirements for tuitioning schools, *see id.* §§ 2951(5), 2953–2954.

52.     Twenty-eight current BCS high-school students live in tuitioning SAUs:
Bradford, Glenburn, Levant, Orrington, and Veazie, Maine.

53.     BCS's total high-school enrollment for the 2022–23 school year is 92 students.

54.     Crosspoint Church pays 95% of tuition for the children of Crosspoint Church
employees, including BCS staff, to attend BCS.

55.     For the 2023–24 school year, eight BCS high-school students are children of
Crosspoint Church employees and live in Glenburn, Maine—a tuitioning SAU.

56.     If the state approved BCS for tuition purposes, BCS would charge the tuition for
these eight students to Glenburn, resulting in an annual savings of approximately $47,120.

57.     If the state approved BCS for tuition purposes, the BCS high school students
residing in tuitioning SAUs would be eligible to participate in the tuitioning program instead of
paying BCS tuition out of pocket.

**C.      The Sectarian Exclusion**

58.     Until 1980, religious schools were eligible to and did participate in the tuitioning
program.

59.     In 1981, based on a 1980 opinion from the Maine Attorney General concluding
that allowing religious schools to participate in the tuitioning program violated the Establishment

Clause, the Legislature adopted 20-A M.R.S.A. § 2951(2), which required schools to be "nonsectarian" to receive approval for tuition purposes.

60.     In 2003, after the Supreme Court held that the Establishment Clause does not forbid school choice programs that allow parents to use state funding at religious schools, *see Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), the Legislature considered repealing the sectarian exclusion. *See* L.D. 182, "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools."

61.     L.D. 182 failed, due in part to legislators' opposition to many religious schools' practice of hiring only co-religionists, which some legislators described as "discriminatory." *Carson v. Makin*, No. 1:18-cv-327, ECF No. 24 (hereinafter "*Carson* Stip. R.") Ex. 2 at 25–47 (Legislative Record, House, May 13, 2003 at H-582–89[2]).

62.     Relying on this legislative history, the Education Commissioner determined that the sectarian exclusion's purpose (beyond complying with the Establishment Clause), is to exclude religious schools whose religious exercise the state considers to be "discriminatory," including "instruction that advances a particular religion" and restricting hiring to co-religionists. *Carson* Stip. R. at 221 (Interrogatory response of Education Commissioner).

63.     In administering the sectarian exclusion, the Education Department

> consider[ed] a sectarian school to be one that is associated with a particular faith or belief system and which, in addition to teaching academic subjects, promotes the faith or belief system with which it is associated and/or presents the material taught through the lens of this faith. While affiliation or association with a church or religious institution is one potential indicator of a sectarian school, it is not dispositive. The Department's focus [was] on what the school teaches through its curriculum and related activities, and how the material is presented.

---

[2] *Available at* http://lldc.mainelegislature.org/Open/LegRec/121/House/LegRec_2003-05-13_HP_pH0578-0608.pdf.

*Carson v. Makin*, 979 F.3d 21, 38 (1st Cir. 2020) (quoting interrogatory response of the Maine Education Commissioner).

64.     In practice, the Education Department deemed schools operated by religious organizations sufficiently nonsectarian when they taught "universal spiritual values." *Carson* Stip. R. Ex. 2 at 17–18; Transcript of Oral Argument at 63–64, *Carson v. Makin*, 142 S. Ct. 1987 (2022) (No. 20-1088).

65.     Thus, the Education Department administered the sectarian exclusion to exclude religious schools that operated according to disfavored religious beliefs while permitting religious schools operated according to favored religious beliefs to participate.

66.     The sectarian exclusion rendered BCS ineligible to participate in the tuitioning program.

**D.      *Carson v. Makin* invalidated the sectarian exclusion.**

67.     In 2018, three families, including two families whose children attended BCS, sued the Maine Education Commissioner to challenge the sectarian exclusion under the First Amendment's Free Exercise Clause. *Carson v. Makin*, 142 S. Ct. 1987, 1994–95 (2022).

68.     In June 2022, the U.S. Supreme Court held that the sectarian exclusion violates the Free Exercise Clause because it "operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Id.* at 1997, 2002.

69.     Specifically, the Supreme Court held that "BCS . . . [is] disqualified from this generally available benefit 'solely because of [its] religious character,'" and "[b]y 'conditioning the availability of benefits in that manner,' Maine's tuition assistance program . . . 'effectively penalizes the free exercise' of religion." *Id.* at 1997 (quoting *Trinity Lutheran v. Comer*, 137 S. Ct. 2012, 2021 (2017)).

70. The Supreme Court found the Education Department's practice of "scrutinizing whether and how a religious school pursues its educational mission" particularly troubling because of the potential for "state entanglement with religion and denominational favoritism." *Id*. at 2001.

71. As a result of the Supreme Court's decision in *Carson*, the sectarian exclusion is unenforceable.

**E.    The Maine Legislature Adds a Poison Pill to the Tuitioning Program.**

72. Throughout the *Carson* litigation, Commissioner Makin strove to deter Plaintiff from agreeing to participate in the tuitioning program if its students' suit succeeded. For example, Commissioner Makin contended that if the state approved BCS for tuition purposes, the employment discrimination provisions of the Maine Human Rights Act would require Plaintiff to hire employees that do not share its religious beliefs. Defendant's Mot. for Summ. J. at 7–8, 13–14, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. June 26, 2019) (No. 1:18-cv-327); Brief of Appellee at 22–23, *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020) (No. 19-1746).

73. The U.S. Court of Appeals for the First Circuit ultimately rejected Commissioner Makin's argument that this somehow undermined the Plaintiffs' standing. *See Carson*, 979 F.3d at 28, 31.

74. While the *Carson* plaintiffs' petition for certiorari was pending before the Supreme Court, the Legislature considered and adopted the poison pill, P.L. 2021, Ch. 366, § 19, "An Act to Improve Consistency in Terminology and within the Maine Human Rights Act."

75. The poison pill amended 5 M.R.S.A. § 4602, the provision of the Maine Human Rights Act prohibiting educational discrimination, by adding gender identity and religion as protected classes and narrowing the preexisting exemption for religious schools.

76.     Prior to the poison pill, 5 M.R.S.A. § 4602(4) exempted all religious schools from the provisions relating to sexual orientation. The pre-poison pill language read, "The provisions in this subsection relating to sexual orientation do not apply to any education facility owned, controlled or operated by a bona fide religious corporation, association or society." 2005 Me. Legis. Serv. Ch. 10 (S.P. 413) (L.D. 1196).

77.     The poison pill conditioned the religious exemption on the refusal to accept tuition funds: "Nothing in this section . . . requires a religious corporation, association or society *that does not receive public funding* to comply with this section as it relates to sexual orientation or gender identity." P.L. 2021, Ch. 366, § 19; 5 M.R.S.A. § 4602(5)(C) (emphasis added).

78.     The poison pill contains no religious exemption from the prohibition on discrimination on the basis of religion in education and further requires that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." P.L. 2021, Ch. 366, § 19; 5 M.R.S.A. § 4602(5)(D).

79.     A private school's becoming approved for tuition purposes triggers liability under Section 4602 if the school is not a single-sex school. 5 M.R.S.A. § 4553(2-A) (defining "educational institution" for purposes of the MHRA as "any public school or educational program, any public post-secondary institution, any private school or educational program approved for tuition purposes if both male and female students are admitted and the governing body of each such school or program.").

80.     By narrowing the religious exemption for the sexual orientation and gender identity provisions, the poison pill operates to deter religious schools from participating in the tuitioning program if they hold disfavored religious beliefs, including teaching from a particular

religious perspective or operating in accordance with traditional beliefs about the nature of marriage and sexuality.

81.     The poison pill took effect on or about October 18, 2021.

82.     On October 22, 2021, Commissioner Makin filed her response brief in *Carson*, arguing that the poison pill eliminated the *Carson* plaintiffs' standing because, under the poison pill, BCS's religious beliefs disqualified BCS from becoming approved for tuition purposes even if the Supreme Court invalidated the sectarian exclusion. *See* Brief for Respondent at 54, *Carson v. Makin*, 142 S. Ct. 1987 (2022) (No. 20-1088).

83.     Although it failed to moot *Carson*, the poison pill continues to effectuate the religious discrimination at the heart of the sectarian exclusion.

84.     This result is not accidental, as Maine Attorney General Frey explained in his press release[3] the day the Supreme Court decided *Carson*:

> The education provided by the schools at issue here is inimical to a public education. They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff. One school teaches children that the husband is to be the leader of the household. While parents have the right to send their children to such schools, it is disturbing that the Supreme Court found that parents also have the right to force the public to pay for an education that is fundamentally at odds with values we hold dear. I intend to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry.
>
> While the Court's decision paves the way for religious schools to apply to receive public funds, it is not clear whether any religious schools will do so. Educational facilities that accept public funds must comply with anti-discrimination provisions of the Maine

---

[3] https://www.maine.gov/ag/news/article.shtml?id=8075979.

Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices.

85.     Attorney General Frey's press release specifically targeted and expressed hostility to Plaintiff's religious beliefs.

86.     This statement is consistent with General Frey's representation of the Education Commissioner throughout the *Carson* litigation. Indeed, Commissioner Makin's briefing routinely targeted Plaintiff's religious beliefs and characterized them as discriminatory. *See Carson v. Makin*, No. 1:18-cv-327, ECF No. 25 at ¶ 79 ("BCS believes that God has ordained distinct and separate spiritual functions for men and women, and the husband is to be leader of the home and men are to be the leaders of the church."); *Id.* ¶ 102 ("BCS teaches children that the husband is the leader of the household."); Defendant's Mot. for Summ. J. at 6 n.1, 7–8, 13–14, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. June 26, 2019) (No. 1:18-cv-327); Brief of Appellee at 9–12, *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020) (No. 19-1746); Brief of Respondent at 11, 28, 42, *Carson v. Makin*, 142 S. Ct. 1987 (2022) (No. 20-1088).

87.     The then-Speaker of the Maine House of Representatives also confirmed that the poison pill is designed to operate as an end-run around *Carson* to exclude Plaintiff from the tuitioning program:



https://twitter.com/SpeakerFecteau/status/1541041572636237826?s=20&t=YuvVEeWthiIx7ZxR NhS5C.

## COUNT I: FREE EXERCISE OF RELIGION (FIRST AND FOURTEENTH AMENDMENTS) AS TO 5 M.R.S.A. § 4602.

88.     Plaintiff incorporates by reference Paragraphs 1 through 87.

89.     The Free Exercise Clause of the First Amendment to the U.S. Constitution provides in relevant part that "Congress shall make no law . . . prohibiting the free exercise" of religion.

90.     The Free Exercise Clause applies to States and their subdivisions through the Fourteenth Amendment to the U.S. Constitution. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

91.     The Free Exercise Clause prohibits governmental entities from burdening a plaintiff's "sincere religious practice pursuant to a policy that is not neutral or generally applicable . . . unless the government can satisfy strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22 (2022) (quotations omitted).

92.     The Free Exercise Clause prohibits incidental burdens to the free exercise of religion as well as direct prohibitions. *Sherbert v. Verner,* 374 U.S. 398, 404 (1963) ("It is too late in the day to doubt that the libert[y] of religion . . . may be infringed by the denial of or placing of conditions upon a benefit or privilege.").

93.     A law "will not qualify as neutral if it is 'specifically directed at . . . religious practice,'" such as "if it 'discriminate[s] on its face,' or if a religious exercise is otherwise its 'object.'" *Kennedy*, 142 S. Ct. at 2422 (quoting *Emp't Div., Dep't of Hum. Res. of Ore. v. Smith*,

494 U.S. 872, 877 (1990); *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)).

94.     A law is not generally applicable "if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *Id.* (quoting *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021)).

95.     BCS meets the statutory requirements to become approved for tuition purposes.

96.     If the state approves BCS for tuition purposes, the portions of P.L. 2021, Ch. 366, § 19 codified at 5 M.R.S.A. § 4602(1), (5)(C), (5)(D), relating to discrimination in education on the basis of religion, sexual orientation, and gender identity, will prohibit Plaintiff from (1) teaching its religious beliefs as true to the exclusion of other religions, (2) considering applicants' alignment with Plaintiff's statement of faith when making admissions decisions, (3) requiring that parents and students agree to cooperate with the religious purpose of the school, (4) requiring that students adhere to a code of conduct consistent with Plaintiff's statement of faith, and (5) otherwise operate BCS in accordance with its religious beliefs.

97.     5 M.R.S.A. § 4602(1), (5)(C), (5)(D) substantially burdens Plaintiff's sincere religious exercise by conditioning Plaintiff's participation in a generally available tuition program on Plaintiff forfeiting its right to operate BCS consistent with its religious beliefs.

98.     MHRA violations, including violations of 5 M.R.S.A. § 4602, carry civil monetary penalties of up to $20,000 for a first violation, up to $50,000 for a second violation, and up to $100,000 for subsequent violations, as well as attorney's fees in certain circumstances. 5 M.R.S.A. §§ 4613(2)(B)(7); 4614.

99.     The MHRA's monetary penalties impose a substantial burden on Plaintiff's sincere religious exercise.

100.    But for the poison pill's penalization of Plaintiff's religious exercise, Plaintiff would apply to become approved for tuition purposes.

101.    Plaintiff faces a credible threat of enforcement: Commissioner Makin's brief in *Carson v. Makin* threatened to enforce 5 M.R.S.A. § 4602 against Plaintiff if the state approved for tuition purposes, and Attorney General Frey's June 21, 2021 press release specifically identified Plaintiff as an enforcement target.

102.    The poison pill is not neutral and derives from religious hostility. It targets Plaintiff because of its religious exercise and is designed to exclude Plaintiff from the tuitioning program.

103.    The poison pill is designed to perpetuate the unconstitutional sectarian exclusion by excluding from the tuitioning program schools the state deems "pervasively sectarian" and "discriminatory."

104.    Gross statements of religious hostility surround the poison pill—not only towards all religious schools exercising disfavored religious beliefs, but towards Plaintiff's religious beliefs in particular.

105.    5 M.R.S.A. § 4602 is not generally applicable, because single-sex schools are categorically exempt from all of § 4602's educational nondiscrimination provisions (except those relating to disability), including those relating to sex, sexual orientation, gender identity, and religion. 5 M.R.S.A. § 4553(2-A).

106.    Defendants have no compelling interest in applying 5 M.R.S.A. § 4602 to prohibit Plaintiff's religious exercise or to exclude Plaintiff from the tuitioning program.

107.    The poison pill is not narrowly tailored to achieve any governmental interest Defendant purports to have.

108.    Mooting a Supreme Court case to avoid an adverse decision is not a compelling interest.

109.    Circumventing a Supreme Court decision is not a compelling interest.

110.    Withholding tuition funding from schools whose religious beliefs are considered "inimical to public education"[4] simply attempts to maintain stricter separation than the Establishment Clause requires, which is not a compelling interest.

111.    Avoiding state endorsement of a particular school's teaching or policies is not a compelling interest, because tuition funds only flow to religious schools because of the independent choices of tuition beneficiaries—the parents.

112.    Maine has no compelling interest in applying the nondiscrimination provisions against Plaintiff and other religious school when it categorically exempts all single-sex schools from those provisions.

113.    On its face and as applied to Plaintiffs, 5 M.R.S.A. § 4602(1), (5)(C), (5)(D) violates the Free Exercise Clause of the First Amendment to the U.S. Constitution insofar as it unconstitutionally conditions participation in the tuitioning program on Plaintiff relinquishing its constitutional right to free religious exercise.

## COUNT II: ESTABLISHMENT AND FREE EXERCISE CLAUSES (U.S. CONSTITUTION) AS TO 5 M.R.S.A. § 4572.

114.    Plaintiff incorporates by reference Paragraphs 1 through 113.

115.    Before the Maine Legislature adopted the poison pill, Commissioner Makin attempted to craft another poison pill from existing provisions of MHRA, contending that if the

---

[4] Statement of Maine Attorney General Aaron Frey on Supreme court Decision in *Carson v. Makin*, June 21, 2022, https://www.maine.gov/ag/news/article.shtml?id=8075979.

state approved BCS for tuition purposes, BCS would be subject to 5 M.R.S.A. § 4572(1)(A),

which prohibits employers from failing or refusing to hire or otherwise discriminating against

any applicant "because of race or color, sex, sexual orientation or gender identity, physical or

mental disability, religion, age, ancestry, national origin or familial status . . . .". *See* Defendant's

Mot. for Summ. J. at 7–8, 13–14, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. June 26, 2019)

(No. 1:18-cv-327); Brief of Appellee at 22–23, *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020)

(No. 19-1746).

116.   Although the U.S. Court of Appeals for the First Circuit rejected this argument as

to the *Carson* plaintiff's standing, *Carson*, 979 F.3d at 28, 31, Plaintiff faces a credible threat of

Defendants enforcing 5 M.R.S.A. § 4572(1)(A) to prohibit its practice of hiring only co-

religionists if it participates in the tuitioning program. *See Statement from Attorney General Frey*

*on Carson v. Makin oral argument*, OFFICE OF THE MAINE ATTORNEY GENERAL, Dec. 8, 2021, at

https://www.maine.gov/ag/news/article.shtml?id=6220781.

117.   Under the MHRA, the penalty for an employment discrimination violation for an

employer with 14-100 employees is compensatory and punitive damages up to $50,000 plus

attorney's fees. 5 M.R.S.A. § 4613(2)(B)(8)(e)(i); 5 M.R.S.A. § 4614.

118.   The MHRA's plain language protects Plaintiff's right to hire only co-religionists,

even if it participates in the tuitioning program. 5 M.R.S.A. § 4553(4) ("'Employer' does not

include a religious or fraternal organization or association . . . with respect to employment of its

members of the same religion."); 5 M.R.S.A. § 4573-A(2) (defining as "not unlawful

employment discrimination" a religious organization requiring that all applicants and employees

conform to the religious tenets of the organization).

119.    Enforcing 5 M.R.S.A. § 4572 to prohibit Plaintiff from hiring only co-religionists if it participates in the tuitioning program violates the Establishment and Free Exercise Clauses of the First Amendment to the U.S. Constitution.

120.    The ministerial exception, grounded in the First Amendment, forbids a government from "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so . . . ." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171,188 (2012).

121.    "By imposing an unwanted minister, the state infringes the Free Exercise Clause," and "[a]ccording the state the power to determine who will minister to the faithful also violates the Establishment Clause." *Id.* at 188–89.

122.    The Supreme Court has made clear that teachers or other employees who "play[] a vital part in carrying out the mission of the church" or a religious school are covered by the ministerial exception. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2066 (2020).

123.    Teachers and staff tasked with "educating young people in their faith, inculcating its teachings, and training them to live their faith" fulfill "responsibilities that lie at the very core of the mission of a private religious school" and are subject to the ministerial exception. *Id*. at 2064.

124.    Plaintiff's hiring practices for its ministries, including BCS, are protected under the ministerial exception.

125.    BCS teachers and staff uphold the Statement of Faith and Educational Philosophy and Objectives of the school.

126.    BCS teachers and staff carry out Plaintiff's mission by educating students in their faith and fostering their spiritual development. Their duties are vital to accomplishing Plaintiff's purpose in preaching and educating students in the Gospel of Jesus Christ.

127.    BCS teachers and staff educate students in Plaintiff's faith, inculcate its teaching, and train them to live their faith. They serve as Christian role models to the students, both in and out of school. They must not only agree that they share Plaintiff's Statement of Faith to be hired, but they must also feel that teaching at BCS is God's direction for them.

128.    If 5 M.R.S.A. § 4572(1)(A) requires Plaintiff to employ its ministers in accordance with the religion, sexual orientation, and gender identity nondiscrimination provisions in 5 M.R.S.A. § 4553(10)(G), it "[r]equir[es] a church to accept or retain an unwanted minister or punish[es] a church for failing to do so," violating both the Free Exercise Clause and the Establishment Clause. *Hosanna-Tabor*, 565 U.S. at 188.

129.    Therefore, Maine attempts to circumvent the ministerial exception by coercing religious organizations to choose between forfeiting public funds and hiring in accordance with their religious beliefs on one hand or accepting public funds and violating its religious beliefs on the other.

130.    Conditioning participation in the tuitioning program on Plaintiff relinquishing its constitutional right to select its own ministers violates the Religion Clauses of the U.S. Constitution.

131.    As applied to Plaintiff, 5 M.R.S.A. § 4572(1)(A) violates the Free Exercise Clause and Establishment Clause of the U.S. Constitution insofar as it unconstitutionally conditions participation in the tuitioning program on Plaintiff relinquishing its constitutional right to select its own ministers.

## COUNT III: FREE SPEECH (U.S. CONSTITUTION, FIRST AND FOURTEENTH AMENDMENTS) AS TO 5 M.R.S.A. § 4602.

132.    Plaintiff incorporates by reference Paragraphs 1 through 131.

133.    The Free Speech Clause of the First Amendment to the U.S. Constitution provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech."

134.    The Free Speech Clause applies to states and their subdivisions and municipalities through the Fourteenth Amendment to the U.S. Constitution.

135.    The Free Speech Clause prohibits restrictions on speech that are based on content or viewpoint.

136.    Plaintiff's teaching of its religious beliefs is a form of speech and expression protected under the Free Speech Clause.

137.    The poison pill restricts Plaintiff's speech based on content and viewpoint because it requires Plaintiff to stop educating its students from its religious perspective as a condition of participating in the tuition program. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995) ("Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered."); *id.* at 828–29 ("[T]he government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression.").

138.    The poison pill restricts Plaintiff's speech because the government disfavors its religious beliefs and expression.

139.    Punishing expression the government deems "offensive" violates the Free Speech Clause. *See Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017).

140.     Defendants violate the Free Speech Clause by imposing financial burdens on Plaintiff based on the content of its expression.

141.     Defendants cannot deny Plaintiff a benefit on a basis that infringes its interest in free speech.

142.     Defendants have no compelling interest in excluding Plaintiff from the tuitioning program because of its religious expression and teaching.

143.     The poison pill is not narrowly tailored to achieve any government interest Defendant purports to have.

144.     As applied to Plaintiff, 5 M.R.S.A. § 4602 violates the Free Speech Clause of the U.S. Constitution.

## PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

A.     A declaratory judgment that the religion, sexual orientation, and gender identity provisions of 5 M.R.S.A. § 4602 are unconstitutional as applied to Plaintiff;

B.     A declaratory judgment that 5 M.R.S.A. § 4572 violates the federal and Maine Free Exercise clauses as applied to Plaintiff, insofar as it restricts Plaintiff's ability to employ only co-religionists as a condition of participating in the tuitioning program;

C.     Injunctive relief prohibiting Defendants from enforcing 5 M.R.S.A. § 4572 and the religion, sexual orientation, and gender identity provisions of 5 M.R.S.A. § 4602 against Plaintiff if the state approves it for tuition purposes or otherwise conditions approval for tuition purposes on Plaintiff violating its religious beliefs;

D.     An award of attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

   E.  Any other legal and equitable relief the Court may deem appropriate and just.


Dated: March 27, 2023

             Respectfully submitted,

             *s/ Patrick Strawbridge*
             Patrick Strawbridge (Bar No. 10024)
              *Lead Counsel*
Jeffrey C. Mateer*         Consovoy McCarthy PLLC
David J. Hacker*         Ten Post Office Square
Lea E. Patterson*        8th Floor South PMB #706
Keisha T. Russell*        Boston, MA 02109
Courtney A. Jones*       (703) 243-9423
First Liberty Institute       patrick@consovoymccarthy.com
2001 W Plano Parkway, Suite 1600
Plano, Texas 75075        Tiffany H. Bates*
(972) 941-4444         Consovoy McCarthy PLLC
lepatterson@firstliberty.org     1600 Wilson Blvd.
             Suite 700
             Arlington, VA 22209
             (703) 243-9423
             tiffany@consovoymccarthy.com

             *Certificates for admission pro hac vice* pending

             Attorneys for Plaintiff Crosspoint Church

## <u>VERIFICATION</u>

I, Tom Brown, declare under penalty of perjury that: (1) I am over 18 years of age and am otherwise competent to testify and (2) I have reviewed the Complaint and the factual statements contained in this Complaint are true and correct to the best of my knowledge, information, and belief.


Date: <u>March 27, 2023</u>                                    /s/ Tom Brown
                                                                                Tom Brown
                                                                                Senior Pastor, Crosspoint Church