## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| CROSSPOINT CHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-cv-00146-JAW |
| | ) | |
| A. PENDER MAKIN, in her official | ) | |
| capacity as Commissioner of the | ) | |
| Maine Department of Education, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, WITH INCORPORATED MEMORANDUM OF LAW

Last June, in *Carson v. Makin*, 142 S. Ct. 1987 (2022), the United States Supreme Court held that the Free Exercise Clause of the First Amendment prevents Maine from excluding religious secondary schools from its school tuitioning program. *See* 20-A M.R.S. §§ 2951(2), 5204(4). One such school, Cheverus High School, applied to be in the program for the 2022-2023 school year. Welter Decl., ¶ 4. The Department of Education ("DOE") accepted its application, processed it in the same manner as non-religious schools, and approved Cheverus to participate in the program shortly thereafter. *Id.*, ¶¶ 5-6.

Plaintiff Crosspoint Church operates Bangor Christian Schools ("BCS"), and it alleges that it would participate in the program so long as it would not then need to comply with provisions of the Maine Human Rights Act ("MHRA") prohibiting discrimination in employment and education. Unlike Cheverus, BCS has not applied to be in the program. Instead, Plaintiff comes before this Court essentially seeking an advisory ruling that <u>if</u> it were to apply and be accepted into the tuitioning program, and <u>if</u> a person in a protected class were then to apply for admission or employment, and <u>if</u> BCS were then to deny the application, and <u>if</u> the

aggrieved person or a staff member of the Maine Human Rights Commission ("MHRC") were then to file a charge of discrimination, the Free Exercise Clause would bar the action.  As this list of hypothetical events makes clear, there is no imminent threat of enforcement and Plaintiff's lawsuit is not ripe and should be dismissed.

But even if the case was ripe, Plaintiff is not entitled to a preliminary injunction based on well-established precedent because it is not likely to prevail on the merits and none of the other relevant factors supports an injunction.  The MHRA prohibits discrimination against various protected classes, but Plaintiff appears to take issue only with the prohibitions against discrimination based on religion and sexual orientation or gender identity.  Admitting students belonging to these protected classes will in no way burden Plaintiff's religious practices.  BCS would still be free to teach and say whatever it wishes – it simply would not be allowed to prevent willing students from receiving whatever education BCS chooses to deliver.  Indeed, BCS already admits students of different religions, thus demonstrating that the makeup of the student body does not interfere with its religious practices.  And even if the prohibitions against discrimination did interfere with Plaintiff's religious practices, they are permissible because they are neutral and generally applicable.  In any event, the prohibitions against unlawful discrimination satisfy strict scrutiny because, as the Supreme Court has recognized, states have a compelling interest in ending discrimination, and this outweighs any interest schools may have in discriminatory policies, even when such policies are based on sincerely held religious beliefs.

With respect to employment, the MHRA expressly permits Plaintiff to hire only members of its religion and to require all employees to conform to Plaintiff's religious tenets.  The so-called "ministerial exception" recognized by the Supreme Court may provide Plaintiff with further protection by barring application of the MHRA to some employment positions.  The

extent to which the exception applies cannot be decided in the abstract in this facial challenge and must instead await an actual controversy.  Finally, the prohibitions against discrimination do not violate Plaintiff's First Amendment right to free speech because they regulate conduct, not speech.  Plaintiff is free to say whatever it wishes; it just cannot exclude willing listeners for discriminatory reasons.  Plaintiff's preliminary injunction motion should thus be denied.

### MEMORANDUM OF LAW

### <u>Statutory Background</u>

The Maine Human Rights Act was enacted in 1971.  Me. Pub. L. 1971, c. 501.  As originally enacted, it prohibited only unlawful employment, housing, and public accommodations discrimination.  *Id*.  In these three areas, it prohibited discrimination based on race, color, religion, ancestry, or national origin, and, with respect to employment discrimination, age.  *Id*.

As enacted, the MHRA expressly permitted (and continues to permit) non-profit religious organizations to limit employment to members of their own religion.  *Id; see also* 5 M.R.S. § 4553(4) (exempting from the definition of "employer" any "religious or fraternal corporation or association, not organized for private profit and in fact not conducted for private profit, with respect to employment of its members of the same religion, sect or fraternity. . . .").  In 1995, the Legislature added a provision expressly stating that the provisions governing unlawful employment discrimination

> do[] not prohibit a religious corporation, association, educational institution or society from giving preference in employment to individuals of its same religion to perform work connected with the carrying on by the corporation, association, educational institution or society of its activities. Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of that organization.

Me. Pub. L. 1995 c. 393, § 21, *codified at* 5 M.R.S. § 4573-A(2).[1]

In 1983, the Legislature added Subchapter V-B to the MHRA to prohibit discrimination in education. Me. Pub. L. 1987 c. 578, § 3. However, it prohibited only discrimination based on sex. *Id.* "Educational institution" was defined as "any public school or educational program, any public post-secondary institution, any private school or educational program approved for tuition purposes if both male and female students are admitted and the governing body of each such school or program." *Id.*, § 2, *codified at* 5 M.R.S. § 4553(2-A). Excluding single-sex schools from this definition made sense inasmuch as such schools might otherwise have been unable to comply with the new anti-discrimination provisions.

Subsequently, the Legislature prohibited other forms of educational discrimination. In 1987, discrimination based on physical or mental disability was prohibited. Me. Pub. L. 1987, c. 478. In 1989, the Legislature prohibited educational institutions from discriminating based on national origin. Me. Pub. L. 1989 c. 725. Discrimination based on race was added in 1991. Me. Pub. L. 1991 c. 100. In 2005, the Legislature enacted "An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation." Me. Pub. L. 2005 c. 10. This extended protection from discrimination based on sexual orientation to all aspects of the MHRA – employment, public accommodations, housing, and education. *Id.*[2] However, "education facility[ies] owned, controlled or operated by a bona fide religious corporation, association or

---

[1] In some ways, this provides <u>more</u> protection to religious organizations than the "ministerial exception," which exempts religious organizations from employment discrimination laws only with respect to employees "holding certain important positions." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).

[2] "Sexual orientation" was defined as including "gender identity or expression," Me. Pub. L. 2005 c. 10, § 3, so the prohibition of sexual orientation discrimination encompassed gender identity discrimination. This remains the case today, but in recognition of the difference between sexual orientation and gender identity, the MHRA now has a separate definition for gender identity, which is defined as "the gender-related identity, appearance, mannerisms or other gender-related characteristics of an individual, regardless of the individual's assigned sex at birth." 5 M.R.S. § 4553(5-C). Wherever discrimination based on sexual orientation was prohibited prior to amendments to the MHRA in 2021, the MHRA now prohibits discrimination on the basis of "sexual orientation or gender identity."

society" were exempted from the provisions prohibiting education discrimination based on sexual orientation. *Id.*, § 21. Moreover, non-profit religious organizations that <u>do not receive public funds</u> were exempted from the provisions prohibiting employment and housing discrimination based on sexual orientation. *Id.*, § 6, *codified at* 5 M.R.S. § 4553(10)(G).[3] Simply put, there was inconsistency with respect to the treatment of religious organizations when it came to sexual orientation – such organizations were always exempt with respect to education discrimination, but only those that did not accept public funds were exempt with respect to employment and housing discrimination.

As additional categories of unlawful discrimination were added to the section addressing educational discrimination, the Legislature, for the most part, did not go back and address the definition of "educational institution."[4] As discussed above, this definition excluded single-sex schools, thus effectively exempting them not just from prohibitions against sex discrimination, but from prohibitions against most other forms of discrimination. While it was reasonable to exempt single-sex schools from prohibitions against sex discrimination, it made no sense to exclude them from prohibitions against other forms of discrimination. Thus, it is likely that the failure of the Legislature to update the definition of educational institution was inadvertent. On April 27, 2023, a bill was introduced to remove the exemption for single-sex schools. *See* LD 1833, attached hereto as Exhibit 1.

---

[3] This law also exempted non-profit religious organizations that do not receive public funds from the prohibition against sexual orientation discrimination in education, but, as noted above, a separate provision exempted <u>all</u> religious organizations from that prohibition.

[4] The one exception was that in 1995, the Legislature added the following to the definition: "For purposes related to disability-related discrimination, 'educational institution' also means any private school or educational program approved for tuition purposes." Me. Pub. L. 1995 c. 393, § 4. This meant that single-sex schools were not exempt from the provisions prohibiting unlawful disability discrimination. Chapter 393 also amended the definition of "employer" to state that even if a religious entity is not an "employer" for purposes of hiring members of its religion, it is an "employer" with respect to disability-related discrimination. *Id.*

On May 6, 2021, the MHRC submitted "An Act to Improve Consistency Within the Maine Human Rights Act." *See* L.D. 1688, attached hereto as Exhibit 2. The MHRC's Executive Director testified that the MHRA's provisions were "amended in a piecemeal fashion," resulting in "internal inconsistencies," sometimes with no "logical rationale." Sneirson Test., attached hereto as Exhibit 3, at 1. The twelve-page bill addressed numerous parts of the MHRA, including the statement of policy, the definitions, and the provisions governing employment, housing, public accommodation, credit extension, and education discrimination. Exhibit 2.

Among the purposes of LD 1688 was to "clarify[] the scope of the Maine Human Rights Act application in education." *Id*. Sections 18 and 19 addressed education discrimination, with Section 18 amending the MHRA's broad statement of the right to be free from discrimination in education and Section 19 amending the substantive provisions prohibiting such discrimination set forth in 5 M.R.S. § 4602. Exhibit 2. With respect to Section 19, the MHRC's Executive Director testified that "[t]he MHRA's current education coverage is woefully out of date, and inconsistent with the rest of the Act." *See* Exhibit 3, at 5. In addition to reformatting Section 4602, the bill added ancestry, color, and religion to the protected categories to make it consistent with the MHRA's general protections against discrimination.[5] The bill struck the provision exempting all religious organizations from the prohibition against sexual orientation discrimination and replaced it with a provision stating: "Nothing in this section . . . [r]equires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity." Exhibit 2, § 19, *codified at* 5

---

[5] Gender identity was also separately named, but was not added as a protected class, since sexual orientation was already defined as including "gender identity or expression." *See* n.2, *supra*. LD 1688 changed references to "sexual orientation" to "sexual orientation or gender identity" throughout the MHRA to make clear that gender identity is protected. Exhibit 3, at 2 n.3.

M.R.S. § 4602(5)(C).  While Plaintiff refers to this as a "poison pill," it simply made the education discrimination provision pertaining to sexual orientation or gender identity discrimination consistent with the provision governing employment and housing discrimination, which already exempted only religious organizations that do not receive public funds.  5 M.R.S. § 4553(10)(G).  The bill also clarified that educational institutions are not required "to participate in or endorse any religious beliefs or practices," but that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." Exhibit 1, § 19, *codified at* 5 M.R.S. § 4602(5)(D).

With some amendments not relevant here, LD 1688 was passed in both chambers of the Legislature on June 17, 2021 and signed into law by the Governor on June 24, 2021.[6]  Under current law, then, only those religious educational institutions that do not receive public funds may discriminate in their educational programs based on sexual orientation and gender identity. 5 M.R.S. § 4553(10)(G)(3); 5 M.R.S. § 4602(5)(C).  Such organizations may not discriminate based on any other protected class, and religious organizations that receive public funds are fully subject to the MHRA's provisions prohibiting education discrimination (including religion and sexual orientation or gender identity).  With respect to employment, all religious organizations may give employment preference to individuals of the same religion and may require all applicants and employees to conform to the organization's religious tenets.  5 M.R.S. § 4573-A(2).[7]  Only those religious organizations that do not receive public funds may discriminate based on sexual orientation and gender identity.  5 M.R.S. § 4553(10)(G)(1).  No religious

---

[6] *See* https://legislature.maine.gov/LawMakerWeb/summary.asp?paper=SP0544&SessionID=14.

[7] Plaintiff claims that "[t]o undermine the *Carson* plaintiffs' standing, Commissioner Makin contended that if the state approved BCS for the tuition program, provisions of the [MHRA] would require BCS to hire employees that do not share its religious beliefs."  PI Motion, at 5.  This is <u>not</u> what the Commissioner said.  What she did say is that if BCS were to accept public funds, it would no longer be able to discriminate in its hiring based on sexual orientation or gender identity.  *See, e.g.,* Brief for Appellee at 22–23 in *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020) (No. 19-1746)).

organizations are permitted to discriminate in employment based on any of the other protected

classes (except to the extent, as discussed below, that the "ministerial exception" permits the

discrimination).

Actions to enforce the MHRA may be brought by either the MHRC or an aggrieved

person.  5 M.R.S. §§ 4611-4623.

## I.  The Plaintiff Is Not Likely to Prevail on the Merits.

### A.  This Lawsuit is Not Ripe.

"[T]he doctrine of ripeness has roots in both the Article III case or controversy

requirement and in prudential considerations."  *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st

Cir. 2003).  "The basic rationale of the ripeness inquiry is to prevent the courts, through

avoidance of premature adjudication, from entangling themselves in abstract disagreements in

violation of Article III's case or controversy requirement."  *Lab. Rels. Div. of Constr. Indus. of

Massachusetts, Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (cleaned up).  "A claim is not

ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or

indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).

The plaintiff "bears the burden of alleging facts sufficient to demonstrate ripeness," and "[e]ven

a facial challenge to a statute is constitutionally unripe until a plaintiff can show that federal

court adjudication would redress some sort of imminent injury that he or she faces."  *Reddy v.

Foster*, 845 F.3d 493, 501 (1st Cir. 2017).

Here, Plaintiff is not under threat of any MHRA action by either an aggrieved person or

the MHRC.  While Plaintiff claims that in her Supreme Court brief, the DOE Commissioner

"threatened to enforce 5 M.R.S.A. § 4602 against Plaintiff if it participated in the tuitioning

program," PI Mot., at 8, the Commissioner said no such thing, nor does she have any authority to

enforce the MHRA.[8]  Rather, the Commissioner simply explained that BCS and the other school at issue would be required to comply with certain MHRA provisions if they were to participate in the tuitioning program.  Respondent's Brief in *Carson v. Makin* (No. 20-1088), at 54.[9]  Nor did the Attorney General, as Plaintiff claims, "specifically identif[y] Plaintiff as an enforcement target."  PI Mot., at 8.  In the press release Plaintiff cites to, the Attorney General stated that he intended to explore statutory amendments to address the Supreme Court's decision and that he was not sure whether any religious schools would decide to receive public funds because they would then be required to comply with provisions of the MHRA.[10]  The Attorney General never threatened enforcement action against Plaintiff or anyone else, nor could he: as previously noted, only the MHRC or an aggrieved party is authorized to file a civil suit to enforce the MHRA.

Presently, the extent to which the MHRA applies to Plaintiff should it accept public funds is a purely hypothetical issue.  First, Plaintiff has not yet applied to participate in the tuitioning program.  Second, even if it were to participate and be accepted, a claim would arise only if a person protected by the MHRA were to apply to attend, or work at, BCS, and were to then be denied based on their membership in a protected class.  BCS apparently does not discriminate based on any class other than sexual orientation or gender identity.  BCS offers no evidence suggesting that persons who identify as anything other than heterosexual and cis-gender might apply to BCS, and they may well not given the beliefs BCS espouses and values it teaches.  And even then, the issue would not be ripe unless a person denied admission or employment, or a staff member of the MHRC, were to make a charge of discrimination to the MHRC.  If all that

---

[8] The Commissioner must be informed of the results of investigations and findings regarding unlawful educational discrimination with respect to public schools and private schools approved for tuition purposes and may participate in informal conciliation efforts.  5 M.R.S. § 4604.
[9] *Available at* http://www.supremecourt.gov/DocketPDF/20/20-1088/197324/20211022151803212_Brief%20of%20Respondent%2010%2022%2021.pdf
[10] *See* https://www.maine.gov/ag/news/article.shtml?id=8075979.

did occur, the issue of the extent to which the MHRA applies to Plaintiff could then be litigated.

Now, though, the issue is not ripe and the case should be dismissed.

**B. Prohibitions Against Discrimination Do Not Violate Plaintiff's Free Exercise Rights.**

*1. The Prohibitions Do Not Burden Plaintiff's Religious Practices.*

The First Amendment's Free Exercise Clause states: "Congress shall make no law . . .

prohibiting the free exercise" of religion.  U.S. Const. amend. I.  Plaintiff's claim fails at the

outset because it does not demonstrate how Maine's prohibition against discrimination would

impose any burden on Plaintiff's religious practices.  Plaintiff is prohibited from discriminating

based on religion and, if it accepted public funds, it would be prohibited from discriminating

based on sexual orientation or gender identity with respect to its admissions.[11]  However,

Plaintiff already will accept students from families of any religion provided they support

Plaintiff's philosophy of Christian education.  Complaint, ¶ 31.  As BCS testified at its

deposition in the *Carson* case, being Christian is not a requirement for admission if the student is

"on the same page of what they're going to be learning in the school and the students want to be

there."  Benjamin Dep. (attached hereto as Exhibit 4), p. 24 line 25 to p. 25 line 6; *see also id*., p.

29, lines 6-16 (testifying that BCS will accept a student from any religious background so long

as they are willing to support BCS's philosophy of Christian education, conduct, and other

practices).  This demonstrates that admitting students of other religions does not burden BCS's

religious practices.[12]

It does appear (although it is not entirely clear) that BCS refuses to admit students who

do not identify as heterosexual and cis-gender.  But Plaintiff fails to demonstrate that admitting

---

[11] As discussed above, Plaintiff is prohibited from discriminating against other protected classes, but religion and sexual orientation or gender identity are the only classes at issue here.

[12] Nor is it possible to see how admitting a student of another religion would impose any burden.  BCS would still be free to teach and instill Christian beliefs.  While it would likely not be allowed to prohibit such a student from

such students would burden its religious practices.  Plaintiff would still be free to teach students that, for example, marriage means only a union between one man and one woman and that "any deviation from the sexual identity that God created" is unacceptable.  Complaint, ¶ 28.  That students who do not identify as heterosexual or cis-gender might be among the recipients of these messages in no way interferes with Plaintiff's ability to teach and instill them.  Quite simply, requiring Plaintiff to accept all willing students does not burden its religious practices. *See Runyon v. McCrary*, 427 U.S. 160, 175 (1976) (while private school was free to teach that racial segregation is desirable, there was no showing that ordering school to not exclude racial minority students "'would inhibit in any way the teaching in these schools of any ideas or dogma.'"); *see also Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) ("There is no constitutional right . . . to discriminate in the selection of who may attend a private school. . . ."); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 260 (1964) ("[I]n a long line of cases this Court has rejected the claim that the prohibition of racial discrimination in public accommodations interferes with personal liberty.").

   *2. The Prohibitions Against Discrimination are Neutral and Generally Applicable.*

   Even if there were some burden on Plaintiff's religious practices, Supreme Court cases "establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Employment Division v. Smith*, 494 U.S. 872 (1990)); *see also City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) ("[N]eutral, generally applicable laws may be applied to religious practices even when not supported by a compelling

_____

expressing his or her <u>own</u> religious beliefs, 5 M.R.S. § 4602(5)(D), this would not inhibit BCS's expression or conduct.

governmental interest.").  A law is not neutral when its object "is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533; *see also Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (2021) ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature.").  "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 540) (emphasis added).  A law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877.  A law may also be not generally applicable if it "permit[s] the government to grant exemptions based on the circumstances underlying each application." *Id*.; *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022).  If the law is not neutral and generally applicable, it is subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest.  *Kennedy*, 142 S. Ct. at 2426; *Lukumi*, 508 U.S. at 546.

### a.  The Prohibitions Against Discrimination are Neutral.

It is simply not true, as Plaintiff claims, that the 2021 MHRA amendment allowing only those religious schools which do not accept public funding to discriminate on the basis of sexual orientation or gender identity was a "poison pill" intended to "specifically target[] Plaintiff's religious beliefs."  PI Mot., at 9.  As explained above, when it comes to employment and housing discrimination, it was already the case that only religious organizations that did not receive

public funds were exempt from the MHRA's prohibitions against sexual orientation or gender identity discrimination.  Extending the same treatment with respect to educational discrimination simply achieved consistency.

Plaintiff claims that statements made by Maine's Attorney General are evidence that LD 1688 was targeted at Plaintiff.  PI Mot., at 9-10.  Those statements, though, were made on June 21, 2022, a year <u>after</u> LD 1688 was signed into law.  The Attorney General did not testify on LD 1688,[13] and there is no evidence that he (or the DOE Commissioner) had any involvement in the introduction or eventual enactment of the bill.[14]

It is also important to note that LD 1688 was enacted after both this Court and the First Circuit had <u>upheld</u> the statutory provision excluding sectarian schools from the tuitioning program and before the Supreme Court had granted certiorari.  *Carson v. Makin*, 141 S. Ct. 2883 (Mem.).  Moreover, the Supreme Court had three times before denied certiorari petitions seeking review of decisions from the First Circuit and the Maine Law Court upholding the exclusion of sectarian schools.  *Anderson v. Town of Durham, Maine*, 549 U.S. 1051 (2006) (Mem.); *Bagley v. Raymond Sch. Dep't*, 528 U.S. 947 (1999) (Mem.); *Strout v. Albanese*, 528 U.S. 931 (1999) (Mem.).  There was no reason to assume the Court would take the case and then reverse.

Finally, even if LD 1688 was introduced and enacted in anticipation of an adverse Supreme Court ruling, it was not a "poison pill."  Until then, religious schools were not eligible to receive public funds because they were excluded from the tuitioning program.  There was thus no need to differentiate between religious schools receiving public funds and those that were not.

---

[13] *See* http://www.mainelegislature.org/legis/bills/display_ps.asp?ld=1688&PID=1456&snum=130.

[14] Plaintiff compares the Attorney General's comments to comments made by a state official in *Masterpiece Cakeshop*, 138 S. Ct. at 1719.  There, though, the official described a person's religion as "despicable" and "something insubstantial and even insincere" and compared the person's invocation of his religious beliefs "to defenses of slavery and the Holocaust."  *Id.*, at 1729.  The Attorney General, on the other hand, did not disparage the religion of the two schools at issue.  *See* https://www.maine.gov/ag/news/article.shtml?id=8075979.

If the Legislature anticipated that Maine might soon be prohibited from excluding religious schools from the tuitioning program, it would have been entirely appropriate for them to then draw the same distinction that already existed when it came to employment and housing discrimination – religious educational institutions not receiving public funds could discriminate based on sexual orientation or gender identity, while those receiving public funds were prohibited from doing so.[15]

b.   The Prohibitions Against Discrimination are Generally Applicable.

Plaintiff argues that the provisions of the MHRA prohibiting schools from discriminating on the basis of sexual orientation, gender identity, and religion are not generally applicable because single-sex schools are exempt from that prohibition.  PI Mot., at 11-12.  As discussed above, though, this was not intentional but was instead likely the result of the "piecemeal fashion" in which the MHRA was amended over the years, sometimes resulting in "internal inconsistencies" with no "logical rationale."  *See* Exhibit 3, at 1.  Further, as discussed above, a bill has been introduced to remove the exemption for single-sex schools, so the exemption may well be gone before the Court rules on this motion.  Moreover, to defendants' knowledge, there are no single-sex schools in Maine, and have not been any for at least the last few years.  Thus, this exemption has, at least in the recent past, had no operative effect.  Additionally, religious

---

[15] The Court should give no consideration to a single ten-word "tweet" from a state legislator.  *See Lukumi*, 508 U.S. at 558 (Scalia, J., concurring) ("[I]t is virtually impossible to determine the singular 'motive' of a collective legislative body, . . . and this Court has a long tradition of refraining from such inquiries.").  In any event, the "tweet" does not suggest that LD 1688 was intended to be a "poison pill."  In response to another "tweet" stating that "Maine just changed the guidelines to exclude schools that discriminate against LGBTQ+ students," the legislator responded:  "Sure did.  Anticipated the ludicrous decision from the far-right SCOTUS."  PI Mot., at 10.  In fact, though, Maine did <u>not</u> exclude schools that discriminate based on sexual orientation or gender identity.  Rather, it amended the law to prohibit such discrimination.  Discriminatory schools are free to participate in the tuitioning program regardless of whether they comply with the MHRA.  So, the legislator's response could be interpreted as simply acknowledging that the Legislature had anticipated an adverse ruling from the Supreme Court and took action to ensure that religious schools participating in the program would be subject to the MHRA's provisions prohibiting sexual orientation or gender identity discrimination.

14

schools are entitled to the exemption on exactly the same terms as non-sectarian schools.  So, at least under present law, a single-sex religious school would be subject to only the educational provisions prohibiting discrimination based on disability.

In the event the Court concludes that the current exemption for single-sex schools means that the prohibition against education discrimination is not generally applicable, the Court should simply strike the exemption.  The severability of a statute is a legal question that is governed by state law.  *Leavitt v. Jane L.*, 518 U.S. 137, 139-44 (1996); *Rhode Island Med. Soc'y v. Whitehouse*, 239 F.3d 104, 106 (1st Cir. 2001).  Maine's Legislature has expressly declared that "[t]he provisions of the statutes are severable" and that "[i]f any provision of the statutes or of a session law is invalid, or if the application of either to any person or circumstance is invalid, such invalidity does not affect other provisions or applications which can be given effect without the invalid provision or application."  1 M.R.S. § 71(8); *see also IMS Health Corp. v. Rowe*, 532 F.Supp.2d 183, 186 (D. Me. 2008).  "An invalid portion of a statute" can be severed unless "it is such an integral portion of the entire statute or ordinance that the enacting body would have only enacted the legislation as a whole."  *Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 18, 856 A.2d 1183, 1190.  Because there appears to be no logical reason for excluding single-sex schools, and given Maine's stated interest in broadly prohibiting discrimination, the Court should strike the exemption but let the rest of the MHRA stand, including the provision prohibiting religious schools that accept public funds from discriminating based on sexual orientation or gender identity.

### 3.  *The Prohibitions Against Discrimination Pass Strict Scrutiny.*

It is the stated policy of Maine to prevent discrimination in many aspects of society, including employment, housing, public accommodations, and, as relevant here, education.  5

M.R.S. § 4552.  It is further Maine's policy to provide opportunities for individuals "to participate in <u>all</u> educational, counseling and vocational guidance programs, all apprenticeship and on-the-job training programs and all extracurricular activities without discrimination because of sex, sexual orientation or gender identity, a physical or mental disability, ancestry, national origin, race, color or religion."  5 M.R.S. § 4601 (emphasis added).  There can be no dispute that states have a compelling interest in eliminating discrimination.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 609 (1982) (recognizing that a state has a substantial interest in protecting its citizens from "the political, social, and moral damage of discrimination"); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (eliminating discrimination "plainly services compelling state interests of the highest order").

As the Supreme Court's decision in *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) makes clear, Maine's compelling interest in eliminating discrimination outweighs whatever interest Plaintiff might have in refusing to admit certain students.  At issue in *Bob Jones* was an IRS ruling making private schools with racially discriminatory admissions policies ineligible for tax-exempt status.  Two Christian colleges challenged the ruling, arguing that its racially discriminatory policies were based on sincerely held religious beliefs and that applying the ruling to them would violate their rights under the Free Exercise Clause.  *Id*., at 579-585, 602-03.  The Supreme Court rejected the challenge, finding that the government had a "compelling," "fundamental," and "overriding" interest in eliminating racial discrimination in education.  *Id*., at 604.  The Court further concluded that this interest "substantially outweighs whatever burden denial of tax benefits places on [the colleges'] exercise of their religious beliefs" and that no less restrictive means were available to achieve the government's interest. *Id*.  Similarly, in *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984), the Supreme Court held that

a state's "compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms."  These cases make clear that even if the prohibitions against discrimination are not neutral and generally applicable, they would pass strict scrutiny.

According to Plaintiff, Defendants "must demonstrate that they have a compelling interest in denying Plaintiff an exemption."  PI Mot., at 12 (*citing Fulton*, 141 S. Ct. at 1881). But here, Maine's compelling interest in broadly ending discrimination in education itself demonstrates that it has a compelling interest in denying exemptions.  To the extent that Plaintiff is arguing that Defendants must demonstrate a compelling interest for distinguishing between religious schools that accept public funds and those that do not, Plaintiff misses the fact that exempting non-publicly funded schools was not constitutionally required in the first place. Maine could have prohibited <u>all</u> religious schools from discriminating based on sexual preference or gender identity.  It provided an exception, though, to balance the interests of religious schools against those of the State by allowing an option for religious schools that want to discriminate – they may forego public funds.  To the extent that Defendants need to show a compelling interest for allowing that option, it is the need to prevent public funds from being used to further practices that are contrary to Maine's public policy goal of ending discrimination. It also minimizes conflict that would likely result among taxpayers who object to such use.[16]

### C.  Plaintiff Is Permitted to Limit Employment to Members of Its Religion.

Plaintiff argues that it is likely to succeed on its claim that the Establishment and Free Exercise Clauses prevent Maine from prohibiting Plaintiff from hiring only "co-religionists."  PI

---

[16] To the extent that Plaintiff argues that Section 4602 is not narrowly tailored because it exempts single-sex schools, PI Mot., at 12-13, the defendants have already addressed why that exemption, which may soon be repealed, provides little support for Plaintiff's argument.

Mot., at 14.  But the MHRA does <u>not</u> impose such a prohibition.  <u>All</u> religious organizations (regardless of whether they receive public funds) are allowed to give employment preference to individuals of the same religion and may require all applicants and employees to conform to the organization's religious tenets.  5 M.R.S. § 4573-A(2).[17]  Plaintiff is thus free to limit employment to persons who share Plaintiff's religion and who conform to its religious tenets.[18]

The extent to which the "ministerial exception" would apply to a particular employment action Plaintiff might take is not an issue this Court can or should address.  It is important to note, at the outset, that the provision permitting religious organizations to hire only persons of the same religion and who conform to the organizations' religious tenets applies to all employees, regardless of whether they play sufficiently key roles to qualify for the ministerial exception.  *See, e.g., Our Lady of Guadalupe Sch*., 140 S. Ct. at 2063-65 (discussing factors to be considered in determining whether the exception applies).

The MHRA does not exempt religious organizations from the provisions prohibiting employment discrimination with respect to protected classes other than religion.  It is clear, though, that under binding Supreme Court precedent, the MHRA's employment provisions could not be applied against Plaintiff with respect to employment actions relating to employees whose positions fall within the ministerial exception.  *See Our Lady of Guadalupe Sch*., 140 S. Ct. at 2049; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C*., 565 U.S. 171 (2012).

---

[17] Plaintiff claims that the DOE Commissioner "argued that the exemption for religious employers in section 4553(4) is conditional on refusal to accept public funds under section 4553(10)(G)."  PI Motion, at 15.  This is simply false, and the Commissioner never suggested such a thing.  What she did say is that if a religious school were to accept public funds, it would no longer be able to discriminate on the basis of sexual orientation or gender identity in its hiring practices.  *See, e.g.,* Brief for Appellee at 22–23 in *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020) (No. 19-1746)).

[18] It may be that Plaintiff is implicitly claiming that no person who is not heterosexual, or who is not cis-gender, is capable of conforming with Plaintiff's religious tenets, regardless of how they conduct themselves while attending BCS.  Whether that is true is not a question that this Court can or should decide in evaluating this motion.  If, for example, a homosexual person applies to work at BCS, is rejected, and files a claim or lawsuit, the MHRC and/or a court can decide whether the person was lawfully rejected for not conforming to Plaintiff's religious tenets.

At the same time, it is exceedingly unlikely that some positions at BCS, such as custodian, would qualify for this exemption.  In this facial challenge, the Plaintiff "must establish that no set of circumstances exists under which the [the challenged law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) ("a facial challenge must fail where the statute has a "'plainly legitimate sweep").  Here, where the MHRA can be lawfully applied to at least some of Plaintiff's employees, Plaintiff's facial challenge fails.

### D.  The Prohibitions Against Discrimination Do Not Violate Plaintiff's First Amendment Right to Free Speech.

The applicable MHRA provisions regulate conduct, not speech.  *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc*., 547 U.S. 47, 60 (2006) (upholding against a First Amendment challenge a federal law that denied funding to colleges that prohibited military recruiters because it "regulate[d] conduct, not speech" and did not dictate what colleges may or may not say).  It does not, as Plaintiff claims, "force Plaintiff to stop educating its students from its religious perspective as a condition of participating in the tuition program."  PI Mot., at 18.  Plaintiff is free to teach students as it currently does, regardless of whether it accepts public funds.  It may continue to teach from a biblical perspective and instill its religious values.  The only thing that would change if Plaintiff accepted public funds is that it could not refuse to admit students based on sexual orientation or gender identity.  In other words, the MHRA would restrain Plaintiff from restricting the audience, but would not restrain the message.  There is no interference with the right to free expression.

### II.  The Plaintiff Will Not Suffer Irreparable Harm.

To warrant injunctive relief, the alleged irreparable harm must be more than speculative. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996); *Kelly Servs.,*

*Inc. v. Greene*, 535 F. Supp.2d 180, 188 (D. Me. 2008).  For reasons already discussed, it is purely speculative as to whether Plaintiff would be harmed if Defendants are not enjoined from enforcing the applicable provisions of the MHRA against Plaintiff.  Plaintiff has not yet even applied to participate in the tuitioning program.  And even if it were to participate, there is no evidence suggesting a probability that a member of a protected class would apply for admission or employment, be denied, and file (or that MHRC staff would file) a legal action.  Plaintiff wants essentially an advisory opinion to inform its decision about whether to apply to the tuitioning program, but that is not a valid reason for entering a preliminary injunction (or even for exercising federal court jurisdiction).  And even if the Court were to enjoin Defendants, that would not provide Plaintiff with the assurance it seems to be seeking.  This is because the injunction would not prevent an aggrieved person from filing a legal action.

**III.  The Balance of Equities and the Public Interest Warrant Denying an Injunction.**

Again, because Plaintiff has not applied to participate in the tuitioning program, the extent to which the MHRA applies to Plaintiff is, at this point, hypothetical, and an injunction would not insulate Plaintiff from private claims.  On the other hand, Maine has a compelling interest in the broad application of its anti-discrimination laws, and the public interest would suffer if its efforts to eliminate discrimination were impeded.  The remaining factors thus favor denying injunctive relief.

<u>**Conclusion**</u>

For the reasons set forth above, Defendants respectfully request that Plaintiff's preliminary injunction motion be denied.

Dated:  April 28, 2023             Respectfully submitted,
       Augusta, Maine               AARON M. FREY
                                     Attorney General

s/ Christopher C. Taub_____
Christopher C. Taub
Chief Deputy Attorney General
Sarah A. Forster
Assistant Attorney General
Office of the Attorney General
State House Station 6
Augusta, ME 04333
Telephone: (207) 626-8800
Email: christopher.c.taub@maine.gov
        sarah.forster@maine.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 28th day of April, 2023, I electronically filed the above document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.  To my knowledge, there are no non-registered parties or attorneys participating in this case.

/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Chief Deputy Attorney General
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145
Christopher.C.Taub@maine.gov