# Maine Human Rights Commission

# 51 State House Station, Augusta, ME 04333-0051

*Physical location: 19 Union Street, Augusta, ME 04330*
Phone (207) 624-6290 ▪ Fax (207) 624-8729 ▪ TTY: Maine Relay 711
*www.maine.gov/mhrc*



**Amy M. Sneirson**
EXECUTIVE DIRECTOR

**Barbara Archer Hirsch**
COMMISSION COUNSEL

May 14, 2021

The Honorable Anne Carney, Senate Chair
The Honorable Thom Harnett, House Chair
Joint Standing Committee on Judiciary
100 State House Station
Augusta, ME 04333

  Re:  An Act to Improve Consistency within the Maine Human Rights Act  – LD 1688

Dear Senator Carney, Representative Harnett, and Members of the Joint Standing Committee on Judiciary:

The Maine Human Rights Commission ("Commission") - the quasi-independent, neutral, apolitical State agency[1] charged with enforcing the Maine Human Rights Act, 5 M.R.S. §§ 4551, *et seq*. ("MHRA" or the "Act") - has the duty of: investigating, conciliating, and at times litigating discrimination cases under the MHRA; promulgating rules and regulations to effectuate the MHRA; and making recommendations for further legislation or executive action concerning infringements on human rights in Maine.  5 M.R.S. § 4566(7), (11).

The MHRA has a long and distinguished history, influenced by time and public acceptance of certain protected groups, but its provisions have been amended in a piecemeal fashion.  As a result, the scope of the MHRA's protection varies based on which area of its jurisdiction is invoked:

| Area of Jurisd. | Protected Classes |
|---|---|
| Employment | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, age, and religion, as well as retaliation for engaging in activity protected by the Maine Whistleblowers' Protection Act ("WPA") and for having made a workers' compensation claim against a previous employer. |
| Housing | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, religion, familial status, and receipt of public assistance. |
| Public accommodation | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, and religion. |
| Education | sex, sexual orientation, race, national origin, and physical or mental disability. |
| Extension of Credit | sex, sexual orientation, race, color, national origin, ancestry, physical or mental disability, religion, age, and marital status. |

   While there are some entirely appropriate reasons for these internal inconsistencies,[2] often there is not a logical rationale for them. LD 1703 attempts to update the balance of the MHRA's protections across areas of application so the Act is internally consistent, and more understandable and user-friendly for the public. To that end, the Commission is pleased to provide this testimony in support of LD 1703.

---

[1] The Commission itself is made up of five Commissioners, appointed by the Governor for staggered five-year terms.  By statute, there can be no more than three Commissioners from any political party.  5 M.R.S. § 4561.

[2] For example, the WPA applies only in employment. Even so, tenants often file Commission complaints alleging whistleblower retaliation for reporting unsafe or unlawful housing conditions, which is not covered in housing.

## Section 1

This section, the overall statement of the MHRA's "Policy", would be amended to reflect changes to coverage that are discussed below. Those changes include adding "familial status" protection in employment, updating education protections to include routine protected classes, and adding age to the protected classes covered in public accommodations.[3] We will discuss each in detail below.

Another amendment within this Policy statement makes clear that the Act prohibits discrimination on the basis of both protected class status and perceived protected class status, meaning a person can file a complaint if they are subjected to discrimination because they are in the protected class or because they were perceived to be in the protected class.

- Currently, the MHRA explicitly protects against discrimination based on perceived disability: the definition of "physical or mental disability" includes "being regarded as having or likely to develop" a disability. 5 M.R.S. § 4553-A(1)(D). "Perceived disability" claims are common at the Commission, especially in the employment context: for example, employees who are injured at work are often regarded as disabled even if their injury resolves within six months and they have no remaining restrictions.
- While these are the most common perception claims, they are not the only such claims filed with the Commission, and the Commission has interpreted the MHRA to include other perception-based claim. For example, the Commission has seen a number of claims from individuals alleging they were discriminated against based on their perceived sexual orientation. In these cases, individuals who do not conform to gender stereotypes allege that they are perceived as gay and are harassed or otherwise discriminated against as a result. In one such case, a student was bullied and harassed because his classmates perceived him to be gay; the harassment began as mocking his "man-boobs", making sexual comments, and repeatedly conducting a "gay test" by seeing how long it took him to react to being touched, and eventually escalated to alleged sexual assault.[4]
- The Commission believes it is important to make clear in the statute itself that discrimination on the basis of perceived protected class status is unlawful: otherwise, an individual engaged in blatant discriminatory conduct would be excused if they happened to target someone in error.

## Sections 2, 4 and 5

The MHRA already bars discrimination in housing based on "familial status", which currently is defined as a familial unit containing one or more individuals under the age of 18 and which prohibits housing providers from denying housing to families with minor children. LD 1688 would make two changes to

---

[3] The Policy section also reflects amendments made to the MHRA in 2019 to add a distinct MHRA definition for "gender identity" separate from the definition of "sexual orientation". Gender identity already is protected under the MHRA, but is included in the definition of sexual orientation; this is confusing for two distinct reasons. First, gender identity is not a type of sexual orientation, and should not be defined as such. Second, because the text of the nondiscrimination provisions of the Act (as opposed to the definition section) refers only to sexual orientation, members of the public frequently do not comprehend that gender identity is protected under the MHRA. This word change will make it easier for people to understand what the Act covers and prohibit. The Policy proposal here simply carries that definition forward by changing references to sexual orientation to "sexual orientation or gender identity". This update is applied in many sections of the Bill, including 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, and 16 - 19.

[4] The student's mother (for herself and the student) and the Commission filed suit against the school unit, alleging a hostile educational environment based on sex and perceived sexual orientation. The case eventually resolved. *See Doe et al. v. Brunswick School Department*, Docket No. 15-CV-00257-DBH, U.S. District Court for the District of Maine.

familial-status coverage: (a) expand the definition of familial status to include caring for a dependent adult; and (b) make familial status discrimination unlawful in the employment context as well as housing.

- *Section 2 would amend the definition of "familial status" to include care for a dependent adult*:
    - The proposed change would include in the definition of familial status a familial unit containing "[o]ne or more individuals who lack the ability to meet essential requirements for physical health, safety or self-care because the individual or individuals are unable to receive and evaluate information or make or communicate decisions".
    - This definition was drawn from the definitions section of the Adult Protective Services Act, and uses language which became effective 7/1/19. *See* 22 M.R.S. § 3472(10) ("Incapacitated adult").
    - This change is intended to reflect the reality of today's families, which often include not only minor children, but elderly or incapacitated adults who require assistance from family members. This is particularly true in Maine, with the oldest population in the country.
    - A person's need to care for dependent family members should not be used as a reason to deny them access to housing or employment, whether that care is required for a child or incapacitated adult.

- *Sections 4 and 5 would add "familial status" to the protected classes in employment*:
    - This change would prohibit employers from discriminating based on an employee's need to care for dependent family members, whether those are children or adults. This is not intended to create a new type of leave for workers[5], but rather is intended to stop employers from making stereotypical assumptions about employees with family care obligations.
    - An employer would <u>not</u> be required to excuse an employee from their work responsibilities; if an employee is unable to perform their work because of family responsibilities, they would still be subject to the employer's usual disciplinary process. The employer would not, however, be able to (for example) refuse to hire an applicant who lives with their disabled sibling based on the assumption that the applicant would need time off from work to care for their family member.
    - Again, this change is intended to reflect the reality of today's families, where employees are often responsible for minor children and incapacitated or elderly adults.

- The Commission notes that these changes are not a substantial change to the scope of the MHRA, but rather a change in terminology and an effort to make the Act clearer.
    - Whether in employment or housing, the sort of discrimination covered under "familial status" might also be alleged as discrimination based on association with an individual with a disability. The Commission purposely chose the definition of "incapacitated adult" rather than "dependent adult" in an effort to balance the rights of caretakers and families against the rights of employers and housing providers. *Compare* 22 M.R.S. § 3472(10) *with* § 3472(6).
    - As for employment discrimination on the basis of having minor children, many potential claims could already be covered based on sex (disparate impact claims: claims that neutral policies have the effect of discriminating on the basis of protected class) or age (association with minor child).

## Section 6

In 2019, the MHRA was updated in several places, both via agency bills that the Commission introduced and via other proposals. One of the changes made in a Commission agency bill was the removal of

---

[5] With the federal Family and Medical Leave Act and its Maine counterpart already protecting employees who need time away from work to care for a newborn child or a sick family member, and this Legislature's action in 2019 requiring employers to provide earned paid leave, it would be understandable (but incorrect) for employers to warily view the proposal in LD 1688 as another attempt to build employee leave requirements.

5 M.R.S. § 4573-A(1-B), which had provided that employers did not have to employ individuals with disabilities who could not travel to and from and/or remain at the workplace.[6] The Commission initiated this amendment related to clarify a ruling by the Maine Supreme Judicial Court, sitting as the Law Court, that the statutory section in question meant that a leave of absence was not a potential reasonable accommodation for individuals with disabilities. *See Carnicella v. Mercy Hospital,* 2017 ME 161. The *Carnicella* decision, which arose in a case where an employee sought indefinite leave from employment, was inconsistent with the MHRA's protections, the Commission's longstanding interpretation of the MHRA that temporary or finite leave *could* be a reasonable accommodation, and the ADA. At the Commission's behest, the Legislature removed 5 M.R.S. § 4573-A(1-B) from the MHRA.

Unfortunately, the removal of § 4573-A(1-B) in its entirety had the unintended consequence of casting doubt on the continued existence of the employer's so-called "safety defense" that arose from the removed section. The removed language had been interpreted to permit employers not to hire/retain disabled individuals if the employer proved that the individual caused a risk to the health and safety of themselves or others. Because of this uncertainty, the Commission has proposed reinserting language spelling out the contours of the safety defense in the statute. This will promote clarity and consistency of interpretation of the MHRA.

### Sections 12-14

Places of public accommodation are privately- or publicly-owned places, privileges or services that are offered or open to the public. The MHRA currently does not prohibit discrimination on the basis of age in places of public accommodation, and there is no logical rationale for excluding people based on age from Maine's publicly-offered spaces, privileges, and services. The Commission believes that it is important to add this coverage, both to make the MHRA more consistently applicable throughout the State and to address an issue that is important to Maine's aging population. In 2019, 21.9% of Mainers were age 65 or older, and Maine had the largest share of population in that age group in the country. *See* https://www.census.gov/newsroom/press-releases/2020/65-older-population-grows.html. Maine continues to have the highest median age (44.7 years old) in the country. *See* https://worldpopulationreview.com/en/state-rankings/median-age-by-state.

### Section 15

Another 2019 update to the MHRA confirmed the Commission's longstanding interpretation that the MHRA bars discrimination because of a person's association with another person who is in a protected class by amending the 5 M.R.S. § 4553(1-D) definition of an "aggrieved person" who could bring a MHRA claim, and the proposal in Section 15 would update references in the Act's public accommodation section to reflect that.

---

[6] Under the framework of disability employment laws, a person with a disability is allowed to request that their employer change how a policy is applied if necessary because of the employee's disability, which leads to an interactive dialogue between employer and employee about the request, its reasonableness, and its relationship to the employee's disability. The Commission always has interpreted the MHRA to acknowledged that a *temporary* leave of absence can be a reasonable accommodation that allows an employee with a disability to address a disability issue and then to return to work. This is consistent not only with the purpose of the MHRA, but with other state law (such as the Maine Family Medical Leave Act) and federal employment laws like the federal Family and Medical Leave Act and the Americans with Disabilities Act ("ADA"). Whether *open-ended* leave can be a reasonable accommodation is another question altogether, and the Commission, again consistent with state and federal law. has repeatedly held that indefinite leave is not a reasonable accommodation.

This aligns with the Commission's longstanding interpretation of the MHRA coverage as including associational claims, an interpretation upheld by courts reviewing MHRA actions.[7] There are circumstances when a person who is not themselves in a protected class is targeted for discrimination in a place of public accommodation because they are associated with someone who is in a protected class. Some examples could include a person who is denied service at a restaurant because someone else in their party has a service animal, or a family which was turned away from staying at a hotel because the mother wore a hijab. The discrimination still occurs **because of** the protected class, so the 2019 amendment to the "aggrieved person" definition and the proposed amendment to the MHRA in Section 15 allow the associated person who also was impacted by the discrimination to bring a claim related to it.

The proposal in this section would simply make clear to all reading the Act that the Commission's interpretation applies in places of public accommodation.

### Section 19

The MHRA's current education coverage is woefully out of date, and inconsistent with the rest of the Act. The Act's education provisions currently prohibit discrimination on the basis of race (but not color), national origin (but not ancestry), sex and sexual orientation, and physical or mental disability. This is confusing for at least two reasons.

First, there is no reason to cover race and national origin, but not color and ancestry. These most likely were simply drafting oversights due to the piecemeal amendment process mentioned above.

Second, most Maine educational institutions are also covered as places of public accommodation[8], as the MHRA specifically includes a "nursery, elementary, secondary, undergraduate or postgraduate school or other place of education" and an "establishment of the State" in its "public accommodation" definition. As public accommodations schools also are prohibited from discriminating on the basis of color, ancestry and religion.[9] Because those prohibitions are not currently made explicit in the education provisions of the Act, however, students, parents, and schools may not know of this coverage.

This proposed change would make the Act clearer and more consistent.

### Sections 20-21

In 2019, the Legislature added a new subsection to 5 M.R.S. § 4612 which spelled out the Executive Director's previously implicit (although found in the Commission's rules) authority to administratively dismiss certain claims without the need for investigations, such as cases falling outside the Commission's limited jurisdiction, or cases in which the complaining party refuses to cooperate with the Commission's process. One

---

[7] For example, in May 2017, the Commission prevailed in litigation establishing that both a Caucasian woman and an African American man were discriminated against based on race when they were denied the opportunity to rent housing once the housing provider learned of the man's race by observing and speaking with their biracial children. *Maine Human Rights Commission et al. v. Megunticook Management and Realty Corp.*, KEN-CV-15-135 (Me. Super. Ct. Ken. Cty., May 15, 2017)(*Murphy, J*).

[8] Schools are also covered as employers, but this aspect appears to the Commission to be fully understood both by schools and by their employees.

[9] The MHRA specifically excludes from its definition of "educational institution" single-sex schools. See 5 M.R.S. § 4553(2-A). It also provides that the sexual orientation protections in education do not apply to education facilities owned, controlled or operated by a bona fide religious corporation, association or society. Id. at § 4602(4).

such reason for administrative dismissal is failure to file a claim within the Commission's 300-day statute of limitations.  *See* 5 M.R.S. § 4612(2-A)(C).  We have since learned that this change created some confusion with regard to the award of attorneys' fees and costs in subsequent court cases.  The Act provides that attorneys' fees are available only if the plaintiff establishes that they had previously filed a complaint with the Commission, which had taken on of several specific enumerated actions on their complaint; the changes to the Act in 2019 added administrative dismissal to that list of actions.  *See id.* at § 4622(1)(A).  The Commission did not intend to amend the act to allow the award of attorneys' fees to individuals who had failed to timely file their Commission complaint.  This result would leave complaining parties with no incentive to file a timely complaint with the Commission, since the failure to do so would have no consequence in court.  It would also undermine the Commission's function of screening and evaluating cases before litigation is initiated, which is intended to easy the burden on Maine's courts.  This revision addresses any misunderstanding about the impact of an administrative dismissal for failure to timely file with the Commission.

### Section 22

A 2019 amendment of the MHRA revised wording about pregnancy to be gender-neutral, so that the reference is to a pregnant person rather than to a pregnant woman. This change was made in recognition of the fact that individuals whose gender is male or nonbinary can be pregnant. The proposal in Section 22 related to the right of a person to breast-feed wherever they may lawfully be reflects that wording update.

### Conclusion

Thank you for this opportunity to provide testimony in support of LD 1688.  The Commission takes seriously its duty to protect the people of Maine from discrimination, and its duty to safeguard the MHRA itself, and approaches these substantive amendments after much consideration. We greatly appreciate the Committee's attention at this late date in the session, and would be pleased to discuss these issues with you at your convenience, including at the work session on this matter.

Sincerely,

*Amy M. Sneirson*

Amy M. Sneirson, Executive Director

*Barbara Archer Hirsch*

Barbara Archer Hirsch, Commission Counsel