UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CROSSPOINT CHURCH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action 1:23-cv-00146-JAW |
| | ) |
| A. PENDER MAKIN, in her official capacity as Commissioner of the Maine Department of Education, and JEFFERSON ASHBY, EDWARD DAVID, JULIE ANN O'BRIEN, MARK WALKER, and THOMAS DOUGLAS, in their official capacities as Commissioners of the Maine Human Rights Commission, | ) |
| | ) |
| Defendants. | ) |

**BRIEF OF AMICI CURIAE THE AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL LIBERTIES UNION OF MAINE IN SUPPORT OF DEFENDANTS**

Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Maine offer this brief in support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction, in the hope that it will assist the Court in resolving the questions presented by this case.

**STATEMENT OF INTEREST**

The American Civil Liberties Union of Maine ("ACLU of Maine"), and its national organization, the American Civil Liberties Union ("ACLU"), advocate for First Amendment liberties as well as for equal rights. They have worked on behalf of their members to support the enactment and enforcement of nondiscrimination laws that do not interfere with the First Amendment rights of individuals or organizations, and they have a strong interest in the

application of the proper standards when evaluating constitutional challenges to civil rights laws. ACLU of Maine supported P.L. 2021, Ch. 366—the statute being challenged in this matter—after carefully analyzing it and finding that it represents a workable model for ensuring the general applicability of neutral nondiscrimination laws in a manner that does not interfere with the freedoms of speech, religion, or association guaranteed to all Americans under the First Amendment.

## INTRODUCTION

The proper question before the Court is whether a private school that chooses to participate in a state-funded education program must comply with the same state regulations as all other program participants, including the state's neutral and generally applicable nondiscrimination laws. Plaintiff Crosspoint Church ("Crosspoint") operates Bangor Christian School, which openly discriminates against students on the basis of their faith, sexual orientation, and gender identity because it deems these students' identities and beliefs inconsistent with its own religious beliefs. *See* Complaint, ¶¶ 28-41. There is no dispute that Crosspoint may continue to operate under these discriminatory policies. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987) (exempting religious entities from nondiscrimination laws serves to "alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions"). Nor, after recent litigation, is there any dispute that Crosspoint may elect to receive public funds by participating in the state's tuitioning program. *See Carson v. Makin*, 1:18-cv-327-JAW (D. Me. April 18, 2023) (judgment permanently enjoining enforcement of 20-A M.R.S. §2951(2)).

But Crosspoint seeks more than what is authorized by Maine law or the Constitution: to elect to obtain all the public funding and other benefits of participating in the state's programs,

2

while at the same time securing a special exemption from the state's generally applicable anti-discrimination laws. Maine's public funding of certain private schools through its tuitioning program was designed to provide an education for Maine students consistent with the state's interests. Those interests include ensuring that students in publicly funded schools receive a baseline education, and therefore schools participating in the state tuitioning program must teach specific courses from a government-approved curriculum. *See* 20-A M.R.S. § 2902. The state's interests also include eliminating discrimination on the basis of religion, sexual orientation, and gender identity and expression to ensure that publicly funded schools are open to all students. These are compelling state interests. As the U.S. Supreme Court observed, "education is perhaps the most important function of state and local governments. . . [and], it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954).

Maine's nondiscrimination laws apply only to entities—businesses, schools, places of public accommodation—that educate and serve the public, under the principle that freely choosing to participate in the public life of the state carries with it the obligation to play by the same rules as everyone else. And, the precise anti-discrimination provisions at issue here, Maine's prohibitions on educational discrimination, apply only to educational institutions that receive public funds—either as traditional public schools or as private schools receiving public funding through the state's tuitioning program. Crosspoint is free to continue to operate as it has in the past, without accepting public funding through the state's tuitioning program and not subject to Maine's anti-discrimination law. But Crosspoint now seeks to have it both ways: receive state funding, but without the conditions that attach to such funding for every other recipient. While Crosspoint argues that single-sex schools are also exempt from some provisions

of the Maine Human Rights Act, they ignore the crucial fact that there are no such schools: no single-sex schools are approved to participate in the tuitioning program.[1] At bottom, Crosspoint asks this Court to grant it an extraordinary right: a constitutional right to openly discriminate against and exclude students from publicly funded education based on their identity. That constitutional right has never been recognized by any court, and this Court should not be the first.

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Bruns v. Mayhew*, 931 F. Supp. 2d 260, 266 (D. Me. 2013).[2] "The purpose of a preliminary injunction is to preserve the status quo," not to play havoc with it. *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). The Court should decline Crosspoint's request to disrupt the status quo in this way.

I. **Crosspoint Is Unlikely to Succeed on the Merits of Its Novel Claim That It Has a Constitutional Right To Discriminate, in Violation of the Maine Human Rights Act.**

Crosspoint is not likely to succeed on its novel claim that it has a constitutional right to exclude students from a publicly funded school on the basis of students' religion, sexual orientation, and gender identity, for at least two independent reasons. **First**, the Maine Human Rights Act does not target participating schools' beliefs or expression, but instead applies to their conduct of excluding students because of their identity. The "First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens"—indeed, "[t]hat is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). And to the extent the Act's

---

[1] Not a single one of the schools approved for Maine's tuitioning program are single-sex institutions. *See* Maine Department of Education, 2022-23, "Private School In-State / Out-of-State - Approved Schools & Tuition Rates," https://www.maine.gov/doe/funding/reports/tuition.
[2] Unless otherwise indicated, all emphasis is added and all internal citations are omitted.

regulation of discriminatory conduct by participating schools may impose incidental burdens on the schools' expression, that regulation is no broader than necessary to advance the important governmental interest in nondiscrimination in publicly funded education.

**Second**, the Act, including the recent amendments to the Act contained in P.L. 2021, Ch. 366, § 19, is a neutral law of general applicability, and labeling these amendments a "poison pill" (Complaint, ¶74, *et seq*.) does not change the analysis. For decades, Maine's nondiscrimination provisions have applied broadly to all educational institutions receiving public funds. Indeed, since 2005—well over a decade before the most recent amendments to the Maine Human Rights Act—the "Definitions" section of the Act has included an exemption for religious organizations "that do[] not receive public funds," language virtually identical to the recently amended exemption. *See* 5 M.R.S. § 4553(10)(G) (eff. 2005). The recent amendments are not an effort to target Crosspoint or any other religious school. Instead, these amendments simply maintain the status quo: that the Maine Human Rights Act broadly prohibits discrimination in publicly funded education, but does not apply to religious institutions that do not receive state public funds.

> A.  **The Maine Human Rights Act Properly Regulates Crosspoint's Conduct, Not Expression, in Furtherance of the Compelling Government Interest in Preventing Discrimination in Publicly Funded Education.**

If Maine were to adopt a law targeting Crosspoint's beliefs, that would indeed raise important free speech and free exercise concerns. It is undisputed that the First Amendment does not allow the government to deny participation in a government funding program based on viewpoint. *Cf. Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).

But, that is not what the Maine Human Rights Act does. Instead, the Act provides that, if a school or business or place of public accommodation decides to serve the public, it cannot exclude certain members of the public based on protected characteristics including race, sex,

5

religion, sexual orientation, and gender identity. Crosspoint can continue to operate as it always has—as a private entity that excludes people because of their religion, sexual orientation, or gender identity. But it cannot use the Free Speech and Free Exercise Clauses as a tool to transform Maine's public education system into one that supports and endorses that discrimination.

At issue here is the Act's regulation of a participating schools' actions, rather than government targeting of participating schools' beliefs or expression. Crosspoint seeks not merely to express its beliefs, but to exclude from the school students whose identity Crosspoint deems inconsistent with those beliefs. Crosspoint's Code of Conduct prohibits students from "engaging in. . . sexual activity outside of marriage" between a man and a woman, or "identifying as a gender other than their biological sex." Complaint ¶37. Crosspoint is clear that students who do not comply with this Code are "subject to removal from the school." Complaint ¶35; *see also* ¶¶29-31 (admissions policy and criteria).[3] Crosspoint makes no effort to hide its discriminatory conduct. In its own words, it does not simply want to "teach from its religious perspective;" it also wants to "requir[e] parents and students to agree with BCS's religious beliefs" and "requir[e] students to adhere to [its] code of conduct." Crosspoint Motion at 6.

Because the Maine Human Rights Act regulates Crosspoint's discriminatory actions, rather than targeting its beliefs or expression, the proper governing test under the Free Speech Clause is whether the government regulation "furthers an important or substantial governmental interest," whether that interest is "unrelated to the suppression" of expression or belief, and whether the "incidental restriction" on First Amendment freedom is "no greater than necessary to

---

[3] Notably, Crosspoint's admissions policy states that it does not discriminate on the basis of certain listed protected categories, but does not include sexual orientation, gender identity, or religion in that list. Complaint ¶29.

the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968) (applying standard in context of First Amendment free speech claim); *Sorrell*, 564 U.S. at 567. The Act easily satisfies each of these requirements.[4]

> 1. *Maine has an important interest in preventing discrimination in publicly funded education, unrelated to the suppression of expression or belief.*

The Maine Human Rights Act furthers an important state interest in prohibiting discrimination in publicly funded schools. It is well established that eliminating discrimination in education is a government interest of the utmost importance. *See Bob Jones Univ. v. U.S.*, 461 U.S. 574, 604 (1983) ("[T]he government has a fundamental, overriding interest in eradicating racial discrimination in education."); *Norwood v. Harrison*, 413 U.S. 455, 469 (1973) (holding that Mississippi could not give textbooks to students attending racially segregated private schools because "discriminatory treatment exerts a pervasive influence on the entire educational process" and finding that "the Constitution . . . places no value on discrimination as it does on the values inherent in the Free Exercise Clause.").

The use of government-funded education to demand adherence to religious beliefs from people who do not share those beliefs constitutes an inexcusably tragic part of this nation's history. In the 19th and 20th centuries, entire generations of Indigenous children were removed from their families by the government and placed in white, Christian boarding schools and homes. *See* Raymond Cross, *American Indian Education: The Terror of History and the Nation's Debt to the Indian Peoples*, 21 U. Ark. Little Rock L. Rev. 941, 957 (1999). Clergy serving as teachers and administrators in those schools prohibited Indian children from observing and

---

[4] Under the Free Exercise Clause, "valid and neutral laws of general applicability" like the Maine Human Rights Act are subject to an even lower standard of review. *See Employment Div., Dept. of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990) Here, because the state satisfies the more stringent standard under *O'Brien*, it also easily satisfies the *Smith* standard.

practicing their own native religions and cultures. *See Indian Child Welfare Program: Hearings before the Subcomm. on Indian Affairs of the S. Comm. On Interior and Insular Affairs*, 93rd Cong. 131 (1974) (statement of Sen. Abourezk). The decision whether to permit any government-funded school or education program to use state resources to discriminate against people with differing religious values or to impose particular religious values on non-adherents of those values must take into account this shameful history.

Moreover, because Section 4602 bars discrimination on the basis of sexual orientation and other protected characteristics, regardless of the school's reasons for discriminating, the challenged statute is not targeted at religion. And the mere fact that Crosspoint's discriminatory conduct may reflect religious views does not mean that Maine's anti-discrimination policies are themselves viewpoint-based. *See, e.g.*, *Christian Legal Society v. Martinez*, 551 U.S. 661, 696 (2010) ("Even if a regulation has a differential impact on groups wishing to enforce exclusionary membership policies, '[w]here the [State] does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.'" (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 390 (1992)); *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 763 (1994) ("[T]hat the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based[.]"); *Rosenberger*, 515 U.S. at 893 ("whether a distinction is based on viewpoint does not turn simply on whether a government regulation happens to be applied to a speaker who seeks to advance a particular viewpoint; the issue, of course, turns on whether the burden on speech is explained by reference to viewpoint.").

Maine has a substantial interest in ensuring that publicly funded education is free from discrimination; that interest is unrelated to suppressing Crosspoint's ideas or beliefs. The

8

exemption Crosspoint seeks to create would severely undermine the state's efforts to serve its important and longstanding goal of equality in education. Indeed, under Crosspoint's reasoning, it is difficult to see how any religious school would be subject to any curriculum requirement or nondiscrimination rule that arguably conflicts with its religious belief—even if, for example, a publicly funded school chose to exclude Black students or students with certain national origins, based on the school's white supremacist religious beliefs.

> 2. *The "incidental restrictions" created by Section 4602 are no greater than necessary to advance Maine's interest in preventing discrimination in publicly funded education.*

Any incidental restrictions that the Maine Human Rights Act imposes on Crosspoint's First Amendment freedoms are no greater than necessary to serve the state's important state interest in preventing discrimination in education. Maine's prohibition on discrimination in publicly funded education "is not a means to some greater end, but an end in itself . . . [It is] the bare minimum necessary to achieve the State's purpose." *Barnes v. Glen Theatre*, 501 U.S. 560, 572 (1991) (finding statute limiting certain form of expression was narrowly tailored). Any restrictions on free speech or free exercise created by 5 M.R.S. § 4602 are, therefore, no more than what is necessary to achieve Maine's aims.

Notably, Crosspoint relies on *Rosenberger* to assert that its speech is restricted by Section 4602. *See* Crosspoint Motion at 18. In that case, the groups receiving government funding were required to "pledge not to discriminate in [their] membership." *Rosenberger*, 515 U.S. at 823. The *Rosenberger* plaintiffs did not challenge that requirement, and the Court did not find it noteworthy or suggest that the anti-discrimination requirement impeded the groups' speech in any meaningful way. *Rosenberger*, therefore, only undermines Crosspoint's position. Because Maine's anti-discrimination statute does no more than is necessary to preserve the state's

9

substantial interest in public education free from discrimination, it does not violate Crosspoint's entitlement to free speech or free exercise.

Crosspoint's arguments in this case are remarkably broad. The logical implication of Crosspoint's theory in this case is not simply an exemption from nondiscrimination laws, but the effective elimination of such laws altogether. Religious entities could assert a right under the Free Exercise Clause to be exempt from any non-discrimination protection that violates their religious beliefs, while any entity—religious or not—would be able to claim the legal authority, under the Free Speech Clause, to exclude members of the public based on religion, race, color, national origin, disability, sex, sexual orientation, or gender identity so long as the group articulated some way in which their ideology might be impaired by requiring compliance with a nondiscrimination rule. The state and federal nondiscrimination laws that millions of Americans have depended on for decades would lose all force.

> **B. The Maine Human Rights Act's Prohibitions on Discrimination Are Neutral and Generally Applicable to All Schools that Receive Public Funding, Whether Those Schools Are Religious or Not.**

Federal courts have repeatedly held that religious entities and individuals may be subjected to neutral nondiscrimination laws that are necessary to protect the public from discrimination, and that these neutral nondiscrimination provisions do not offend free speech or free exercise principles. *See, e.g., Teen Ranch, Inc. v. Udow*, 479 F.3d 403, 410–12 (6th Cir. 2007) (rejecting faith-based youth-services organization's free exercise and free speech claims, holding that organization was not entitled to continue contract with state where organization insisted on subjecting youth in their care to religious instruction in contravention to state policy barring funding for such activity).

10

The Maine Human Rights Act's protections against educational discrimination are neutral with regard to religion. For decades, the Act has applied broadly to "any" educational institution that receives public funding—both traditional "public" schools, and "private" schools that receive public funding through the state's tuitioning program. 5 M.R.S. §4553(2-A). Likewise, the Act is generally applicable: it applies to "any" publicly funded school or educational program, *see id.*, and it does not vest any government body with the power to exempt certain programs but not others. *Cf. Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1879 (2021) ("The creation of a formal mechanism for granting exceptions renders a policy not generally applicable"); *Does 1-6 v. Mills*, 16 F.4th 20, 30 (1st Cir. 2021) (upholding vaccination rule for healthcare workers where the rule did "not require the state government to exercise discretion in evaluating individual requests for exemptions"), *cert. denied sub nom. Does 1-3 v. Mills,* 212 L. Ed. 2d 9, 142 S. Ct. 1112 (2022). Crosspoint makes much of the fact that the Act's defines "educational institution" to include "any private school. . . approved for tuition purposes if both male and female students are admitted," which can be read to exempt single-sex private schools. 5 M.R.S. §4553(2-A). But they ignore two critical facts: that there are no single-sex schools that receive public funding for tuition purposes, and no court has ever interpreted section 4553(2-A) to permit discrimination by single-sex schools.

There is, therefore, no evidence here of "unequal treatment" of Crosspoint or the imposition of any "special disabilities on the basis of religious. . . status." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019-20 (2017). Crosspoint is merely being asked to follow the same governmental rules that apply to every other publicly-funded school in Maine—a rule that is grounded in secular, not religious, concerns. Nothing about this requirement offends the guarantee of free speech or free religious exercise. Crosspoint would

like special treatment because of its religious status. It seeks a license to openly discriminate in its provision of publicly funded education, something that no other publicly funded educational institution in the state is permitted to do. The First Amendment protects Crosspoint's free exercise and expression, but it does not elevate Crosspoint's rights above all others simply because of its religious status.

### C. Maine's Long History of Enacting and Enforcing Its Generally Applicable Nondiscrimination Laws Belies Plaintiff's "Poison Pill" Theory.

Crosspoint accuses Maine of altering the language of the Section 4602 exemption based on animus or hostility towards Crosspoint's religious beliefs. Complaint, ¶3, *et seq*. There is a much simpler explanation: this amendment was necessary to retain the status quo that the Maine Human Rights Act's anti-discrimination provisions broadly apply to the state's publicly funded educational institutions.

As noted above, for decades, the Act's educational discrimination provisions have applied broadly to "any" educational institution that receives public funding—both traditional "public" schools, and "private" schools that receive public funding through the state's tuitioning program. 5 M.R.S. §4553(2-A). In addition, for the 15 years preceding *Carson*, the Act's express protections against sexual orientation discrimination in education applied broadly to any educational institution as defined by the Act but also applied a narrow exemption for religious schools—educational institutions operated "by a bona fide religious corporation, association or society." 5 M.R.S. §4602(4) (eff. May 30, 2006 to Oct. 17, 2021). Throughout this period, there was no need for the Section 4602 exemption for religious schools to say anything about whether the exempted religious schools received public funding because Maine did not permit religious schools to receive public funds through its tuitioning program. Maine's longstanding decision not to permit religious schools to participate in its tuitioning program was regarded as constitutional

by every state and federal court to review the program over the course of more than two decades, until the Supreme Court issued its decision last year in *Carson*. Until *Carson*, there was no need for the Section 4602 exemption to distinguish between "religious schools" and "religious schools that do not receive public funding," because these were identical categories.

With the Supreme Court's decision in *Carson*, that changed. Section 4602's exemption for religious schools was no longer identical to an exemption for religious schools that do not receive public funding, because religious schools were now eligible to receive public funding through the state's tuitioning program. Anticipating the *Carson* decision, the Maine Legislature amended the Maine Human Rights Act to ensure that it would continue to broadly prohibit sexual orientation discrimination in government-funded schools, just as it had for well over a decade. 5 M.R.S. §4602(5)(C) (eff. Oct. 18, 2021) (replacing the prior exemption for religious institutions with an exemption for a "religious" institution "that does not receive public funding"). This alteration to the statutory language simply preserved the generally applicable nondiscrimination protections that have long applied to Maine schools relying on public funding, whether those schools are religious or not.

A provision of the Maine Human Rights Act not cited anywhere in Crosspoint's motion—5 M.R.S. §4553(10)(G)—confirms that the recent Section 4602 amendment was not a change in course but merely a confirmation of longstanding policy. Section 4553(10)(G), which has been in effect in virtually the same form since its enactment in 2005, defines the term "Unlawful Discrimination" to include:

> Discrimination in … educational opportunity on the basis of sexual orientation or gender identity, except that a religious corporation, association or organization that does not receive public funds is exempt from this provision with respect to: … (3) Educational opportunity.

Thus, the longstanding Section 4553(10)(G) definition includes an exemption for religious organizations "that do[] not receive public funds," language virtually identical to the recently amended Section 4602 exemption. This exemption—in effect for well over a decade before *Carson*— confirms that the recent amendment to the Section 4602 exemption was not a shift in the Maine Human Right Act's coverage. Nor was it an effort to target or single out Crosspoint or any other religious school. Instead, it was a clarification to ensure consistency among the MHRA's provisions and confirm that Section 4602, like Section 4553, broadly prohibits sexual orientation discrimination in publicly funded education.

Throughout the decades, the state has been remarkably consistent in its position that Maine's neutral, generally applicable nondiscrimination laws apply to schools that receive public funding. *See Brief of Appellee State of Maine, Eulitt ex rel. Eulitt v. Maine Dep't of Educ.*, 2004 WL 5862608 (1st Cir. 2004), 34 (observing that religious schools can lawfully discriminate in favor of those of their own religion, and that Maine has an interest in not funding that discrimination); *Brief of Appellee State of Maine, Carson v. Makin*, 2019 WL 5692831 (1st Cir. 2019), 39 (arguing that Maine is not hostile to religion but seeks to eradicate discrimination and intolerance and has structured its non-discrimination laws to further those interests).

The consistency of Maine's position stands in contrast to the less-consistent position taken by the U.S. Supreme Court on public funding for religious schools over the past forty years. The Supreme Court has announced that the Establishment clause "absolutely" prohibits government-financed education of private religious beliefs, *see Sch. Dist. of City of Grand Rapids v. Ball*, 473 U.S. 373, 385 (1985). And, it has held that the Establishment clause permits public funding of religious education via school vouchers, *see Zelman v. Simmons-Harris*, 536 U.S. 639, 653 (2002), but does not require such funding when the state has a legitimate

14

antiestablishment interest, *see Locke v. Davey*, 540 U.S. 712, 720-22 (2004). And, more recently, it has reversed course, ruling that there is no such thing as a legitimate state antiestablishment interest, *Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246, 2260 (2020), and, that public funding of private religious education was now required under the Free Exercise Clause in some circumstances. *See Carson v. Makin*, 142 S.Ct. 1987, 1998 (2022).

Crosspoint now asserts, in the wake of *Carson*, that it was always unconstitutional for Maine to exclude religious schools from the tuitioning program. *See* Complaint, ¶1. But in crafting and amending the Maine Human Rights Act over the decades, the Legislature reasonably looked to the decisions of the Maine Superior Court, the Maine Supreme Judicial Court, this Court, and the First Circuit Court of Appeals—all of which upheld Maine's exclusion of religious schools from the tuitioning program. *Bagley v. Raymond Sch. Dept.*, 1999 ME 60, 728 A.2d 127; *Anderson v. Town of Durham*, 2006 ME 39, 895 A.2d 944; *Strout v. Comm'r, Maine Dept. of Educ.*, 13 F. Supp. 2d 112 (D. Me. 1998), *aff'd sub nom. Strout v. Albanese*, 178 F.3d 57 (1st Cir. 1999); *Eulitt v. Maine Dept. of Educ.*, 307 F. Supp. 2d 158 (D. Me. 2004), *aff'd on other grounds sub nom. Eulitt ex rel. Eulitt v. Maine, Dept. of Educ.*, 386 F.3d 344 (1st Cir. 2004). When it appeared possible that the Supreme Court would alter the legal landscape to permit religious schools like Crosspoint's Bangor Christian School to receive public funding through Maine's tuitioning program, the Legislature reasonably acted to amend the Section 4602 exemption to clarify that it meant what it has said for decades: publicly funded schools must abide by the educational nondiscrimination provisions, whether those schools are religious or not.

II.     **Denying Preliminary Injunctive Relief Serves the Public Interest.**

Eliminating discrimination—in employment, education, and other contexts—has long been recognized as a "compelling state interest[] of the highest order." *Roberts v. U.S. Jaycees*,

468 U.S. 609, 624 (1984). That includes discrimination that happens to be motivated by religious beliefs. *See, e.g.*, *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983); *Jews for Jesus v. Jewish Cmty. Relations Council of N.Y.*, 968 F.2d 286, 295 (2d Cir. 1992). This compelling interest is particularly powerful when the government is asked to subsidize discriminatory practices, for "the Constitution does not permit the State to aid discrimination" by private entities. *Norwood*, 413 U.S. at 465–66; *see also Ams. United for Separation of Church & State v. Prison Fellowship Ministries*, 509 F.3d 406, 425 (8th Cir. 2007) (holding that state funding of privately operated prison rehabilitation program was unconstitutional partly because program's operators required prospective participants to meet a religious test to enroll). When considering whether to grant a preliminary injunction, courts consider "whether the public interest might be . . . *injured* by an injunction." *Mclaughlin v. Boston Sch. Comm.*, 938 F.Supp. 1001, 1017 (D. Mass. 1996) (emphasis in original).

      Here, Maine's interest in preventing discrimination, particularly in publicly funded institutions, is expressed throughout Maine law. "[T]he policy of this State" is "to prevent discrimination in employment, housing, or access to public accommodations on account of race, color, sex, sexual orientation, physical or mental disability, religion, ancestry or national origin[.]" 5 M.R.S. § 4552. And Maine law specifically prohibits private schools that are approved to receive state-funded tuition payments from discriminating against any student on the basis of race, national origin, disability, or sex (including pregnancy, marital status, or family status). *See* 5 M.R.S. §§ 4553(2-A), 4601, 4602; *see also Doe v. Regional Sch. Unit 26*, 2014 ME 11, ¶ 22, 86 A.3d 600, 606 (holding that a school's decision to ban a transgender student from the girls' bathroom qualified as forbidden discrimination on the basis of gender).

Although the public's interest in equality of opportunity is always strong, it is at its strongest in publicly funded k-12 education—precisely the education Crosspoint now seeks to offer. This Court has expressly recognized that "the public school remains a most important public resource in the training and development of youth for citizenship and individual fulfillment." *Sheck v. Baileyville Sch. Comm.*, 530 F.Supp. 679, 684 (D. Me. 1982). The Supreme Court, too, has long recognized how schools can promote our fundamental democratic values. Over sixty years ago, the Court recognized that public education is "the very foundation of good citizenship" and "a principal instrument in awakening the child to cultural values." *Brown*, 347 U.S. at 493. Last term, the Supreme Court re-emphasized that in our schools "learning how to tolerate speech . . . of all kinds is part of learning how to live in a pluralistic society, a trait of character essential to a tolerant citizenry." *Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2430 (2022). It is critical that publicly funded schools provide equal access to educational opportunity, so that children from all backgrounds and walks of life can reach their full potential. Furthermore, preventing discrimination in education exposes students to classmates with diverse identities, ideas, and backgrounds, and this exposure enables students to better engage in our diverse society and build empathy and understanding for those who have different experiences and histories than their own. The public's interest in equality of opportunity is severely undermined by exempting Crosspoint from Maine's nondiscrimination laws.[5]

For over fifty years, the Maine Human Rights Act and federal and state protections like it have sought to make our publicly funded schools the "very foundation of good citizenship"

---

[5] By contrast, no state interest in preventing aid to discrimination was at issue in *Trinity Lutheran* because the preschool there did not discriminate based on religion in admissions and even allowed children not enrolled in the school to use its playground. *See* 137 S. Ct. at 2017-18. Similarly, the school-voucher program that survived an Establishment Clause challenge in *Zelman v. Simmons-Harris* prohibited participating schools from discriminating based on religion. *See* 536 U.S. 639, 645 (2002).

envisioned by the Supreme Court in *Brown*. Maine has not always lived up to that promise, but over the years Maine—like the country at large—has steadily worked toward a more inclusive education for our all. Granting Crosspoint's motion would set these efforts back. If this Court were to adopt Crosspoint's novel arguments, there appears to be no logical stopping point: Crosspoint, and countless other institutions like it, could claim a constitutional right to discriminate in the education they provide even as they accept public funds to support that education.

## Conclusion

For these reasons, amici curiae urge the Court to deny Plaintiff's Motion for a Preliminary Injunction.

Respectfully submitted,
this 2nd day of May, 2023,

/s/ Carol J. Garvan
Carol J. Garvan
/s/ Zachary L. Heiden
Zachary L. Heiden
/s/ Anahita D. Sotoohi
Anahita D. Sotoohi
American Civil Liberties Union of Maine Foundation
P.O. Box 7860
Portland, ME 04112
207-619-6224
cgarvan@aclumaine.or
heiden@aclumaine.org
asotoohi@aclumaine.org

/s/ Daniel Mach
Daniel L. Mach*
/s/ Heather L. Weaver
Heather L. Weaver*
ACLU Program on Freedom of Religion and Belief
915 15th Street, NW, Suite 600
Washington, D.C. 20005
Tel:  (202) 675-2314
dmach@aclu.org
hweaver@aclu.org
*application for pro hac vice admission pending

## CERTIFICATE OF SERVICE

I, Zachary L. Heiden, Attorney for amici, certify that on May 2, 2023, I served this brief via ECF on counsel of record in this matter:

COURTNEY A. JONES
cjones@firstliberty.org

DAVID J. HACKER
dhacker@firstliberty.org

JEFFREY C. MATEER
jmateer@firstliberty.org

KEISHA T. RUSSELL
krussell@firstliberty.org

LEA PATTERSON
lepatterson@firstliberty.org

PATRICK N. STRAWBRIDGE
patrick@consovoymccarthy.com

TIFFANY H. BATES
tiffany@consovoymccarthy.com

CHRISTOPHER C. TAUB
Christopher.C.Taub@maine.gov

/s/ Zachary L. Heiden
Zachary L. Heiden
American Civil Liberties Union of Maine Foundation
P.O. Box 7860
Portland, ME 04112
Telephone: 207-619-6224
heiden@aclumaine.org
*Counsel for Amici Curiae ACLU and ACLU of Maine*