UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CROSSPOINT CHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00146-JAW |
| | ) | |
| A. PENDER MAKIN, in her | ) | |
| official capacity as Commissioner of | ) | |
| the Maine Department of Education, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

A church that operates a religious school sues Maine's Education Commissioner and Human Rights Commissioners to preclude enforcement of the state's educational and employment antidiscrimination laws, arguing that they violate the Free Exercise, Establishment, and Free Speech Clauses of the U.S. Constitution. The Court denies the injunction, primarily because it concludes that the plaintiff is unlikely to succeed on the merits. The Court determines that the educational antidiscrimination provisions do not violate the Free Exercise Clause because they are neutral, generally applicable, and rationally related to a legitimate government interest. The Court concludes further that the educational provisions do not violate the Free Speech Clause because they regulate conduct, not speech. Finally, the Court concludes that the employment provisions do not proscribe any constitutionally protected conduct.

Recognizing that this case presents novel constitutional questions in the wake of the Supreme Court's decision in *Carson v. Makin*, the Court has framed its opinion as a prelude to a challenge to the Court of Appeals for the First Circuit for a more authoritative ruling.

## I.   PROCEDURAL HISTORY

On March 27, 2023, Crosspoint Church filed a three-count complaint against A. Pender Makin, in her official capacity as Commissioner of the Maine Department of Education, and Jefferson Ashby, Edward David, Julie Ann O'Brien, Mark Walker, and Thomas Douglas, in their official capacities as Commissioners of the Maine Human Rights Commission (MHRC Commissioners), alleging that certain provisions of the Maine Human Rights Act (MHRA) effectively excluded it from approval for Maine's school tuitioning program in violation the Free Exercise, Establishment, and Free Speech Clauses of the U.S. Constitution.[1]  *Compl.* (ECF No. 1).  That same day, Crosspoint filed a motion for preliminary injunction to enjoin the Defendants from enforcing the provisions in Maine law that allegedly exclude it from the tuitioning program.  *Pl.'s Mot. for Prelim. Inj.* (ECF No. 5) (*Pl.'s Mot.*).

On April 28, 2023, the Defendants opposed Crosspoint's motion.  *Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.* (ECF No. 14) (*Defs.' Opp'n*), and on May 2, 2023, the American Civil Liberties Union of Maine (in conjunction with its national

---

[1]      Specifically, Crosspoint alleged that "[o]n its face and as applied to Plaintiff[], 5 M.R.S. §§ 4602(1), (5)(C), [and] (5)(D) violate[] the Free Exercise Clause of the First Amendment to the U.S. Constitution," *Compl.* ¶ 113, that "[a]s applied to Plaintiff, 5 M.R.S. § 4572(1)(A) violates the Free Exercise Clause and the Establishment Clause of the U.S. Constitution," *id.* ¶ 131, and that "[a]s applied to Plaintiff, 5 M.R.S. § 4602 violates the Free Speech Clause of the U.S. Constitution." *Id.* ¶ 144.

organization) filed an amici curiae brief in support of the Defendants' opposition. *Br. of Amici Curiae the American Civil Liberties Union and American Civil Liberties Union of Maine in Supp. of Defs.* (ECF No. 20). On May 12, 2023, Crosspoint filed a reply in support of its motion. *Pl.'s Reply in Supp. of Mot. for Prelim. Inj.* (ECF No. 21) (*Pl.'s Reply*). Also on May 12, 2023, the Defendants answered the complaint. *Defs.' Answer to Pl.'s Compl.* (ECF No. 23) (*Answer*).

On June 20, 2023, after this motion was taken under advisement, the Defendants filed correspondence with the Court regarding a bill recently passed by the Maine Legislature that amended the MHRA's definition of educational institution. *Notice/Correspondence Re: Enactment of Maine Pub. L. 2023, ch. 188* (ECF No. 28) (*Defs.' June 20 Correspondence*). On June 27, 2023, Crosspoint filed its own correspondence regarding the bill. *Notice/Correspondence Re: Enactment of Maine Pub. L. 2023, ch. 188* (ECF No. 29) (*Pl.'s June 27 Correspondence*).

## II.   FACTUAL BACKGROUND

### A.   The Parties

Crosspoint is a Christian church incorporated as a nonprofit corporation under Maine law and located in Bangor, Maine. *Compl.* ¶ 7. Bangor Christian Schools (BCS), a private, Christian school educating students from K4 to 12th grade, is an integrated auxiliary of Crosspoint. *Id.* ¶ 8. A. Pender Makin is the Commissioner of the Maine Department of Education, an agency of the state of Maine created and empowered under 20-A M.R.S. § 201, to "[s]upervise, guide and plan for a coordinated system of public education for all citizens of the State." *Id.* ¶ 9 (quoting 20-A M.R.S. § 201(1)).

Mr. Ashby, Mr. David, Ms. O'Brien, Mr. Walker, and Mr. Douglas are Commissioners of the Maine Human Rights Commission, an agency of the state of Maine, created and empowered under 5 M.R.S. § 4566 to "investigat[e] all forms of invidious discrimination, whether carried out legally or illegally, and whether by public agencies or private persons." *Id.* ¶ 12; 5 M.R.S. § 4566. Commissioner Makin and the MHRC Commissioners have joint rule-making authority to effectuate the subchapter of the MHRA prohibiting discrimination with respect to educational opportunity. *Compl.* ¶ 13; *Answer* ¶ 13.

### B.   Maine's School Tuitioning Program

#### 1.   The Pre-*Carson* Regime

Maine law provides that "[i]t is the intent of the Legislature that every person within the age limitations prescribed by state statutes shall be provided an opportunity to receive the benefits of a free public education." 20-A M.R.S. § 2(1). The "control and management of the public schools" is "vested in the legislative and governing bodies of local school administrative units [SAUs], as long as those units are in compliance with appropriate state statutes," *id.* § 2(2), and "[a] school administrative unit that neither maintains a secondary school nor contracts for secondary school privileges . . . shall pay the tuition . . . at the public school or the approved private school of the parent's choice at which the student is accepted." *Id.* § 5204(4). A similar provision exists for elementary schools. *Id.* § 5203(4). The upshot is that Maine's tuitioning program permits SAUs—some of which are sparsely populated—to pay the tuition for students to attend other approved public or private schools, in lieu of maintaining their own.

4

When a SAU opts to pay students' tuition rather than maintain its own school(s), parents are solely responsible for selecting the school their children attend. *Compl.* ¶ 47. To receive the tuitioning benefit, however, the parents must select an "approved" school satisfying certain statutory criteria. *Id.* ¶ 46. Section 2951 of title 20-A of the Maine statutes, entitled "Approval for tuition purposes," provides in pertinent part:

> A private school may be approved for the receipt of public funds for tuition purposes only if it:
>
> **2. Nonsectarian.** Is a nonsectarian school in accordance with the First Amendment of the United States Constitution.

20-A M.R.S. § 2951(2).

### 2.   The *Carson* Litigation

In 2018, three families, including two families whose children attended BCS, sued Maine's Education Commissioner to challenge 20-A M.R.S. § 2951(2), the "sectarian exclusion," claiming that it violated the First Amendment's Free Exercise Clause. *See Carson v. Makin*, 979 F.3d 21, 26-27 (1st Cir. 2020); *Carson v. Makin*, 142 S. Ct. 1987, 1994-95 (2022). On June 21, 2022, the United States Supreme Court held that Maine's sectarian exclusion violates the Free Exercise Clause because it "operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Id.* at 2002. Specifically, the Supreme Court held that "BCS . . . [is] disqualified from this generally available benefit 'solely because of [its] religious character.'" *Id.* at 1997 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017)). The Court continued, "[b]y 'condition[ing] the availability of benefits' in that manner, Maine's tuition assistance program . . .

'effectively penalizes the free exercise' of religion." *Id.* at 1997 (first alteration in original) (quoting *Trinity Lutheran*, 137 S. Ct. at 2022). As a result of the Supreme Court's decision in *Carson*, the sectarian exclusion is unenforceable.[2] *Compl.* ¶ 71.

### C. The Maine Human Rights Act's Antidiscrimination Provisions

While *Carson* was pending, the Maine Legislature enacted several amendments to the MHRA. *See* P.L. 2021, ch. 366, § 19 ("An Act to Improve Consistency in Terminology and within the Maine Human Rights Act"), 2021 Me. Laws 766-67 (Chapter 366).

Prior to the 2021 amendments, the MHRA's educational discrimination provisions did not include gender identity, religion, ancestry, or color as protected classes and stated that "[t]he provisions in this subsection [prohibiting discrimination on the basis of] sexual orientation do not apply to any education facility owned,

---

[2]     Paragraph 71 of Crosspoint's Complaint states: "As a result of the Supreme Court's decision in *Carson*, the sectarian exclusion is unenforceable." In their Answer, the Defendants admit only that "as a result of the Supreme Court's decision in *Carson*, sectarian schools are eligible to participate in the tuitioning program and otherwise deny the allegations made in this paragraph." *Answer* ¶ 71.
        The Court is unclear how the Defendants could deny in good faith the proposition that the "sectarian exclusion is unenforceable." Upon remand, this Court asked the parties, including Commissioner Makin, to submit proposed final judgments. *See Carson v. Makin*, No. 1:18-cv-00327-JAW, 2023 U.S. Dist. LEXIS 60496, at *29-30 (D. Me. Apr. 6, 2023). Although the Plaintiffs' and Commissioner Makin's proposed judgments differed in some respects, the Plaintiffs and Commissioner Makin each proposed an order permanently enjoining the state from enforcing 20-A M.R.S. § 2951(2). *See Carson v. Makin*, No. 1:18-cv-00327-JAW, *Letter from Michael Bindas, Senior Att'y, Inst. for Just., to Judge Woodcock* (Apr. 13, 2023), Attachs. 1 & 2 (ECF No. 95). *Compare id.*, Attach. 1, *[Proposed] Order Granting Pls. Declaratory and Permanent Inj. Relief* at 2 ("Defendant is hereby permanently **ENJOINED** as follows: 1. Defendant shall not enforce 20-A M.R.S. § 2951(2)"), *with id.*, Attach. 2, *[Proposed] Order Granting Pls. Declaratory and Permanent Inj. Relief* at 1 ("Defendant is hereby permanently **ENJOINED** from enforcing 20-A M.R.S. sec. 2951(2)"). On April 18, 2023, this Court adopted Commissioner Makin's proposed enjoining language. *J.* at 2 (ECF No. 96) ("Defendant is hereby permanently **ENJOINED** from enforcing 20-A M.R.S. section 2951(2)"). As this Court permanently enjoined enforcement of 20-A M.R.S. § 2951(2) based on language supplied by the Commissioner, the Court is perplexed as to how the Defendants in this case, including Commissioner Makin, could deny that the sectarian exclusion is unenforceable, since the Court has permanently enjoined its enforcement, and its judgment on this issue is final. The Court declines to accept the Defendants' denial of paragraph 71 to the extent they deny the terms of this Court's June 29, 2023 permanent injunction in *Carson v. Makin*.

controlled or operated by a bona fide religious corporation, association or society." *Compl.* ¶¶ 75-76; P.L. 2005, ch. 10, § 21 ("An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation").

Chapter 366, which took effect on October 18, 2021, added gender identity, religion, ancestry, and color as protected classes under the statute and narrowed the religious exception to state that "[n]othing in this section . . . requires a religious corporation, association or society *that does not receive public funding* to comply with this section as it relates to sexual orientation or gender identity." *Compl.* ¶¶ 77, 81; P.L. 2021, ch. 366, § 19, 2021 Me. Laws 767; 5 M.R.S. § 4602(5)(C) (emphasis in *Compl.*).   Chapter 366 provides no exemptions from the prohibition against discrimination on the basis of religion in education and further requires that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." P.L. 2021, ch. 366, § 19, 2021 Me. Laws 767; 5 M.R.S. § 4602(5)(D).  MHRA violations, including violations of 5 M.R.S. § 4602, carry civil monetary penalties of up to $20,000 for a first violation, up to $50,000 for a second violation, and up to $100,000 for subsequent violations, as well as attorney's fees in certain circumstances.  5 M.R.S. §§ 4613(2)(B)(7), 4614.  The Maine Superior Court is also empowered to issue a cease-and-desist order, *id.* § 4613(2)(B)(1), to order reinstatement of a victim of unlawful employment discrimination with or without back pay, *id.* § 4613(2)(B)(2), and to award both compensatory and punitive damages, *Id.* § 4613(2)(B)(8).

When Crosspoint filed its complaint, the MHRA exempted single-sex schools, even those participating in the tuitioning program, from its prohibition on discriminating on the basis of race, color, ancestry, national origin, sex, religion, sexual orientation, and gender identity.  *Compl.* ¶ 79; *Defs.' Opp'n* at 14 (acknowledging the exception but asserting it was unintentional).  On June 15, 2023, the Governor of Maine signed Maine Public Law 2023, Chapter 188 (Chapter 188), which amended the MHRA to remove the exclusion of single-sex schools from the Act's definition of "educational institution."  P.L. 2023, ch. 188, § 1 ("An Act to Amend the Definition of 'Educational Institution' Under the Maine Human Rights Act to Include Single-Sex Education Institutions"), 2023 Me. Laws 370; *Defs.' June 20 Correspondence* at 1.

Crosspoint believes that Chapter 366 is a "poison pill . . . designed to operate as an end-run around *Carson* to exclude Plaintiff from the tuitioning program." *Compl.* ¶ 87.  As evidence of this connection, Crosspoint points to a press release from Maine's Attorney General issued on the day the Supreme Court decided *Carson*, in which the Attorney General stated:

> The education provided by the schools at issue here is inimical to a public education.  They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff.  One school teaches children that the husband is to be the leader of the household.  While parents have the right to send their children to such schools, it is disturbing that the Supreme Court found that parents also have the right to force the public to pay for an education that is fundamentally at odds with values we hold dear.  I intend to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry.

> While the Court's decision paves the way for religious schools to apply to receive public funds, it is not clear whether any religious schools will do so.  Educational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices.

*Id.* ¶ 84.  Crosspoint also cites a June 26, 2022 tweet by then-Speaker of the Maine House of Representatives Ryan Fecteau.  *Id.* ¶ 87.  An individual tweeted, "You know how SCOTUS said Maine couldn't exclude religious schools from their voucher program?  Maine just changed the guidelines to exclude schools that discriminate against LGBTQ+ students."  *Id.*  Speaker Fecteau responded, "Sure did.  Anticipated the ludicrous decision from the far-right SCOTUS."  *Id.*

### D.    Bangor Christian Schools' Tuitioning Eligibility and Policies

#### 1.    Tuitioning Eligibility

BCS is accredited by the New England Association of Schools and Colleges, annually maintains basic school approval under 20-A M.R.S. § 2901(2)(A), meets the requirements for reporting and release of student records, and is willing to comply with the remaining applicable requirements for tuitioning schools—aside from the disputed MHRA provisions.  *Compl.* ¶¶ 49-51.

BCS's total high-school enrollment for the 2022-23 school year is 92 students, 28 of whom live in tuitioning SAUs: Bradford, Glenburn, Levant, Orrington, and Veazie.  *Id.* ¶¶ 52-53.  Crosspoint Church pays 95% of tuition for the children of Crosspoint Church employees, including BCS staff, to attend BCS.  *Id.* ¶ 54.  For the 2023-24 school year, eight BCS high-school students are children of Crosspoint Church employees and live in Glenburn, Maine—a tuitioning SAU.  *Id.* ¶ 55.  If the

state approved BCS for tuition purposes, BCS would charge the tuition for these eight students to Glenburn, resulting in an annual savings of approximately $47,120. *Id.* ¶ 56. If the state approved BCS for tuition purposes, the BCS high-school students residing in tuitioning SAUs would be eligible to participate in the tuitioning program instead of paying BCS tuition out of pocket. *Id.* ¶ 57. BCS has not applied for the tuitioning program but avers that it would apply if exempted from Chapter 366's penalties for discriminating on the basis of religion, sexual orientation, and gender identity. *Id.* ¶¶ 96, 100.

### 2. School Policies

Crosspoint's objective is "full obedience to the will of the Lord Jesus Christ who is the Founder and Head of the Church." *Id.* ¶ 19. BCS's vision "is to help students discover God's plan for their lives and to equip them to be successful on whatever path He is leading them," and its mission "is to assist families in educating the whole child by encouraging spiritual maturity and academic excellence in a supportive environment. Our final authority in all matters is the Word of God." *Id.* ¶¶ 25-26.

BCS operates in accordance with its Statement of Faith, which provides, in relevant part that: (1) the term marriage has only one legitimate meaning—a covenantal union between one man and one woman; and (2) all "sexual activity, identity or expression" that lies outside this definition of marriage "are sinful perversions of and contradictory to God's natural design and . . . will not be accepted." *Id.* ¶ 28. Its admissions policy provides:

> Bangor Christian Schools adheres to and supports the historical truth claims and moral foundations of Christianity. This includes, but is not limited to, the biblical definition of marriage, sexuality and moral

10

conduct, and the clear biblical teaching that gender is both sacred and established by God's design.  Parents or the legal guardians, who choose to enroll their children at our school, are agreeing to support these and other basic biblical values derived from historical Christianity and the relevant Christian positions embraced by Crosspoint Church.  Parents understand and agree that Bangor Christian Schools will teach these principles and biblical values.

Bangor Christian Schools does not discriminate in its practices against any person because of race, color, national or ethnic origin, gender, age, or disability.

*Id.* ¶ 29.  Two criteria BCS uses for admissions are whether the student "is in agreement with school policies" and whether the parents "are willing to have their children trained in accordance with this philosophy."  *Id.* ¶ 30.  Finally, the admissions policy provides that BCS "will consider admission for students from any family who, despite their religious background or beliefs, is willing to support our philosophy of Christian education, student conduct requirements, and the above-stated positions and . . . [c]ontinued enrollment at Bangor Christian Schools is contingent upon this same understanding and support."  *Id.* ¶ 31.

Any student who "persistently and unrepentantly engages in . . . advocating beliefs contrary to BCS's statement of faith" would be "subject to removal from the school."  *Id.* ¶ 35.  BCS's code of conduct "prohibits students from . . . engaging in immoral conduct, including sexual activity outside of marriage as defined in the Statement of Faith, or identifying as a gender other than their biological sex."  *Id.* ¶ 37.

Crosspoint Church employees, including BCS staff, "must be co-religionists— that is, they must be in agreement with Crosspoint's Statement of Faith and engage

in religious practice consistent with Crosspoint Church's spiritual standards." *Id.* ¶ 39. BCS teachers "must agree to both BCS's Statement of Faith and the Educational Philosophy and Objectives and be committed to upholding them," including by adhering to the policies "relating to sexual behavior." *Id.* ¶¶ 40-41.

## III. THE PARTIES' POSITIONS

### A. Crosspoint Church's Motion for Preliminary Injunction

Crosspoint argues that it is entitled to a preliminary injunction because: (1) Chapter 366, as applied to religious institutions, violates the First Amendment's Free Exercise Clause; (2) applying the MHRA to prohibit Crosspoint from employing only co-religionists violates the First Amendment's Free Exercise and Establishment Clauses; (3) Chapter 366 violates the First Amendment's Free Speech Clause; (4) Crosspoint will suffer irreparable harm in the absence of an injunction; and (5) the balance of equities and public interest favor an injunction. *Pl.'s Mot.* at 1-20.

Beginning with the Free Exercise Clause, Crosspoint submits that "[t]he Free Exercise Clause prohibits government from burdening a plaintiff's 'sincere religious practice pursuant to a policy that is not neutral or generally applicable . . . unless the government can satisfy strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest.'" *Id.* at 7 (alteration in original) (quoting *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022)). It asserts that Chapter 366 "substantially burdens Plaintiff's sincere religious exercise." *Id.* Furthermore, Crosspoint contends that Chapter 366 is not

neutral because "[a]lthough the poison pill[3] has ramifications for many religious schools, its timing and structure show that its purpose was to preemptively exclude Plaintiff from the tuitioning program in order to moot *Carson* . . . [t]his result is intentional and specifically targets Plaintiff's religious beliefs." *Id.* at 9. Assuming that Chapter 366 is not neutral, Crosspoint asserts that the Court should apply strict scrutiny. *Id.* at 11. Alternatively, Crosspoint offers that the Court should apply strict scrutiny on the theory that Chapter 366 is not generally applicable—specifically, because it exempts single-sex schools from the antidiscrimination provisions. *Id.* Crosspoint asserts that Chapter 366 cannot survive strict scrutiny because it is not narrowly tailored to achieve a compelling government interest. *Id.* at 12-14.

Next, Crosspoint argues that applying the MHRA "to prohibit Plaintiff from hiring only co-religionists violates the Establishment and Free Exercise Clauses." *Id.* at 14. It points to the MHRA's provision prohibiting employers from discriminating against applicants because of, inter alia, religion and submits that "Plaintiff faces a credible threat of Defendants enforcing § 4572(1)(A) to prohibit BCS's practice of hiring only co-religionists if BCS participates in the tuitioning program." *Id.* at 14-15. Yet such enforcement would be unconstitutional, Crosspoint contends, because the "MHRA's plain language protects Plaintiff's right to hire only co-religionists" and "Plaintiff's hiring practices for its ministries, including BCS, are protected by the ministerial exception." *Id.* at 15-16. Crosspoint maintains that "[t]hreatening to

---

[3]    Crosspoint refers to the disputed MHRA educational antidiscrimination provisions as a "poison pill" while Defendants refer to them as "Chapter 366." The Court adopts the neutral framing of Chapter 366.

enforce 5 M.R.S. § 4572(1)(A) against Plaintiff if it participates in the tuitioning program unconstitutionally conditions participation on Plaintiff relinquishing its First Amendment right to select its ministers." *Id.* at 17.

Crosspoint then contends that Chapter 366 "violates the U.S. Constitution's Free Speech Clause." *Id.* at 18. In its view, Chapter 366 "restricts Plaintiff's speech based on content and viewpoint, because it is designed to force Plaintiff to stop educating its students from its religious perspective as a condition of participating in the tuition program." *Id.* Crosspoint submits that "[i]mposing financial burdens because Plaintiff's teaching reflects its religious perspective is unconstitutional under the Free Speech Clause." *Id.* at 19.

Finally, Crosspoint asserts that it will suffer irreparable harm in the absence of an injunction and that the balance of equities and public interest also favor an injunction. *Id.* at 19-20. It concludes that the Court should grant a preliminary injunction enjoining the Defendants from enforcing the religion, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 against Crosspoint and from enforcing 5 M.R.S. § 4572(1)(A) to prohibit Crosspoint from hiring co-religionists. *Id.* at 20.

## B. The Defendants' Opposition

The Defendants argue first that Crosspoint's claim is not ripe because it is predicated on a "list of hypothetical events"—including Crosspoint applying for funding, being accepted, denying admission to a person in a protected class, and then facing a MHRC discrimination charge—and thus "there is no imminent threat of enforcement and Plaintiff's lawsuit . . . should be dismissed." *Defs.' Opp'n* at 1-2.

The Defendants go on to assert that, if ripe, "Plaintiff is not entitled to a preliminary injunction based on well-established precedent because it is not likely to prevail on the merits and none of the other relevant factors supports an injunction." *Id.* at 2. They submit that "[a]dmitting students belonging to these protected classes will in no way burden Plaintiff's religious practices," as "BCS would still be free to teach and say whatever it wishes – it simply would not be allowed to prevent willing students from receiving whatever education BCS chooses to deliver." *Id.*

The Defendants add that "even if the prohibitions against discrimination did interfere with Plaintiff's religious practices, they are permissible because they are neutral and generally applicable." *Id.* Moreover, they offer that, in any event, "the prohibitions against unlawful discrimination satisfy strict scrutiny because, as the Supreme Court has recognized, states have a compelling interest in ending discrimination, and this outweighs any interest schools may have in discriminatory policies, even when such policies are based on sincerely held religious beliefs." *Id.*

Turning to the employment issue, the Defendants observe that "the MHRA expressly permits Plaintiff to hire only members of its religion and to require all employees to conform to Plaintiff's religious tenets" and "[t]he so-called 'ministerial exception' recognized by the Supreme Court may provide Plaintiff with further protection by barring application of the MHRA to some employment positions." *Id.* In their view, however, "[t]he extent to which the exception applies cannot be decided in the abstract in this facial challenge and must instead await an actual controversy." *Id.* at 2-3.

Finally, regarding Crosspoint's free speech claim, the Defendants submit that "the prohibitions against discrimination do not violate Plaintiff's First Amendment right to free speech because they regulate conduct, not speech" and "Plaintiff is free to say whatever it wishes; it just cannot exclude willing listeners for discriminatory reasons." *Id.* at 3.

### C.  Crosspoint's Reply

In reply, Crosspoint first submits that "Defendants' Response at least concedes (at 18) that the ministerial exception restricts the application of 5 M.R.S. § 4572(1)(A) to BCS's employment practices with respect to a significant portion of its employees" and "[a]t a minimum, then, a preliminary injunction to that effect is appropriate." *Pl.'s Reply* at 1.

Crosspoint also reiterates that "the Defendants' ongoing First Amendment violations justify the full injunction Plaintiff seeks." *Id.* Addressing the Defendants' ripeness argument, Crosspoint submits that "BCS need not risk the MHRA's substantial legal penalties to seek relief." *Id.* Crosspoint contends that its claim is ripe for pre-enforcement review because it is eligible for and would participate in the tuitioning program, but for the challenged provisions. *Id.* at 2. It says that it reasonably fears enforcement and thus "the poison pill forces BCS to either relinquish its religious identity or forego participation in the tuitioning program for which it is otherwise eligible." *Id.* at 2-3.

Next, Crosspoint contends that "Section 4602 burdens Plaintiff's religious exercise" because "BCS's religious exercise encompasses all aspects of operating BCS according to its religious beliefs" and "BCS's requiring students to behave

consistently with BCS's statement of faith is an exercise of BCS's religious beliefs and is necessary to its religious educational mission." *Id.* at 3-4. Thus, in its view, "Section 4602 burdens BCS's religious exercise not just in its admissions, as Defendants claim, but also in BCS's daily internal operations" by requiring BCS to "permit student religious expression contrary to its statement of faith" and "also requir[ing] BCS to affirm a student's gender identity and sexual orientation, contrary to its statement of faith." *Id.* at 4.

Crosspoint also reiterates that Chapter 366 violates the Free Exercise Clause because it "is not neutral and generally applicable," triggering strict scrutiny, and it cannot survive strict scrutiny because "Defendants assert . . . only a general interest in nondiscrimination" that is insufficiently compelling. *Id.* at 5-8.

### D.   The Parties' Correspondence Regarding Recent Legislation

While this motion was under advisement, each party filed correspondence with the Court regarding the passage of Chapter 188, which amended the MHRA to remove the exclusion of single-sex schools from the Act's definition of "educational institution." *See Defs.' June 20 Correspondence*; *Pl.'s June 27 Correspondence*. After the Defendants notified the Court that the bill had been enacted, Crosspoint responded that "[a]lthough this amendment removed one of the constitutional flaws with the existing statutory scheme, it does not resolve Plaintiff's other challenges" and "[t]his challenge remains ripe for review" because "Plaintiff will suffer irreparable harm absent an injunction." *Pl.'s June 27 Correspondence* (citations omitted).

17

## IV.   LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).   A judge should use the authority to grant such injunctive relief "sparingly." *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Off. of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

To determine whether to issue a preliminary injunction a court must analyze four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18.   Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## V.   DISCUSSION

### A.   Likelihood of Success on the Merits

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his

quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is "the most important part of the preliminary injunction assessment" (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007))).   The Court analyzes the merits of Crosspoint's challenges to the MHRA and concludes that the religion, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 do not violate the Free Exercise, Establishment, or Free Speech Clauses of the U.S. Constitution.   The Court also concludes that Crosspoint is not entitled to a preliminary injunction on its challenge to 5 M.R.S. § 4572(1)(A) because the parties agree that Crosspoint is exempt from this provision.

### 1.   Ripeness

As a threshold matter, the Court considers the Defendants' claim that Crosspoint's suit is not yet ripe for review.   The Court concludes that it is ripe.

"If standing is a question of who, then ripeness—which shares standing's constitutional and prudential pedigree—is a question of when." *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999) (citation omitted).   The United States Supreme Court explained that the basic function of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).   "While the doctrine has a prudential flavor, a test for ripeness is also mandated by the constitutional requirement that federal jurisdiction extends only to actual cases or controversies." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st

Cir. 1995) (citing U.S. CONST. art. III, § 2; *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242-45 (1952)).

"To determine whether a case is ripe for review, a federal court must evaluate the fitness of the issue presented and the hardship that withholding immediate judicial consideration will work." *Whitehouse*, 199 F.3d at 33. "To establish ripeness in a pre-enforcement context, a party must have concrete plans to engage immediately (or nearly so) in an arguably proscribed activity," and "[a] showing that the challenged statute, fairly read, thwarts implementation of the plan adds the element of hardship." *Id.* Crosspoint submits that both requirements are met because: (1) "BCS is eligible for the tuitioning program and would participate if the challenged MHRA provisions did not impose liability because of BCS's religious exercise"; and (2) the "Defendants also agree that BCS 'would be required to comply' with the challenged MHRA provisions if BCS participates in the tuitioning program." *Pl.'s' Reply* at 2.

The Court finds *Whitehouse* instructive and agrees with Crosspoint. In *Whitehouse*, the First Circuit considered a First Amendment challenge to a law prohibiting the use of certain public records for commercial solicitation. 199 F.3d at 28-29. The plaintiff association obtained protected records to use for commercial solicitations but feared prosecution under the law, despite no person having been criminally charged in its 20-year existence. *Id.* at 28. "Reluctant either to execute or to abandon its [plan], and seeing no other way of resolving the issue, the Association sued" to have the law enjoined as unconstitutional. *Id.* at 29. The state's Attorney

General contended that the complaint "showed neither a sufficiently definite plan to engage in conduct that would transgress [the challenged law] nor a sufficiently imminent threat of prosecution." *Id.*

The *Whitehouse* Court sided with the plaintiff. Regarding fitness, the First Circuit observed that:

> This is not a case of statutory ambiguity but, rather, one that presents a single, purely legal question: Does Rhode Island's prohibition on using public records for commercial solicitation unconstitutionally restrain free expression? The Association has described a concrete plan to recruit new members—an activity plainly proscribed by the text of section 38–2–6—and no one has suggested any valid reason why resolution of the apparent conflict should await further factual development. Since the controversy was well-defined and amenable to complete and final resolution, it was fit for judicial review.

*Id.* at 34.

Crosspoint's case is fit for similar reasons. As in *Whitehouse*, this is not "a case of statutory ambiguity" but rather "a single, purely legal question." *Id.* Here, there is no ambiguity as to whether the MHRA, as amended by Chapter 366, proscribes Crosspoint's desired conduct. Crosspoint desires to apply for Maine's tuitioning program, a benefit the Supreme Court recently ruled the state could not deny to sectarian institutions, such as Crosspoint. While the Supreme Court was considering *Carson*, Maine's Legislature amended the MHRA to prohibit educational institutions that accept state funding—including religious institutions—from discriminating on the basis of "sexual orientation or gender identity." 5 M.R.S. § 4602(1). On the day the Supreme Court decided *Carson*, Maine's Attorney General stated that "[t]he education provided by the schools at issue here," including BCS, "is inimical to a

public education.  They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff."  *Compl.* ¶ 84.  He added further that "[e]ducational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices."  *Id.*

In the Court's view, there is no statutory ambiguity here.  There is no serious dispute that, if BCS received state funding, its stated policies would conflict directly with the MHRA's prohibition against discrimination on the basis of sexual orientation or gender identity.  *See, e.g., id.* ¶¶ 37-38 (BCS's code of conduct prohibits students from "identifying as a gender other than their biological sex" and BCS's dress code requires students to "wear clothing consistent with their biological sex"); *Defs.' Opp'n* at 9 ("BCS apparently does not discriminate based on any class *other than* sexual orientation or gender identity" (emphasis added)).

The Defendants posit that Crosspoint's claim is unripe because it is based on a pyramid of hypotheticals, with its fear of sanction under the MHRA first dependent on applying for tuitioning, being approved, denying admission to a protected person, and then being charged and punished by the MHRC.  *Defs.' Opp'n* at 9-10.  In essence, the Defendants attempt to avoid *Whitehouse* by characterizing Crosspoint's claim as "rest[ing] upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Id.* at 8 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  Under this logic, *Whitehouse* is distinguishable because there, the plaintiff

association could have faced legal liability as soon as it started soliciting new members, whereas Crosspoint must wait for a member of a protected class to apply, and presumably be rejected. But the only way for Crosspoint to avoid liability is by refraining from acting. Once Crosspoint is approved for tuitioning, a member of a protected class could apply at any time, forcing Crosspoint to either violate the statute or compromise its religious beliefs. Therefore, Crosspoint is in the same position as the *Whitehouse* plaintiff: do nothing or give up control over concerns for legal liability. To accept the Defendants' chain of hypotheticals would be to confine *Whitehouse* to the type of statute at issue in that case. The Defendants have provided no support for such a limited reading of *Whitehouse*, and the Court sees none.

The Defendants do not suggest that Crosspoint is insincere in its stated desire to apply for tuitioning or that its policies are not motivated by religious conviction. The Defendants do not offer any reason why, but for its religious convictions, Crosspoint/BCS would not be approved for tuitioning if it applied,[4] and it is equally clear that Crosspoint's policies violate the MHRA's antidiscrimination provisions. Based on the statements of the Maine Attorney General, it is a short step from Crosspoint/BCS's acceptance of tuition from the state to the Attorney General's enforcement of the unlawful educational discrimination provisions of Maine law with its potential of civil and other penalties. *See* 5 M.R.S. § 4613.[5]

---

[4]    The Defendants' chain of hypotheticals assumes Crosspoint would be approved for tuitioning, and the Defendants themselves admit as much. *See Defs.' Opp'n* at 14 n.5 ("Discriminatory schools are free to participate in the tuitioning program regardless of whether they comply with the MHRA").

[5]    If Crosspoint violates the MHRA, it could be subject to civil penalties not in excess of $20,000 in the case of the first order under the Act, and escalating civil penalties thereafter, not in excess of $100,000 for a third or subsequent order. 5 M.R.S. § 4613(2)(B)(7). The MHRA also provides for an order to cease and desist. *Id.* § 4613(B)(1).

In short, the record does not reveal why "resolution of the apparent conflict should await further factual development." *Whitehouse*, 199 F.3d at 34.  In terms of fitness for review, Crosspoint's claim primarily offers a "purely legal question," *id.*, of whether, after *Carson*, the state may require religious institutions with faith-motivated policies that discriminate on the basis of sexual orientation or gender identity to comply with the MHRA's antidiscrimination provisions as a condition of participating in the tuitioning program.  Because this "controversy [is] well-defined and amenable to complete and final resolution," it is fit for judicial review.  *Id.* at 34; *see also Sullivan v. City of Augusta*, 511 F.3d 16, 31-32 (1st Cir. 2007) (constitutional challenge to parade permit ordinance containing thirty-day advance notice requirement was ripe even though plaintiff had not applied for a permit less than thirty days before a planned march); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 830 (1st Cir. 2020) ("So long as th[e] uncertainty [inherent to pre-enforcement suits] does not undermine the credible threat of prosecution or the ability of the court to evaluate the merits of the plaintiff's claim in a preenforcement posture, there is no reason to doubt standing" (alteration in original) (quoting *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012))).

Turning to the hardship prong of ripeness, *Whitehouse* is again instructive.  In *Whitehouse*, the plaintiff "refrained from carrying forward its plan because it reasonably feared prosecution" under the challenged statute (even though the state had never pursued criminal charges under that statute).  199 F.3d at 32, 34.  The First Circuit observed that the plaintiff "thus faced the direct and immediate

dilemma of choosing between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believe[d] to be constitutionally protected activity" and that "[b]ecause lost opportunities for expression cannot be retrieved, delaying or denying resolution of the issue would have worked a substantial hardship." *Id.* at 34 (internal citations and quotations omitted).

The Court reaches the same conclusion here.  In *Carson,* the Supreme Court struck down the sectarian exclusion, holding that "BCS . . . [is] disqualified from this generally available benefit 'solely because of [its] religious character,'" 142 S. Ct. at 1997 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021), and "[b]y 'condition[ing] the availability of benefits' in that manner, Maine's tuition assistance program . . . 'effectively penalizes the free exercise' of religion.'" *Id.* (quoting *Trinity Lutheran*, 137 S. Ct. at 2022).  Crosspoint now seeks to avail itself of that program and avers that "[b]ut for the poison pill's penalization of Plaintiff's religious exercise" and the "credible threat of enforcement" it "would apply to become approved for tuition purposes." *Compl.* ¶¶ 100-01.

Setting aside—for the moment—the constitutionality of the challenged provisions, Crosspoint's fear of MHRA enforcement is eminently reasonable, especially given the timing of the amendments and the then-Speaker of the House's frank statement of his understanding of legislative intent.  Moreover, the Maine Attorney General is the "chief law officer of the State," *Withee v. Lane & Libby Fisheries Co.*, 120 Me. 121, 123, 113 A. 22 (1921), and his statement on the day of the

*Carson* decision would cause Crosspoint reasonably to conclude that he would pursue Crosspoint for asserted violations of the MHRA's antidiscrimination provisions.

In sum, Crosspoint may apply for tuitioning, but its policies plainly run afoul of the MHRA's antidiscrimination provisions.  Crosspoint is thus fairly stuck between "the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believe[s] to be constitutionally protected activity."  *Whitehouse*, 199 F.3d at 34 (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)); *see also Trinity Lutheran*, 582 U.S. at 462 ("To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[ ] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties" (alterations in original) (quoting *McDaniel v. Paty*,  435 U.S. 618, 626 (1978))).  Crosspoint has satisfied both the fitness and hardship prongs, and its claims are ripe for judicial review.

### 2.    Crosspoint's Free Exercise Claims

Crosspoint brings two Free Exercise claims, alleging that the MHRA's educational discrimination provisions—codified at 5 M.R.S. § 4602—and employment discrimination provisions—§ 4752(1)(A)—each violate its First Amendment rights. *Pl.'s Mot.* at 7-17.  The Court concludes that neither claim is likely to succeed on the merits. The educational discrimination claim is unavailing because the challenged provisions are neutral, generally applicable, and rationally related to a legitimate government interest.  The employment discrimination claim fails because Crosspoint has not identified any constitutionally protected conduct infringed by the statute.

The Free Exercise Clause prohibits the government from burdening a plaintiff's "sincere religious practice pursuant to a policy that is not neutral or

generally applicable . . . unless the government can satisfy strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* at 2421-22 (citations and internal quotations omitted). The Supreme Court clarified that "the Free Exercise Clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Trinity Lutheran*, 137 S. Ct. at 2022 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)). "[I]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.* (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)). "To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties." *Id.* at 2022 (alterations in original) (quoting *McDaniel*, 435 U.S. at 626). In *Carson*, the Supreme Court held explicitly that Maine's "nonsectarian" requirement violated the Free Exercise Clause because "the program operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." 142 S. Ct. at 2002.

The Supreme Court has also provided that "a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of our case law." *Kennedy*, 142 S. Ct. at 2421.

27

####### a.     The Educational Discrimination Claim

The gravamen of Crosspoint's suit is that Chapter 366 impermissibly burdens religious exercise by forcing Crosspoint to compromise its religious beliefs to participate in the tuitioning program. *See, e.g., Compl.* ¶ 80 (alleging that § 4602 "operates to deter religious schools from participating in the tuitioning program if they hold disfavored religious beliefs, including . . . operating in accordance with traditional beliefs about the nature of marriage and sexuality"). Crosspoint asserts that *Carson* prohibited the state from excluding sectarian institutions from the tuitioning program, but Chapter 366 would now improperly force them to compromise their religious beliefs to access that benefit. *Pl.'s Mot.* at 7. The Defendants counter that "[a]dmitting students belonging to these protected classes will in no way burden Plaintiff's religious practices" and "BCS would still be free to teach and say whatever it wishes – it simply would not be allowed to prevent willing students from receiving whatever education BCS chooses to deliver." *Defs' Opp'n* at 2.

Whether the MHRA burdens Crosspoint's religious exercise presents a close call, at least in this pre-enforcement context. The MHRA provides:

> It is unlawful educational discrimination in violation of this Act, on the basis of sex, sexual orientation or gender identity, physical or mental disability, ancestry, national origin, race, color or religion, to:
>
> A. Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research, occupational training or other program or activity;
>
> B. Deny a person equal opportunity in athletic programs;
>
> C. Apply any rule concerning the actual or potential familial status or marital status of a person or to exclude any person from any program or

activity because of pregnancy or related conditions or because of sex or sexual orientation or gender identity;

D. Deny a person admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or

E. Deny a person financial assistance availability and opportunity.

5 M.R.S. § 4602(1). These provisions are subject to the qualification that "[n]othing in this section . . . [r]equires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity." *Id.* § 4602(5). The MHRA further provides that "'Discriminate' includes, without limitation, segregate, separate or subject to harassment." *Id.* § 4553(2).

The statute plainly would prohibit Crosspoint—if it joins the tuitioning program—from denying admission to or otherwise excluding applicants based on their sexual orientation, gender identity, or religion. It does not, on its face, appear to directly limit the content of Crosspoint's religious expression or teaching—e.g., Crosspoint could not reject applicants for being homosexual, but it could still teach that homosexuality is a sin. *See Compl.* ¶ 28 (characterizing sexual conduct outside the Bible's definition of marriage as "sinful perversions of and contradictory to God's natural design and purpose for sexual activity").

Crosspoint responds, however, that "BCS's requiring students to behave consistently with BCS's statement of faith is an exercise of BCS's religious beliefs and is necessary to its religious educational mission" and "[a]ccordingly, applicants for admission at BCS must agree to cooperate with BCS's statement of faith and code of

29

conduct, and a student who persistently advocates beliefs contrary to BCS's statement of faith is subject to expulsion for failure to cooperate with BCS's religious purpose and code of conduct." *Pl.'s Reply* at 4.  It adds further that "[t]o say that § 4602 does not burden BCS's religious practice because BCS may still express—but not enforce—its religious beliefs is absurd." *Id.* at 5.

Essentially, as noted earlier, Crosspoint is saying that the state's law requires it to admit students only to expel them.  If Crosspoint admitted students with sexual orientations, gender identities, or religious views inconsistent with its central religious tenets, the students would be required under Crosspoint policy to adhere to religious beliefs inimical to their own sexual orientations, gender identities, and religious beliefs on pain of "removal from the school." *Compl.* ¶ 35.

Crosspoint's reasoning fits within recent Supreme Court precedent.  In *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), the Supreme Court considered the case of Catholic Social Services (CSS), a private agency that had contracted with the city to provide foster care services but refused to certify same-sex couples because it considered "the certification of prospective foster families to be an endorsement of their relationships." *Id.* at 1875.  The city stated that it would not enter a future foster care contract with CSS "unless the agency agreed to certify same-sex couples," and CSS sued to enjoin the city from enforcing that directive.  *Id.* at 1875-76.  The Supreme Court sided with CSS, stating:

> As an initial matter, it is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs.  The City disagrees.  In its view, certification reflects only that foster parents

> satisfy the statutory criteria, not that the agency endorses their relationships. But CSS believes that certification is tantamount to endorsement. And "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981). Our task is to decide whether the burden the City has placed on the religious exercise of CSS is constitutionally permissible.

*Id.* The Court went on to find that the city's policies triggered strict scrutiny because they were not generally applicable and concluded that:

> CSS seeks only an accommodation that will allow it to continue serving the children of Philadelphia in a manner consistent with its religious beliefs; it does not seek to impose those beliefs on anyone else. The refusal of Philadelphia to contract with CSS for the provision of foster care services unless it agrees to certify same-sex couples as foster parents cannot survive strict scrutiny, and violates the First Amendment.

*Id.* at 1881-82.

*Fulton* is helpful on the issue of burden. In *Fulton*, the government burdened an organization's religious exercise "by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs" through requiring it to—in the organization's view—"endorse" homosexual relationships to which it objected. *Id.* at 1875-76. Here, Crosspoint avers that requiring students to behave consistently with its statement of faith is an exercise of its religious beliefs and noncompliant students are subject to expulsion. Its policies prohibit "students from, among other things, engaging in immoral conduct, including sexual activity outside of marriage as defined in the Statement of Faith, or identifying as a gender other than their biological sex" and the school's "dress code requires students to wear clothing consistent with their biological sex." *Compl.* ¶¶ 37-38. To the extent that Crosspoint

31

requires all students to comply with its statement of faith, the MHRA effectively prohibits Crosspoint from enforcing some tenets of those policies (for example, it likely could not permissibly discipline a student for identifying as transgender[6] or entering a non-heterosexual relationship).  As such, the challenged provisions of the MHRA burden Crosspoint's religious exercise.

As the Supreme Court observed in *Fulton*, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."  141 S. Ct. at 1876 (quoting *Thomas,* 450 U.S. at 714). Taking Crosspoint at its word, the challenged provisions of the MHRA "put[] it to the choice of curtailing its mission or approving [conduct] inconsistent with its beliefs." *Id.* at 1876.  Against the backdrop of *Fulton*, the Court concludes that the MHRA's antidiscrimination provisions—which would effectively prohibit Crosspoint from enforcing several of its religiously motivated policies relating to sexual orientation and gender identity—burden Crosspoint's religious exercise.

Burdensome, however, does not mean impermissible, as "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Parker v. Hurley*, 514 F.3d 87, 95 (1st Cir. 2008) (quoting *Church of the*

---

[6]      *See, e.g., Doe v. Reg'l Sch. Unit 26*, 2014 ME 11, ¶ 24, 86 A.3d 600, 607 (holding that "denying access to the appropriate bathroom [consistent with a student's gender identity] constitutes sexual orientation discrimination in violation of the MHRA"); *see also Pl.'s Reply* at 4 n.7 (reiterating its representatives' prior testimony that "it violates BCS's statement of faith to admit a student or allow a student to remain enrolled who violates BCS's statement of faith by presenting as a gender not consistent with his or her biological sex or by professing the entrenched belief that a homosexual sexual orientation is who [the student is] and [the student] think[s] that is right and good" (citation and internal quotation marks omitted)).

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)).  Crosspoint contends that § 4602 triggers strict scrutiny because it is neither neutral nor generally applicable.

Crosspoint's argument on general applicability appears to have been mooted. It initially asserted that "5 M.R.S. § 4602 is not generally applicable, because it categorically exempts single-sex schools from nearly all educational nondiscrimination provisions, including those relating to religion, sexual orientation, and gender identity." *Pl.'s Mot.* at 11.  When this suit was filed, single-sex schools were indeed exempt.  However, as each party acknowledges, on June 15, 2023, the Governor of Maine signed Maine Public Law 2023, Chapter 188, which eliminated the exemption for single-sex educational institutions.  *See* P.L. 2023, ch. 188, § 1, 2023 Me. Laws 370; *Defs.' June 20 Correspondence*; *Pl.'s June 27 Correspondence*. Crosspoint, presumably referring to its general applicability claim, stated that "[a]lthough this amendment removed one of the constitutional flaws with the existing statutory scheme, it does not resolve Plaintiff's other challenges." *Pl.'s June 27 Correspondence* at 1.  Because Crosspoint has not raised any other reason to suggest that the challenged provisions are not generally applicable, the Court concludes that the law is generally applicable and moves on to neutrality.

To qualify as neutral, a policy must not target religious beliefs or practices "because of their religious nature" and the "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877.  "If the policy's objective is to

impede or constrain religion, the policy is not neutral." *Swartz v. Sylvester*, 53 F.4th 693, 700 (1st Cir. 2022) (citing *Lukumi*, 508 U.S. at 533).  The First Circuit has noted that "[w]e are mindful that the Free Exercise Clause forbids subtle departures from neutrality and covert suppression of particular religious beliefs" and "[w]hen assessing neutrality, a court must survey meticulously the totality of the evidence, both direct and circumstantial . . ..  This includes the series of events leading to the conduct, as well as the historical background."  *Id.* at 701 (citations and internal quotation marks omitted).

Crosspoint asserts that Chapter 366 is not neutral because "its timing and structure show that its purpose was to preemptively exclude Plaintiff from the tuitioning program in order to moot *Carson*," meaning that "[e]xcluding Plaintiff from the tuitioning program is a feature, not a bug."  *Pl.'s Mot.* at 9-11.  It cites Attorney General Frey's press release on the day *Carson* was decided and Speaker Fecteau's tweet about the legislative response to *Carson* as evidence that there is "no doubt that the Legislature specifically crafted the poison pill to target Plaintiff's religious beliefs."  *Id.* at 10.  The Defendants respond that Attorney General Frey issued the contested press release a year after the challenged law was passed and that the Court cannot divine the legislature's intent from a single tweet by then-Speaker Fecteau.  *Defs.' Opp'n* at 13, 14 n.15.  Furthermore, they offer that:

> even if [Chapter 366] was introduced and enacted in anticipation of an adverse Supreme Court ruling, it was not a "poison pill."  Until then, religious schools were not eligible to receive public funds because they were excluded from the tuitioning program.  There was thus no need to differentiate between religious schools receiving public funds and those that were not.  If the Legislature anticipated that Maine might soon be

prohibited from excluding religious schools from the tuitioning program, it would have been entirely appropriate for them to then draw the same distinction that already existed when it came to employment and housing discrimination – religious educational institutions not receiving public funds could discriminate based on sexual orientation or gender identity, while those receiving public funds were prohibited from doing so.

*Id.* at 13-14.

After weighing the parties' claims in light of the totality of the evidence and historical background, the Court concludes that Chapter 366 is neutral. Even accepting Crosspoint's assumption that the Maine Legislature passed Chapter 366 in anticipation of the Supreme Court striking down the sectarian exclusion, the Court does not find significant evidence that this legislation's objective was "to impede or constrain religion" as opposed to ensuring uniformity in a legislative scheme that already prohibited these types of discrimination by organizations receiving public funds in the housing and employment contexts. *Swartz*, 53 F.4th at 700 (citing *Lukumi*, 508 U.S. at 533).

The MHRA's history provides useful context for the recent amendments to its educational discrimination provisions. When the MHRA was enacted in 1971, it prohibited unlawful discrimination in employment, housing, and public accommodations—but not education. P.L. 1971, ch. 501. It also did not initially prohibit discrimination based on sex, sexual orientation, or gender identity. *Id.* Later, the Legislature expanded the MHRA to prohibit discrimination in education (initially only prohibiting sex discrimination). P.L. 1987 ch. 578, § 3. Between 1987 and 1991, the Legislature continued to expand the educational discrimination

35

provisions to prohibit discrimination on the basis of disability, race, and national origin. *See* P.L. 1987, ch. 478; P.L. 1989, ch. 725; P.L. 1991, ch. 100.

Then, in 2005, the Legislature again expanded the MHRA to prohibit discrimination on the basis of sexual orientation in all areas covered by the Act (employment, housing, public accommodations, and education). P.L. 2005, ch. 10 ("An Act to Extend Civil Rights Protections to All People Regardless of Sexual Orientation"). At the time, sexual orientation was defined to also include gender identity. *Id.* ("'Sexual orientation' means a person's actual or perceived heterosexuality, bisexuality, homosexuality or gender identity or expression"). Religious organizations that did not receive public funds were exempted from the provision on sexual orientation discrimination in employment, housing, and education. *Id.* (prohibiting "[d]iscrimination in employment, housing, public accommodation, credit and educational opportunity on the basis of sexual orientation, except that a religious corporation, association or organization that does not receive public funds is exempt from this provision"). Education facilities "owned, controlled or operated by a bona fide religious corporation, association, or society" were fully exempted. *Id.*

In other words, since 2005 the MHRA has prohibited sexual orientation/gender identity discrimination in employment, housing, and education but has also generally exempted religious organizations that do not receive public funds. From 2005 to 2021, its educational discrimination subsection—5 M.R.S. § 4602—exempted religious organizations, without distinguishing whether they received public funds,

and, in 2021, Chapter 366 narrowed this exclusion to exempt only religious institutions that do not receive public funds. *Compare* P.L. 2005, ch. 10, *with* P.L. 2021, ch. 366, § 19; *see also* 5 M.R.S. § 4602(5).

Crosspoint submits that this change was made to target its purportedly disfavored religious exercise and subvert the Supreme Court's *Carson* decision. The Court acknowledges that Attorney General Frey's immediate negative response to *Carson* and then-Speaker Fecteau's opinion about the purpose of the legislation lend credence to Crosspoint's argument. But Attorney General Frey was not a member of the Maine Legislature when it enacted Chapter 366, and there is no evidence that he had a hand in proposing the legislation to a legislator. Regarding Speaker Fecteau, the United States Supreme Court has repeatedly cautioned against relying on the statements of one legislator to ascribe motivations to the entire legislative body. *See United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) ("Inquiries into congressional motives or purposes are a hazardous matter" and courts should not rely on statements made by individual legislators since "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it"); *Lukumi*, 508 U.S. at 558 (Scalia, J., concurring) (subjective motivation of lawmakers is irrelevant when conducting analysis under the First Amendment, and "it is virtually impossible to determine the singular 'motive' of a collective legislative body").

The historical background provides significantly more support for the Defendants' explanation that the Maine Legislature fashioned Chapter 366 to keep

the MHRA's provisions on education discrimination in line with its broader scheme for exempting only religious organizations that do not receive public funding from certain antidiscrimination provisions. The tuitioning program's sectarian exclusion prohibited sectarian educational institutions from receiving public funding from 1981 up until its invalidation by *Carson* in 2022. 142 S. Ct. at 1994, 2002. The MHRA has, since 2005, generally exempted only religious organizations that do not receive public funds from its sexual orientation/gender identity provisions. *See* P.L. 2005, ch. 10. While religious organizations were exempted from those provisions from 2005 until 2022—regardless of whether they received public funding—there would have been no reason to include such a distinction. Because the sectarian exclusion blocked tuitioning funding for sectarian educational institutions, distinguishing between sectarian institutions that did or did not receive public funding would have been unnecessary and redundant.

Once the sectarian exclusion was struck down, however, the public funds distinction was no longer be mere surplusage. After the constitutionality of the sectarian exclusion was challenged during the *Carson* litigation, the Legislature in 2021 passed Chapter 366, which—among other things—added the public funding distinction to the religious exception for educational discrimination. The current exemption, enacted in 2021, is consistent with the text and purpose of the Legislature's 2005 Act, which broadly proscribed sexual orientation and gender identity discrimination "in employment, housing, public accommodation, credit and educational opportunity . . . except that a religious corporation, association or

organization *that does not receive public funds* is exempt from this provision."  P.L. 2005, ch. 10 (emphasis added).

The First Circuit has directed that "[w]hen assessing neutrality, a court must survey meticulously the totality of the evidence, both direct and circumstantial . . .. This includes the series of events leading to the conduct, as well as the historical background."  *Swartz,* 53 F.4th at 701 (citations and internal quotation marks omitted).   Against this neutral explanation, Crosspoint insists that Chapter 366 instead targets its religious beliefs and was designed to prevent it from participating in the tuitioning program, relying on the Act's temporal relationship to the *Carson* litigation, then-Speaker Fecteau's tweet, and Attorney General Frey's press release— issued nearly a full year after Chapter 366 was enacted.   Even if some members of the Maine Legislature enacted Chapter 366 with the *Carson* litigation in mind and even if Chapter 366 causes some religious institutions not to apply for tuition funding, the law itself may still be neutral.   Given the historical and circumstantial backdrop, the Court does not find sufficient evidence to suggest that Chapter 366 "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."[7]  *Fulton*, 141 S. Ct. at 1877.

---

[7]      Though the parties focus primarily on the MHRA's sexual orientation and gender identity provisions, Crosspoint also contends that the statute violates its free exercise rights by "requir[ing] BCS to permit student religious expression contrary to its statement of faith."  *Pl.'s Reply* at 4; 5 M.R.S. § 4602(5)(D) (providing that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing").

These issues are not fleshed out in the parties' briefings nearly as thoroughly as the sexual orientation/gender identity issues.   *See Defs.' Opp'n* at 2, 10; *Pl.'s Reply* at 4.   Section 4602(5)(D) appears to primarily protect students' rights to religious expression.   Even assuming that it would burden Crosspoint's religious exercise to prevent it from prohibiting disfavored religious expression, it

The Court concludes that Chapter 366 is neutral and generally applicable. "When a religiously neutral and generally applicable law incidentally burdens free exercise rights, we will sustain the law against constitutional challenge if it is rationally related to a legitimate governmental interest." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021) (citing *Fulton*, 141 S. Ct. at 1876). Maine has a legitimate interest in preventing discrimination in education, and the Court finds that the MHRA's challenged antidiscrimination provisions are rationally related to that interest. Crosspoint has failed to demonstrate a likelihood of success on the merits on its free exercise claim as it pertains to educational discrimination.

### b.     The Employment Discrimination Claim

Crosspoint's employment discrimination claim is similarly unavailing. Crosspoint asserts that "applying MHRA's employment discrimination provision, 5 M.R.S. § 4572(1)(A), to prohibit Plaintiff from hiring only co-religionists violates the Establishment and Free Exercise Clauses." *Pl.'s Mot.* at 14. In Crosspoint's view, "Plaintiff faces a credible threat of Defendants enforcing § 4572(1)(A) to prohibit BCS's practice of hiring only co-religionists if BCS participates in the tuitioning program . . .. Such enforcement violates both MHRA's plain text and the First Amendment." *Id.* at 15.

Section 4572 prohibits employers from discriminating on the basis of religion. As Crosspoint notes, however, 5 M.R.S. § 4573-A states plainly that:

---

is unclear to the Court in which context(s) this would arise and to what extent § 4602(5)(D) would infringe Crosspoint's desired behavior.

For the purposes of this motion, the Court concludes that Crosspoint has not carried its "burden of proving a free exercise violation." *See Kennedy*, 142 S. Ct. at 2421-22.

> This subchapter does not prohibit a religious corporation, association, educational institution or society from giving preference in employment to individuals of its same religion to perform work connected with the carrying on by the corporation, association, educational institution or society of its activities.  Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of that organization.

*Id.*; *Pl.'s Mot.* at 15 ("The plain text of the MHRA protects Plaintiff's employment autonomy even when Plaintiff accepts public funds").  The Defendants agree, offering that "[a]ll religious organizations (regardless of whether they receive public funds) are allowed to give employment preference to individuals of the same religion and may require all applicants and employees to conform to the organization's religious tenets" and "Plaintiff is thus free to limit employment to persons who share Plaintiff's religion and who conform to its religious tenets."  *Defs.' Opp'n* at 18 (emphasis omitted) (citing 5 M.R.S. § 4573-A(2)).  In reply, Crosspoint submits only that "Defendants' Response at least concedes (at 18) that the ministerial exception restricts the application of 5 M.R.S. § 4572(1)(A) to BCS's employment practices with respect to a significant portion of its employees" and "[a]t a minimum, then, a preliminary injunction to that effect is appropriate."  *Pl.'s Reply* at 1.

The Court respectfully disagrees.  Both Crosspoint and the state interpret § 4573-A(2) to exempt Crosspoint, as a religious institution, from § 4572(1)(A)'s prohibition on employment discrimination based on religion.  The Court's own reading of the statute's operation confirms this interpretation.[8]  Crosspoint offers no

---

[8]      Although not mentioned by the parties, Maine's Constitution contains a direct reference to the right of religious societies to employ "public teachers" of their choosing.  Article I, § 3 is entitled,

legitimate justification for the Court to enjoin the hypothetical future enforcement of a statute (disclaimed by the state) in a manner that would appear to plainly violate the statute's own text.   In essence, on this narrow issue, the Court declines to issue an injunction because there is no case or controversy between the parties.   U.S. CONST. art. I, § 2.

### 3.  Crosspoint's Free Speech Claim

Crosspoint argues that Chapter 366 also violates the Constitution's Free Speech Clause, asserting that it "restricts Plaintiff's speech based on content and viewpoint, because it is designed to force Plaintiff to stop educating its students from its religious perspective as a condition of participating in the tuition program." *Pl.'s Mot.* at 17.  Under its interpretation of the law, "[i]f Plaintiff teaches from its religious perspective, it must either forgo accepting publicly funded tuition payments or face thousands of dollars in liability . . . [a]nd suppressing Plaintiff's religious perspective is the poison pill's avowed purpose." *Id.* at 18-19.

The Court is not convinced.  At least in this pre-enforcement context, the plain text of the challenged provisions of the MHRA regulate conduct, not speech.  The Court found that the MHRA's antidiscrimination provisions could burden

---

"Religious Freedom; Sects Equal; Religious Tests Prohibited; Religious Teachers," and provides in part:

> [A]ll religious societies in this State, whether incorporate or unincorporate, shall at all times have the exclusive right of electing their public teachers, and contracting with them for their support and maintenance.

ME. CONST. art. 1, § 3.  The parties' unified position that the Maine statutes exempt Crosspoint as a religious institution from the provisions of Maine law that prohibit discrimination based on religion seems consistent with this specific provision of the Maine Constitution.

Crosspoint's religious exercise by impeding its ability to enforce certain religiously motivated policies. But on its face, the MHRA does not limit Crosspoint's ability to "teach[] from its religious perspective." *Id.* Prohibiting participating religious schools from discriminating on the basis of sexual orientation or gender identity may ultimately affect their conduct, but the Court has yet to see a persuasive argument that it infringes on their expression. *See Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1598 (2022) (Alito, J., concurring) ("'Speech,' as that term is used in our First Amendment jurisprudence, refers to expressive activity that is 'intended to be communicative' and, 'in context, would reasonably be understood . . . to be communicative'" (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984)).

In *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), the Supreme Court held that a law denying certain federal funds to law schools that prohibited military recruiters did not violate the First Amendment because it "neither limits what law schools may say nor requires them to say anything" and the "schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds." *Id.* at 51, 60, 70. The Supreme Court emphasized that "[a]s a general matter, the [challenged law] regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60 (emphasis in original).

The Court concludes the same here: the challenged MHRA provisions limit conduct, not speech, and therefore do not infringe on Crosspoint's right to free expression. Crosspoint has not shown a likelihood of success on any of its claims.

## B. Irreparable Harm to Crosspoint

Having concluded that Crosspoint is not likely to succeed on the merits, the Court next considers the second prong of the preliminary injunction analysis. Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued . . . injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). To show irreparable harm, a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction").

Courts "measure irreparable harm on 'a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.'" *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (quoting *Vaquería Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 485 (1st Cir. 2009)). Thus, "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown," however, "at least some positive showing of irreparable harm must still be made." *Id.* at 43 (internal quotations omitted) (alteration in original); *see also Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221, 1232 (1st

Cir. 1993) ("[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief").

In other words, as the First Circuit has recently put it, "[i]f the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). The Court does not doubt that, if Crosspoint's constitutional claims were meritorious, it would suffer irreparable injury by refraining from applying for the tuitioning program. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Crosspoint, however, has not shown a likelihood of success on the merits, and Chapter 366 is thus unlikely to cause a deprivation of its constitutional rights.

## C.   Balance of the Equities and the Public Interest

The Court must also weigh the balance of the hardships on the parties and the public interest. The Court does not discount Crosspoint's hardship related to not participating in the tuitioning program for fear of MHRA enforcement, but it also does not find that hardship to outweigh the potential hardship the state would face from being unable to fully enforce its educational antidiscrimination laws. The public also has a strong interest in the state being able to effectively combat discrimination. Buttressed by the Court's conclusion about Crosspoint's likelihood of success on the merits, the balance of these factors favors the Defendants.

45

### D.      Summary

The Court concludes that Crosspoint is not entitled to a preliminary injunction. With this said, the Court acknowledges that Crosspoint is raising important legal questions.   Despite the plaintiffs' hard-fought and significant victory at the United States Supreme Court in *Carson*, the Maine Legislature and the Maine Attorney General have largely deprived Crosspoint and similar religious schools of the fruit of their victory.   Crosspoint essentially argues that the Maine Legislature's enactment of statutes that prohibit discrimination on the basis of sexual orientation and gender identity is a form of state-enforced, secular religion.   Yet, the Maine Legislature has the authority to define protected classes under its antidiscrimination laws.   The rub comes when the Maine Legislature's view of the categories of people meriting protected status conflicts with sincerely held beliefs of members of religious communities.   This is a tension as old as the nation itself.   Although it has done its best to set out, analyze, and decide these difficult constitutional issues, the Court also recognizes that this case poses novel constitutional questions and has attempted to frame its opinion as a prelude to a challenge to the Court of Appeals for the First Circuit for a more authoritative ruling.   *See Carson v. Makin*, 401 F. Supp. 3d 207, 212 (D. Me. 2019) ("It has always been apparent that, whatever my decision, this case is destined to go to the First Circuit on appeal, maybe even to the Supreme Court").

## VI.   CONCLUSION

The Court DENIES Crosspoint Church's Motion for Preliminary Injunction (ECF No. 5).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of February, 2024