Exhibit 8



# 121st MAINE LEGISLATURE

## FIRST REGULAR SESSION-2003

Legislative Document                                                    No. 182

H.P. 141                              House of Representatives, January 21, 2003

### An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools

Reference to the Committee on Education and Cultural Affairs suggested and ordered printed.

*Millicent M. MacFarland*

MILLICENT M. MacFARLAND
Clerk

Presented by Representative GLYNN of South Portland.
Cosponsored by Senator NASS of York and
Representatives: DAIGLE of Arundel, SHIELDS of Auburn.

D000020

Be it enacted by the People of the State of Maine as follows:

2      Sec. 1. 20-A MRSA §2951, sub-§2, as enacted by PL 1981, c.
4   693, §§5 and 8, is repealed.

6                          **SUMMARY**

8      Current law prohibits religious private schools from
10  receiving public funding to educate children from school
    districts that do not have secondary schools. This bill repeals
12  that prohibition.

D000021

LEGISLATIVE RECORD - House, May 13, 2003

(6-2) Majority Report of the Committee on **EDUCATION AND CULTURAL AFFAIRS** reporting **Ought Not to Pass** on Bill "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools"

(H.P. 141) (L.D. 182)

Signed:
Senators:
DOUGLASS of Androscoggin
BRENNAN of Cumberland
MITCHELL of Penobscot
Representatives:
CUMMINGS of Portland
GAGNE-FRIEL of Buckfield
FINCH of Fairfield
LEDWIN of Holden
NORTON of Bangor
THOMAS of Orono
FISCHER of Presque Isle
DAVIS of Falmouth

Minority Report of the same Committee reporting **Ought to Pass as Amended by Committee Amendment "A" (H-324)** on same Bill.

Signed:
Representatives:
MURPHY of Kennebunk
ANDREWS of York

(Representative Fischer moves Maj ONTP & TTL)

(Representative Fischer withdrew motion to TTL)

The SPEAKER:  The Chair recognizes the Representative from South Portland, Representative Glynn.

Representative **GLYNN**:  Mr. Speaker, Ladies and Gentlemen of the House.  I rise in support of this bill and against the motion of Ought Not to Pass on this bill.  This bill is a step toward ending discrimination against parents who want to send their children to religious or private schools.

This bill was collaborative of a number of parents as well as the Roman Catholic Diocese.  Maine has a school voucher program that allows parents in towns without their own schools to use up to $6,000 in public funds to send their children to any public school or a non-religious private school.  Several years ago parents were able to use the money to send their children to religious schools, but that changed in 1981.  The Maine Legislature enacted a law banning the use of public funds for religious schools.  Maine's ban saying that parents cannot choose to have their children be taught by people in a religious school is discrimination.  Our public policy is a discriminatory one as if the state enacted a ban to prohibit children from being taught by people with a different color or a different gender.  In this case we are saying that people can't be taught by someone of another faith.

LEGISLATIVE RECORD - House, May 13, 2003

Discrimination is wrong no matter how it is labeled, no matter how it is colored and how it is sold. This ban is clearly unconstitutional and it will be struck down. Because the Maine Legislature has not dealt with this issue equitably, parents have been forced to file lawsuits against this ban in court. One lawsuit was filed in state court by six families from Minot, Durham and Raymond. Another suit has been filed in federal court by two families from Minot. Both suits charge that the prohibition policy by Maine amounts to religious discrimination.

Ladies and gentlemen of the House, public policy should not be set by the court system. It should be set by the Maine State Legislature. If the education community does nothing to address this discrimination, we will, in fact, be mandated to implement these changes perhaps in a consent decree very similar to the one that was used to implement reform and changes in Maine's mental health clients a few short years ago. Additionally in a time with a projected $1.2 billion shortfall that we have been dealing with, Maine will be spending between $100,000 to $300,000 in legal fees and judgments should we continue to discriminate against Maine people's religious choices.

Do we really wish to continue this discrimination against people of faith? If your answer is the same as mine, no you don't, then I urge you to defeat the Majority Ought Not to Pass Report and move on to striking down this discriminatory practice. Thank you Mr. Speaker. When the vote is taken, Mr. Speaker, I request the yeas and nays.

The SPEAKER: The Chair recognizes the Representative from Presque Isle, Representative Fischer.

Representative **FISCHER**: Mr. Speaker, Ladies and Gentlemen of the House. I rise today in sincere opposition to LD 182, "An Act to Eliminate Discrimination Against Parents Who Want to Send their Children to Private Religious Schools." While the title of this bill might sound appealing, its effects, whether intended or unintended, would have dire consequences for the citizens of the State of Maine.

Mr. Speaker, I submit to you and to this body that there are a number of reasons why this bill should be rejected. These reasons are compelling and have at their root the sovereign prerogative of the people of the State of Maine regarding how public funds can and should be used in supporting public education for the children of this state.

At the outset, it is important to clarify the meaning of the recent Supreme Court decision that the proponents of this bill rely upon. That case, Zelman v. Simmons-Harris, decided what a state may do regarding public funding of religious schools. It did not decide what Maine must do.

In no way did that decision limit the sovereign power of the people of the State of Maine, through their duly elected representatives, to decide whether to fund religious schools. Publicly funding education for our children is one of the most important and vital functions of our state and it is this body's responsibility to carefully exercise discretion over our education system.

Mr. Speaker, I submit it is fundamentally wrong for us to fund discrimination, but that is exactly what this bill calls for. Private religious schools freely admit that they do not hire individuals whose beliefs are not consistent with the school's religious teachings. Yet the Maine Human Rights Act and the US Civil Right Act both clearly state the

D000023

LEGISLATIVE RECORD - House, May 13, 2003

following, "It is unlawful employment discrimination for any employer to refuse to hire any applicant because of the race, sex, physical or mental disability, religion, age, ancestry or national origin of the applicant."

This would lead the casual observer to the conclusion that the private religious schools are currently in violation of the Maine Human Rights Act and the US Civil Rights Act. The casual observer, Mr. Speaker, would be wrong.

The reason for this is due to an exclusion in both acts for private religious entities. As we all know, the Constitution protects religious freedom, so both acts include the following exclusion. "It shall not be unlawful employment discrimination for a religious school to hire employees of a particular religion if such a school is in whole or a substantial part owned or supported by a particular religion." Therefore, it's currently legal for private religious schools to discriminate in hiring against individuals of other religions.

That, however, is only the current situation. LD 182 would allow for public money to go to private religious schools. That begs the question, what happens when the school is no longer "in whole or substantial part owned or supported by a particular religion" but rather it is subsidized by the taxpayers of the State of Maine?

Ladies and gentlemen of the House, I ask you to consider this question, can private religious schools discriminate against citizens of the State of Maine, including even members of this body, because of their religious beliefs? Yes, they can. Is it right for them to do this with our tax money? No, it is not.

Ladies and gentlemen of the House, do you want to take our preciously limited resources and promote discrimination?

Mr. Speaker, that is exactly what LD 182 asks for this body to condone, discrimination. When the Governor asked me to raise my right hand and to swear to uphold the Constitution of the United States of America and the State of Maine, I promised I would. The Maine Human Rights Act and the US Civil Rights Act both state quite clearly that freedom from discrimination in employment is a civil right. As the State Representative from Presque Isle, it's my duty to defend these laws, to oppose discrimination and to protect the civil rights of my constituents.

Mr. Speaker, these responsibilities are the same for every member of this chamber. Public money should never be used to subsidize discrimination against the citizens, against the taxpayers, of the State of Maine. I urge you to support the Majority Report, LD 182, Ought Not to Pass. Thank you Mr. Speaker.

The SPEAKER:   The Chair recognizes the Representative from Arundel, Representative Daigle.

Representative **DAIGLE**: Mr. Speaker, Ladies and Gentlemen of the House. This is a very, very said day in the history of this body when I hear the Catholic Church being accused of being a discriminatory agency. Perhaps if I stay around here long enough, I might hear worse, but it is unlikely.

I encourage you to look at this bill in a different manner. I actually wish you would vote against the pending motion, Ought Not to Pass, and go on to pass this bill. First, let me emphasize that this bill would only relate to communities that are tuitioning their

LEGISLATIVE RECORD - House, May 13, 2003

students outside their school district. If you live in a town that has a school that already serves your students and parents which to send their kids to parochial school, this would not apply.

Let me give you an example in Arundel, the town where I live and represent, obviously, why this would be a very attractive option for Arundel. We currently tuition our students to area high schools, paying $6,000 per student per year. The parent wants to send their child to Chevrus High School, so what. It would still be $6,000 as opposed to going to Kennebunk High School, Thornton Academy or Biddeford High School. Right now we are in the position of having to expand our middle school. We are going to have to send our sixth, seventh and eighth graders to Thornton Academy. It will cost us $6,000 per year, per child to send all of our sixth, seventh and eighth graders to Thornton Academy. St. James School in Biddeford offers an excellent education for parishioners for the cost of $1,800 per year. For non-parishioners it is $3,000 per year.

Referring back to the early comment about discrimination, the parochial school system does not discriminate on religion on hiring teachers. It does not discriminate on religion of students enrolled in that school. In fact, if you check the facts in this matter, there are many teachers who are not Roman Catholics and there are far, far many students who are not Roman Catholics. People want to work for the school system because it is a good employer with an excellent environment. Parents want to send their school children to the school because they get an excellent education. If this law were to pass, for every student in Arundel that goes to St. James instead of Thornton Academy, the Town of Arundel and the school funding formula would save $4,200 per student per year for a parishioner and at least $3,000 per student per year for non-parishioners. There is nothing else this body has done in the time I have been up here to reduce the cost of education ever. We have always said we don't fund enough for education ever. If we were to pass this bill, to the extent that parents would go to an option they prefer, St. James, we would be returning many thousands of thousands of dollars and reducing the costs of education.

I encourage you to think of that, if for no other reason, as being one thing we could do to tell our towns that this year we didn't give you enough money, but we gave you the ability to run your schools less expensive than you are running them today. Thank you.

The SPEAKER: The Chair recognizes the Representative from Kennebunk, Representative Murphy.

Representative **MURPHY**: Mr. Speaker, Men and Women of the House. This bill was like a time travel experience, because sometimes you see the after affects of mischief. I had gone on the Education Committee in 1981. In 1979 or 80 there had been a court case on this type of issue. We went through a recodification in 1981 or early 1982 and in those days, and I assume today that you couldn't do mischief in a recodification. You couldn't drop little nuggets in there that shouldn't have been there. What happened in that recodification, either a staff member or a committee chair had put this language in banning those districts that do not have a secondary school of being able to have that option of a youngster being able to go to a parochial school. That was only discovered much later.

LEGISLATIVE RECORD - House, May 13, 2003

We are not sure whose fingerprints were on that change or the violation of the recodification process, but it was there and it is in there as law. The law swings like a pendulum in terms of court cases. In 1979-80, the courts were ruling such bans on public monies and state monies moving towards private schools or parochial schools. The pendulum has swung the other way now. The courts are saying, yes, that those monies going to the parents and then they have the choice as to where their child wants to go. This involves only a handful of communities. As the Representative from Arundel, Representative Daigle, had indicated, this is the practice in Arundel. Up until 1982, because they don't have a middle school, it is real important for you to understand, this only applies to communities that do not have a secondary school, either a high school or a middle school. The parents then have a choice. The town gives them the money and they can go to a neighboring public school or they can go to North Yarmouth Academy or Berwick Academy or out of state to a private school if they want to. Up until the court law changed and then someone snuck this into the law in 1982, parents had that option.

Many parents in Arundel, which is just on the other side of the river from me, and I can look across and see the houses, and up until 1982, their children, many of them had the option of going to Chevrus or Catherine McCauley. The courts decided against that. Someone slipped that into the law and now the pendulum has moved the other way, but we still have this little treasure, this little hidden nugget that remains in the statute. This is what this is all about. The courts have definitely begun to rule against this in Cleveland and other communities. The two positions that are before you is one that just says, no, the door slammed shut and remained shut for the next two years. The other one says, let's follow what is happening in the court. Let's take a closer look at it and be ready for when the court decisions come in. This only involves a handful of communities in the State of Maine and it is parent choice, student choice. What we are looking to do is reaffirm what existed up to 1982 so that those students have a choice.

The SPEAKER:     The Chair recognizes the Representative from Portland, Representative Cummings.

Representative **CUMMINGS**: Mr. Speaker, Men and Women of the House. There are three good and simple reasons why you should stand behind the overwhelming Majority Report. It says that this is the wrong policy move for the State of Maine at this time. Let me start with the most basic one. You can't afford it. I share the sympathies and the positions of Representative Glynn from South Portland. Representative Glynn is concerned about money. Let me remind you that in GPA next year, for the first time in over 12 years, we will be facing smaller amounts than we presently have. The resources yesterday to drain off from public schools to make this happen will be an endangerment to the quality of our public schools and that is a serious consideration.

Secondly, we have for a long time held in the State of Maine a position that the courts are not the best place to make public policy, but you, sent here by your constituents, are the best place to make public policy. Do not give up that right today by allocating to the courts a decision that ought to be within our own jurisdiction to make. Why should we make that decision? There is no clear firewall in the US Constitution, there is clearly a delineation within the US Constitution that our state and our private

D000026

LEGISLATIVE RECORD - House, May 13, 2003

religious sector should be separate. That entanglement is a serious entanglement, one that releases you from accountability or releases entities from accountability of quality.

I want to go back to the Zelman case quickly. In the Zelman case overwhelming evidence of failure in the Cleveland public schools allowed, under some conditions, for vouchers to be an option. Let me tell you it would be hard to say with a straight face that Maine teachers have failed you in the quality of their public education. If you vote for this, you are implicitly saying that the Zelman case allows you, under conditions of inadequate, inappropriate and unworthy public education to support the use of vouchers. It is not clear how the US courts will decide in this case. What is clear is that the policy decisions that are before you today.

Let me make my third point. If we were to move in the direction of religious vouchers at this time in our history, we would effectively be giving up the rights for the education of our children to entities whose overwhelming mission is religious. You do not have to be opposed to religious entities having that kind of control. In our decision today, we have to believe that children are better supported by the public schools with public money. If you choose to do otherwise, then let it be with private money. Thank you.

The SPEAKER: The Chair recognizes the Representative from Biddeford, Representative Sullivan.

Representative **SULLIVAN**: Mr. Speaker, Men and Women of the House. It seems nothing is new under the sun. We have debated this issue since I have been here. I am sure to those prior.

First of all, I want to address some things that were said by the Representative from Arundel, Representative Daigle. Indeed they do have a right for children there going to high school to go to Thornton Academy, a system in which I work, Biddeford, a system in which I live, and Kennebunk, Kennebunkport. However, they also provide transportation. Are we going to provide transportation to Chevrus? That is a right also, transportation to schools.

We also have a school program within each community that we represent that depends on enrollment as part of the way they figure what you have coming to you from GPA. Everybody puts into a fire department. We all hope we never have to use that fire department in the municipality. You can put in sprinklers in your building and in your own home if you want, but you have the right to the fire department. That is part of what community in government provides. Public school is what is provided. If we are going to start looking at this, we are going to say that once you have your aged children out of school, then you no longer have to provide tax money to your education system. It doesn't work that way. Communities provide for both ends of the spectrum. Communities have an educational center.

We have forgotten about America. We have agreed to uphold the Constitution, a separation of church and state. To send to religious schools at taxpayers' expense takes away that very principle. I also question the $6,000. The school systems are reimbursed at what the average rate of school is. Thornton Academy is a semi-private school and they are actually allowed to charge 10 percent more. Having had good friends who live

LEGISLATIVE RECORD - House, May 13, 2003

in Arundel, they have often wondered why Arundel continues to offer Thornton Academy as a choice. They pay extra money than if you go to Biddeford or Kennebunk, public schools. Private schools or semi-private schools are allowed to charge 10 percent more than the average tuition. This is about dollars and cents and it is about the very fabric of the community that you represent, your public schools.

Public schools are what have made the cornerstone of this country. Education, free to all children, to age 18 and in some cases longer. We need to honor that. We need to set policy and say that we support our public schools with taxpayer's money. We don't support private schools, parochial private schools. It is not right. I ask you to go with the Majority Ought Not to Pass Report. Thank you.

The SPEAKER:    The Chair recognizes the Representative from Skowhegan, Representative Richardson.

Representative **RICHARDSON**:  Mr. Speaker, Ladies and Gentlemen of the House. This debate amazes me. The people want to be able to send their children, when they don't have the opportunity, to get educated. We are not sending these children to the pied piper. We are sending them to a school to get educated. It also amazes me that we are so concerned with the separation of church and state, but every morning we have a minister giving a prayer over this body. I might add it sounds like it is needed.

The SPEAKER:    The Chair recognizes the Representative from Farmington, Representative Mills.

Representative **MILLS**:  Mr. Speaker, Women and Men of the House.  I rise in response to some of the issues that have been raised in this debate so far. It has been said that we need to provide vouchers for sectarian schools, to change our current law and do so because it is constitutionally required. I strenuously oppose that position and suggest that there is no basis in law to take that position. In fact, our current statute, as pointed out by the Representative from Kennebunk, has not been changed for 22 or 23 years. Our current statute has been upheld in the courts of Maine. I would refer the gentleman to Strout versus Albanese in 1999, US First Circuit Court of Appeals case, dealing with our current system and finding it constitutional, in addition to the Bagley versus Raymond case in 1999, Maine Supreme Judicial Court case, which also found our current system constitutional. It is not constitutionally required that we change our current system. It has been said several times there are a finite number of resources available to us. I think we all know that. We don't have to serve on Appropriations or Education to understand how GPA is being severely curtailed year by year. We unfortunately can only look forward to additional cuts. I don't see how, as a policy matter, it is possible to give non-secular schools or religious based schools dollars without taking those same dollars away from secular schools and public schools.

It has been said that the Zelman case requires us to change our law. That simply is not so. The Zelman case, as has been pointed out by other speakers, dealt with a very narrow fact situation in the Cleveland School System. It was a 5 to 4 decision. It merely said that in the desperate circumstances in which the Cleveland School System found itself, under court order because of the disastrous circumstances of its schools, under federal court order, it needed to find alternatives to the public school system. It found

D000028

LEGISLATIVE RECORD - House, May 13, 2003

that those narrow alternatives pass constitutional muster weighing in the balance as the court always does - it is a fine line between the Establishment Clause and the Free Exercise Clause - whether or not giving private non-secular education was the establishment of religion or the promoting of religion and whether or not any other system impaired the exercise of religion. In the narrow circumstances of that case, the US Supreme Court found the Cleveland School System passed constitutional muster. It in no way determined or indicated or hinted in the remotest sense that other school systems in other states would be required to change their system to make our system, for instance, similar to that of Cleveland.

Let me just quote you a few facts quoting from the Zelman opinion. It stated and noted and relied upon the fact that "for more than a generation, Cleveland's public schools have been among the worst performing public schools in the nation. In 1995, a federal district court declared a crisis of magnitude and placed the entire Cleveland School District under state control. The Cleveland Public Schools were in the midst of a crisis, perhaps unprecedented in the history of American education. The district court had failed to meet any of the 18 state standards for minimal acceptable performance. More than two-thirds of high school students in Cleveland either dropped out or failed out before graduation. The students who managed to reach their senior year, out of those students, one out of every four failed to graduate. Of those who did graduate, very few could read, write or compute at levels comparable to their counterparts in other cities." Those facts are cited in the Zelman opinion and on which that narrow opinion is based. It is a very, I think, fact based decision. It is a 5 to 4 decision with very strong concurring and dissenting opinions that narrow the focus of the court's opinion even further.

Compared to the Cleveland situation, a desperate one indeed, by any definition, we, in Maine can be very proud of our public education system. In 1999 our system was rated the highest performing K-12 educational system in the nation by the National Education Goals Panel, an independent bipartisan agency. Maine was one of only 11 states to exceed the national average in all subjects measured by the national assessment of education progress. We have the highest rate of school completion graduation in the nation, 95.4 percent, compared to the national average of 86 percent. Our AP classes, 83 percent of public high schools offer AP courses and our students do very well in AP standings and in standardized tests, both statewide and nationwide.

We have a fairly low student teacher ratio. We have a school system over which we can be very proud indeed. We are not about to fall under any federal court order placing us under jurisdiction or custody of the state or some other agency because of poor school performance. I encourage you and urge you to vote Ought Not to Pass on the bill for the reasons stated.

Our system is not constitutionally broke as it currently stands and it is not necessary to fix something that is not broken. Thank you.

The SPEAKER:    The Chair recognizes the Representative from Falmouth, Representative Davis.

Representative **DAVIS**: Mr. Speaker, Ladies and Gentlemen of the House. I urge you to vote the majority on LD 182. In the Majority Report there are both Republicans

D000029

LEGISLATIVE RECORD - House, May 13, 2003

and Democrats on that report. I would urge you in Portland, Maine, alone, if we open this voucher thing up, think down the line. There are Sunni Muslims in the Portland School System and there are Shiite Muslims in the Portland School System. There are Protestants and Catholics and Jewish children. There are Buddhists and Hindus. I had some of them in my own class. If you open this up, be prepared to open it up thoroughly, because some of those groups, I am sure, will be forming their own schools. Thank you very much.

The SPEAKER: The Chair recognizes the Representative from South Portland, Representative Glynn.

Representative **GLYNN**: Mr. Speaker, Men and Women of the House. I believe that the debate has gotten just a tad off topic. I think that if folks weren't looking at the bill in front of them and were listening solely to the debate, then you would believe that we are debating a school voucher program here in the Legislature and that simply is not the case. Maine has a school voucher program right now for school districts which do not have either a high school or a middle school and Maine law allows for use up to $6,000 for these school district to use public funds to send their children to any private school that is non-religious or to a public school. If you are concerned that voting for a bill will siphon governmental funds for the use in private schools, your concerns are misplaced because that is already state statute. The condition that we are speaking to is a very narrow one dealing with a very small handful of school districts. This is the case of a school district, which has no high school or has no middle school currently giving $6,000 in voucher money to a maximum to a set of parents to send their children to any private school or public school of their choice. However, in the State of Maine we have a prohibition on these parents that they cannot send their children to a secular school, be it Catholic, Jewish, Protestant or any of the other religions. That, my friends in the Legislature, is why I believe that we have a discriminatory practice in Maine. The fact that we have a school voucher program is a public policy debate that was decided in a previous day. School vouchers are here in the State of Maine. The fact that we have a law on the books that says that you can send your children to a private school, but if they are going to be taught by a bunch of Catholics, then that is a problem. That is unconstitutional and that is where our law has gone astray. That is why I believe that the lawsuits that are currently pending in our court systems, both in the federal court and in the state court systems by these parents are actually pointing out a clear discriminatory ban that we have in our state. Why would we not want to empower the children and empower the parents so that the parents can choose the most appropriate educational setting for their children to learn in?

I disagree with the points made by previous speakers that support of our public schools and support of these parents and their decision to send the children to a religious school as well as a non-religious private school in some way are mutually exclusive. They are not. We can and we should have it all here in the State of Maine and we should support these parents. I urge you to join with me and defeat the Majority Ought Not to Pass Report. Thank you.

D000030

LEGISLATIVE RECORD - House, May 13, 2003

The SPEAKER:   The Chair recognizes the Representative from Poland, Representative Snowe-Mello.

Representative **SNOWE-MELLO**:   Mr. Speaker, Ladies and Gentlemen of the House. I represent one of these districts, the Town of Minot, where we have parents who have decided to sue the state. This came out of where they asked the superintendent to please have their child sent to St. Doms. They are very unhappy in their beliefs that the school in Poland did not meet their needs. They are very unhappy with the policies set in certain areas. They believed with all their heart that St. Doms would be a much more appropriate school for their child to attend. They went through everything they needed to do, the proper channels. They went to the superintendent and asked them for a superintendent's agreement, because that is our school choice agreement. Our superintendent denied the child to go to that school. I think it was not appropriate at all.

I am very concerned with the statement that was brought up that our private schools cannot do as good a job at teaching our young people as our private schools or religious private schools. Many of our religious schools do an excellent job as teaching our young people. I really was appalled by that statement.

The point I need to make is that I had put in a bill to the Judiciary Committee to ask the state to supply an attorney, free of charge, to help the Town of Minot to help pay for that lawsuit. That is why I think this bill is so incredibly important. It will cut down on those costs. It will help to save tax dollars. It will give aide to our local schools. I really believe that parents and children have the right to go to the school they feel is going to teach their children in the way they believe is appropriate. Thank you.

The SPEAKER: The Chair recognizes the Representative from Saco, Representative O'Neil.

Representative **O'NEIL**:   Mr. Speaker, Colleagues of the House. I am a little confused and conflicted on this. I apologize in advance for speaking on a bill that didn't come out of my committee. I apologize for speaking on a bill that only has two members on the Minority Report. I will work through this while I am on my feet if I could. I have a bit of an interesting perspective here. I have two kids in Catholic School. I am a product of a Catholic School. I am pretty proud of that fact and, in fact, when I went to go to college that helped me a whole lot more than anything else I had done. The fact of the matter is the Representative from Arundel, Representative Daigle, made a couple of points that aroused my interest.

My two kids, Maggie and Max in eighth and fifth grades respectively, are at St. James School in Biddeford. For nine years I have paid property taxes in Saco and sent my kids over to St. James willingly and knowingly. Every time a school voucher or school choice or so called choice vote has come before this body, I have opposed it because I oppose that traditional siphoning of public funds off to private, not necessarily religious, but private institutions for the sake of supporting that bedrock of our democracy, which is the public school system.

That said, I also represent the Town of Dayton, which has undertaken a very divisive and contentious debate over what to do with their middle school kids. They have outgrown their middle school. You might know that Dayton is Maine's fastest growing

LEGISLATIVE RECORD - House, May 13, 2003

town in the '90s. They have outgrown their middle school and they have traditionally sent their seventh and eighth graders to the Saco Middle School. They paid tuition. Arundel is in a similar situation in which they currently receive a voucher to send the kids to a number of different schools. Dayton is in negotiations with Thornton Academy, which is currently a high school to provide a junior high or a middle school service for the Town of Dayton for a cost.

There is the background that tells you what has laid my feet into a quandary. I have heard about the traditional argument about taking money away from the public schools and why that is a bad thing. I agree and I continue to agree. I always have. As I understand it, the applicability of this Minority Report is to schools where they now do get a voucher and that the prohibition is simply on schools that have a religious bend to them. I think that is the crux of the matter right there. If we are okay with the vouchers being granted to go to Thornton Academy, Biddeford or Kennebunk High School from Arundel, are we not okay with it going to a religious school. I think that is the nub right there, whether or not religious schools should get the public funds.

Given my constituency, given my background, but especially given my constituency and given the fact that this applies only to municipalities that now get vouchers because they have no public schools, I just need to be convinced, especially given the fact that these religious schools must have to be licensed and accredited, I need to be convinced as to why I shouldn't support the Minority Report. That argument hasn't been clearly made yet. Thank you.

The SPEAKER: The Chair recognizes the Representative from Presque Isle, Representative Fischer.

Representative **FISCHER**: Mr. Speaker, Men and Women of the House. I want to respond to the good Representative from Saco's concerns. I think there are two things that we should remember as we go to vote on this bill. The first one the good Representative from Portland brought to us, it was about entanglement. He said there is no strict firewall between church and state other than the fact it says in the Constitution and that means a lot to me. Entanglement would mean that if we were to give money to private religious schools, we would have a responsibility to them, to make them accountable in some way. How are we going to make private religious schools who teach religion in the classroom accountable to standards in the State of Maine that do not include any sort of religion in them? How do we reconcile that? There is no answer for that. You can't reconcile. Our public schools are not allowed to teach religion. Private religious schools can. You can't get from one to the other. That is the first thing, entanglement.

The second one is something that I am sure there are members of this body who would be very concerned about. It is about hiring policies. My father, for instance, is a professor. He has his doctorate. He has taught for 40 years now. He cannot get a job at St. Doms Academy. You know why? He is not a Christian. That is fine, but I am telling you if you can discriminate against people on that basis, what does that say. If you receive public money, you are going to be accountable to public laws. I am a Christian. I could get a job at St. Doms. Go figure. The point is you are going to have a firewall

D000032

LEGISLATIVE RECORD - House, May 13, 2003

there, as the good Representative from Portland said. You are suddenly going to have to open yourself up to the laws of the State of Maine if you receive public money. I don't think from the testimony that we received from directors of Christian schools across the State of Maine that that is something that they are willing to accept. They said that they hire based on whether a person's beliefs are the same as ours. That is a direct quote. You ask any member of the Education Committee, even folks on the Minority Report. They will tell you that that is the truth.

How do you explain to my father that he is a professor and he is the most qualified person for a job that you are not going to hire him because he is not a Christian? That is not what we believe in in this state. We had a big discussion yesterday, if you remember, about our terms of employment. Our terms of employment in this state are at will. We are a state that believes and we say every single day when you get a job that we don't discriminate on the basis of, and you put the list right through. That is our state. It is in our Human Rights Act. It is in the US Civil Rights Act. If someone can explain to me how we aren't going to make private religious schools accountable for their hiring practices, then I will vote against this bill too.

I would pose a question to the chair, if someone can answer that question, then I will vote against this bill. Thank you Mr. Speaker.

The SPEAKER: The Representative from Presque Isle, Representative Fischer has posed a question through the Chair to anyone who may care to respond. The Chair recognizes the Representative from Arundel, Representative Daigle.

Representative **DAIGLE**: Mr. Speaker, Ladies and Gentlemen of the House. I have not actually had the research at my fingertips to completely answer your question. I can assure you of one thing I know to be true. There are many teachers at Chevrus High School, which are not members of the Roman Catholic Church. There are many teachers in the Portland Parochial School System, which are not members of the Catholic Church. That is fine. There are a great number of students at Chevrus High Schools and in the Parochial School System of Portland that I am sure of who are not Roman Catholics.

I go on further to respond to the questions about entanglement. I understand the concerns about that. Certainly if a parochial school system is receiving a large amount of funding from public sources, then they probably would be subject to other types of issues, such as hiring practices based upon things supported by public money. I think that is a decision for the school system to make.

I would further add that we talk about accountability, within the parochial school system they all use, without exception, certified teachers. They go through the same credentials as any teacher in the school to include fingerprinting and they follow an accredited program, which is approved by the Department of Education. What they do, because they are so darn clever at it, is provide a better education on every subject that we ask to teach our students and concurrently find a good time to give them a religious understanding and a morality based training of how to become good citizens. For anybody who has had direct contact with that school system, you would clearly understand that to be true.

LEGISLATIVE RECORD - House, May 13, 2003

The SPEAKER:   The Chair recognizes the Representative from Kennebunk, Representative Murphy.

Representative **MURPHY**:  Mr. Speaker, Men and Women of the House.  Even though many issues come around in various cycles, 99 percent of the time I will stay in the chamber and listen to the debate.  What you begin to hear is issues begin to be shaped.  I think what the Representative from Saco went through on his comments just a couple minutes ago is he worked his way through this bill.  He got beyond some of the rhetoric that has been on this floor.  He identified that it is just a handful of communities. They don't have the school so parents and students in that community have a choice and their community gives them that money and they can travel in state and out of state and that they have full control of that money, except they are denied the right that they had prior to 1982.  It was important to listen to what he said.  This isn't a voucher bill.  Every community within the state is only limited in its application.  I think as we go though and look at this, there is a feeling in this chamber that it is either or.  If you have looked at both reports, you begin to understand that if we defeat this report and accept the Minority Report, then during this summer and fall while the court is going to make its decision and the pendulum is swinging in such a direction that it will make a decision, I believe, that will invalidate this law.

The SPEAKER:  Would the Representative please defer?  For what reason does the Representative rise?

Representative **FISCHER**:  Point of order.

The SPEAKER:  The Representative may state his point of order.

Representative **FISCHER**:  Thank you Mr. Speaker.  The good Representative from Kennebunk appears to be debating the merits of the Minority Report at this moment.

The SPEAKER:  The Chair does not find that to be the case.  The Representative from Kennebunk may proceed.

Representative **MURPHY**:  Thank you very much Mr. Speaker, the Representative from Saco did make reference to that.  I was responding to the Representative's comments.

Many of us would like to have the opportunity to be able to take the summer and the fall, wait and look at the court decision and be able to get all the parties together, public and private, the municipalities that are involved and begin to discuss this issue.  Basically what we are facing is something put into the law without proper process, without public hearing that got dropped in as a nugget in the dark of the night.  As the times have changed and court decisions have changed, it is still there.  There is nothing wrong with people having an opportunity to discuss an issue and take time and listen to each other.

The SPEAKER:    The Chair recognizes the Representative from Portland, Representative Cummings.

Representative **CUMMINGS**:  Mr. Speaker, Ladies and Gentlemen of the House. There have been several issues raised that I want to bring back to the attention of those here.  The issue of what is best for children is, in fact, a parent's decision.  From a public policy position, we must believe that a religiously neutral classroom is the best if funded by public dollars.  It is the foundation of our religious agreements to expect diversity in a

LEGISLATIVE RECORD - House, May 13, 2003

situation. If you are asking the question about money, it is not an insignificant amount, the DOE has said that the number could be as many as 2,000 students eligible for vouchers. That doesn't mean they would all take them, but what if they did. When we make a statement that we want to support our public schools, it is not because we have a knee jerk reaction for supporting those, but a constitutional policy demand that we create a neutral playing surface for all religions. Our purpose here today is as policy makers we provide an opportunity for the people of Maine to continue their religious avocations and their religious pursuits, but not with public money for the many reasons you have heard today. Yes, in fact, there is, of course, discrimination in religious institutions. I defend their right to do so, but not with my dollar.

The SPEAKER: The Chair recognizes the Representative from Saco, Representative O'Neil.

Representative O'NEIL: Mr. Speaker, Ladies and Gentlemen of the House. I thank each and every one of you for indulging my queries. I apologize again for pushing into lunchtime, but this really did kind of peak my interest. The good Representative from Presque Isle mentioned entanglement and that is a concept in which I took some interest. I understand that firewall that we have affirmatively decided to place to keep the church and the schools separate. This is in the form of a question that I will put out there. As I understand it if that is the law of the land now, I think it is also the law of the land for us to allow voluntary school prayer. I see that parallel to allowing students to affirmatively choose to take the voucher that we are giving them and go to the school that is accredited of their choice, whether it is religious or it is not.

As to whether we had a philosophical or an ideological divide over whether religion ought to be in the schools, I submit to you that probably the most informative class I took in college was the foundations of western civilization and it had a huge religion component to it.

A friend of mine who has children at the school where my kids go came in as an atheist/agnostic at best and liked the looks of the school. The City of Biddeford helps with finances for transportation and for books at that religious school. She said after the first year that she was pleased with the bonus that she got that her kids got to take this religion course that they had never been exposed to at home. She saw that as a pre-western civilization course with them. She was thrilled with it. The school gave her the option not to take that.

The last point is in trying to get me to support the Majority Report is if this is indeed as many as 2,000 students, why would we object? If we use the Representative from Arundel's math, that is a savings of $6 million. I am still kind of stuck here.

The SPEAKER: The Chair recognizes the Representative from Ellsworth, Representative Crosthwaite.

Representative CROSTHWAITE: Mr. Speaker, May I pose a question through the Chair?

The SPEAKER: The Representative may pose his question.

Representative CROSTHWAITE: Mr. Speaker, Men and Women of the House. My question is I am looking in the Constitution of the United States and of the State of

LEGISLATIVE RECORD - House, May 13, 2003

Maine and I am answering anyone who would care to answer where I could find the separation of church and state in either of those Constitutions. Twice I have heard that said this morning that separation of church and state is part of the Constitution. I can't find the article, nor the section. I need some help. Thank you Mr. Speaker.

The SPEAKER: The Representative from Ellsworth, Representative Crosthwaite has posed a question through the Chair to anyone who may care to respond. The Chair recognizes the Representative from Durham, Representative Vaughn.

Representative **VAUGHN**: Mr. Speaker, Ladies and Gentlemen of the House. I would have to concur that I couldn't find the separation of church and state in either the US Constitution or the Maine State Constitution. In fact, the Maine Constitution mentions that we would like to acknowledge with grateful hearts the goodness of the Sovereign Ruler of the universe in affording us an opportunity, so favorable to the design; and, imploring God's aide and direction and its accomplishment, do agree to form ourselves into a free independent state. That is in the preamble, in Section 3 it goes on to talk of the right of religion referring to worship All Mighty God.

I will submit to you that the separation of church and state was a statute introduced in 1954 in the US Congress by a Representative from Texas, which will deny the continuation of tax-free status if they engage in political activity. Thank you Mr. Speaker.

The SPEAKER: The Chair recognizes the Representative from Poland, Representative Snowe-Mello.

Representative **SNOWE-MELLO**: Mr. Speaker, May I pose a question through the Chair?

The SPEAKER: The Representative may pose her question.

Representative **SNOWE-MELLO**: Mr. Speaker, Ladies and Gentlemen of the House. Representative Murphy alluded to the fact that Maine in 1981 law was not passed by the usual process of a bill in the Legislature. Could someone inform me or explain to me how this prohibition came into being?

The SPEAKER: The Representative from Poland, Representative Snowe-Mello has posed a question through the Chair to anyone who may care to respond. The Chair recognizes the Representative from Kennebunk, Representative Murphy.

Representative **MURPHY**: Mr. Speaker, Men and Women of the House. If during the time that you served during the Legislature you haven't had the good fortune to go through a recodification, you should. As it is restructured and the language is redone, it is purposely set up that no meanings or laws change. Usually a recodification is to put it into more modern language or if after two or three decades things appear with five other titles, then you bring them together or you cross reference them. You try to get rid of the hodge podge. Whenever you go through a recodification there are always reassurances that nothing is being done here other than technical. In that particular case, in the recodification as a committee member of education, we were told repeatedly that there are no changes. They are only technical. It is a clean recodification. After the fact, after it appeared, it was clear that someone had slipped that issue in, which was a policy issue without a hearing and without a vote of the Legislature. It is there as law now.

D000036

LEGISLATIVE RECORD - House, May 13, 2003

The SPEAKER:   The Chair recognizes the Representative from Buckfield, Representative Gagne-Friel.

Representative **GAGNE-FRIEL:** Mr. Speaker, Ladies and Gentlemen of the House. I urge you to support the Ought Not to Pass report. Irrespective and irregardless of all of the discussion that you have about private or religious schools, it will open up the voucher system, regardless of what this bill says, to others to challenge it. We can't afford it. The bottom line is, what are we going to do here? We have so much GPA money and we are going to have to pass it out somewhere. The schools are in existence. We take in the children. If you want to send your child to a different kind of school, then you are going to have to take it upon yourself to pay for it. You have to. We can't afford to do that, 2,000 or 22,000. Part of that is because the schools are open. The operating costs do not change. Hiring teachers, running the buses, opening up the building, all of that has to be paid for and it comes from your GPA money, it comes from the taxes that you pay within your town.

Yes, it would be nice if all of us had vouchers. We could send our kid wherever we wanted them to go, but we can't afford it. That is what the bottom line is. That is why we always vote the way we do and we will have to do it again. Thank you Mr. Speaker.

The SPEAKER:   The Chair recognizes the Representative from Waterford, Representative Millett.

Representative **MILLETT:** Mr. Speaker, Ladies and Gentlemen of the House. I would like to respond to the question initially posed by the Representative from Poland and further amplified on by the Representative from Kennebunk. The opinion that was the source of the language in Title 20A came about as a result of an Attorney General opinion requested by then Howard Petrosky of Bangor in the early part of the 1980 session. He had queried the Attorney General as to whether it was appropriate for local dollars, supplemented by state aide in the towns of Veazie and Glenburn to support the payment of tuition payments to John Bapts High School, which was then a sectarian high school. The opinion of the Attorney General was that it was definitely unconstitutional. This caused a change in both the school tuition formula and subsequently in 1981 a change in the recodification of Title 20A. I happened to work on that process. I can assure the good Representative from Kennebunk that it was done in strict concurrence with the Attorney General's recommendations.

I believe that subsequent to that opinion and the recodification several of the sectarian secondary schools changed their constitution and bylaws so as to permit their continued receipt of public monies. I would concur with the Representative from Farmington that the current state of the law in Maine has been upheld over the years and I see no reason to change the law. I would urge your support of the Majority Report. Thank you.

(ROLL CALL 96 - 89 Y, 56 N)

(Majority Ought Not to Pass Report accepted)

D000037

LEGISLATIVE RECORD - House, May 13, 2003

This is to certify that this is a true and accurate copy of the House Legislative Record dated May 13, 2003.

*Millicent M. MacFarland*

Millicent M. MacFarland
Clerk of the House
May 15, 2003

D000038

Transcription for the Senate Record of May 14, 2003 on remarks made on H.P. 141  L.D. 182:


### Divided Report

The Majority of the Committee on EDUCATION AND CULTURAL AFFAIRS on Bill "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools"

H.P. 141  L.D. 182

Reported that the same **Ought Not to Pass.**

Signed:

Senators:
    DOUGLASS of Androscoggin
    BRENNAN of Cumberland
    MITCHELL of Penobscot

Representatives:
    CUMMINGS of Portland
    GAGNE-FRIEL of Buckfield
    FINCH of Fairfield
    LEDWIN of Holden
    NORTON of Bangor
    THOMAS of Orono
    FISCHER of Presque Isle
    DAVIS of Falmouth

The Minority of the same Committee on the same subject reported that the same **Ought To Pass as Amended by Committee Amendment "A" (H-324).**

Signed:

Representatives:
    MURPHY of Kennebunk
    ANDREWS of York


Comes from the House with the Majority **OUGHT NOT TO PASS** Report **READ** and **ACCEPTED.**


Reports **READ.**

D000039

Senator **GAGNON** of Kennebec moved the Senate **ACCEPT** the Majority **OUGHT NOT TO PASS** Report, in concurrence.

On further motion by same Senator, **TABLED** until Later in Today's Session, pending the motion by same Senator to **ACCEPT** the Majority **OUGHT NOT TO PASS** Report, in concurrence.

---

Intervening action

---

The Chair laid before the Senate the following Tabled and Later Today Assigned matter:

HOUSE REPORTS - from the Committee on EDUCATION AND CULTURAL AFFAIRS on Bill "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools"

                                                            H.P. 141  L.D. 182

Majority - **Ought Not to Pass** (11 members)

Minority - **Ought To Pass as Amended by Committee Amendment "A" (H-324)** (2 members)

Tabled - May 14, 2003, by Senator **GAGNON** of Kennebec

Pending - motion by same Senator to **ACCEPT** the Majority **OUGHT NOT TO PASS** Report, in concurrence

(In House, May 13, 2003, the Majority **OUGHT NOT TO PASS** Report **READ** and **ACCEPTED**.)

(In Senate, May 14, 2003, Reports **READ**.)

**THE PRESIDENT**:  The Chair recognizes the Senator from Aroostook, Senator Martin.

Senator **MARTIN**:  Thank you, Madame President, members of the Senate.  I rise today in opposition to L.D. 182, 'An Act to Eliminate Discrimination Among Parents Who Want to Send Their Children to Religious Private Schools'.  While the title of the bill sounds appealing, its' effects, whether intended or unintended, will have dire consequences for the citizens of the State of Maine.

I submit that there are a number of reasons that this bill should be rejected. These reasons are compelling and have as their roots the sovereign prerogatives of the people of Maine regarding how and in what manner public funds can and should be used in supporting public education for the children of Maine.

At the outset, it is important to clarify the meaning of the recent Supreme Court decision which the proponents of the bill have been relying upon. The case of Zelman v. Simmons-Harris decided what a state may do regarding public funding of religious schools. It did not decide what Maine must do.

In no way did that decision limit the sovereign powers of the people of the State of Maine, through their duly elected representatives, to decide whether to fund religious schools. Publicly funding the education of our children is the most important and vital function of our state, and as a representative of the people of this state, I do not intend to abandon my responsibility to decide what is best for our children.

The Supreme Court case did not take that responsibility away from this body and we should carefully exercise the sovereign discretion over our educational system.

Because we retain a responsibility of a publicly funded education, we must look carefully at what we believe is an appropriate form of education for our children. I submit that our publicly funded education system works best when the education is one of diversity and assimilation. An educational system that promotes tolerance and assimilation by educating all of our children together, without regard to religious affiliation and without promoting religious view points, is preferred. Non-religious publicly funded education has been the norm in Maine and elsewhere in our country, and the 'melting pot' effect of this, on our children is what makes this state and this country great. Religious neutrality in the classroom is best.

Bringing all of our children together, no matter what their religious affiliation or background, promotes democracy, tolerance, and what is best in all of us.

The alternative offered by this bill, I submit, is contrary to that preferred approach. The bill could create and promote 'separate and sectarian' educational systems.

Fifty years ago, the Supreme Court rejected as unconstitutional publicly funded 'separate but equal schools,' where the education system funded separate schools based on race. The bill would have us fund 'separate and sectarian' schools where the educational system funds separate schools based on religion.

While citizens most certainly have the right to attend those schools, I do not believe that we should spend our tax dollars to fund the schools. Rather, we should use our limited dollars for schools, whether the public or private under our tuition programs, that are non-religious and that are neutral on religion.

Not only is this bill bad public policy, it is bad governmental policy. Government and religion should be separate. Separation of church and state is firmly established in this state and country. It is appropriate and necessary for the Department of Education and local education officials to ensure that what is being taught at publicly funded elementary and secondary schools is in keeping with the appropriate cultural morals and values of America. That can be done at public schools and private non-religious schools that receive public funding.

The proponents of the bill would demand public funds for private religious schools because, under the tuition program, public funds can be used for private non-religious schools. But the non-religious schools are just like public schools in that they are

D000041

religiously neutral and can be held accountable. Government officials can review what is being taught in private non-religious schools to make sure what is taught is appropriate and not anti-American. Government officials cannot, and should not, review the religious teachings of religious schools, but that is exactly what we will be funding, religious teachings. The public funds could be used to teach intolerant religious views, but we could not review those without approving or disapproving of a religion. The government does not approve or disapprove of religious teachings, and everyone must agree that we should not fund anti-American teaching in the classroom. Since we cannot hold religious schools accountable for what they teach, we should not fund them. That is why I am for the majority ought not to pass report. Thank you, Madame President.

**THE PRESIDENT**: The Chair recognizes the Senator from Oxford, Senator Bennett.

Senator **BENNETT**: Thank you, Madame President, and fellow members of the Senate. I rise to support the pending motion, but I want to be clear that I do not do so in complete agreement with the intent as put forward by the previous speaker, the Senator from Aroostook, Senator Martin. I suspect that several of us in the Senate, who will be voting against this bill and voting for the majority ought not to pass report, may actually believe that the intention of the underlying bill has validity.

The problem that I see is that the committee has put it before us with two reports, the ought not to pass report is before us. If that were to fail, the report that would likely come to us as the ought to pass as amended report, which just puts off for further study something which is being debated elsewhere.

So, for those reasons, I will be voting for the majority ought not to pass report. Thank you.

On motion by Senator **GAGNON** of Kennebec, the Majority **OUGHT NOT TO PASS** Report **ACCEPTED**, in concurrence.